NOERR MOTOR FREIGHT, Inc., et al., Plaintiffs, D. F. Bast, et al., Intervening Plaintiffs,

v.

EASTERN RAILROAD PRESIDENTS CONFERENCE et al., Defendants.

Civ. A. No. 14715.

United States District Court
E. D. Pennsylvania.

Oct. 10, 1957.

**772**

Dilworth, Paxson, Kalish & Green, Philadelphia, Pa., for plaintiffs.

Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for defendant Eastern R. R. Presidents Conference.

Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., Hughes, Hubbard, Blair & Reed, New York City, for defendant Carl Byoir & Associates, Inc.

Barnes, Dechert, Price, Myers & Rhoads, Philadelphia, Pa., for defendants Pennsylvania R. Co., M. W. Clement and Walter S. Franklin.

Harold B. Bornemann, Philadelphia, Pa., for defendant Lehigh & New England R. Co.

Dennis P. Donovan, New York City, for defendant Canadian National Rys.

Drinker, Biddle & Reath, Philadelphia, Pa., for defendants, Central R. Co. of New Jersey, Central R. Co. of Pennsylvania, Norfolk & W. Ry. Co. and Western Maryland Railway.

Carl E. Glock, Pittsburgh, Pa., and James B. Anderson, Philadelphia, Pa., for defendants Fred W. Okie and Union R. Co.

Guckes, Shrader & Burtt, Philadelphia, Pa., for defendant Baltimore & O. R. Co.

Morgan, Lewis & Bockius, Philadelphia, Pa., for defendants Chesapeake & Ohio Railway Co., Delaware, L. & W. R. Co., Erie R. Co., Lehigh & H. R. Ry. Co., New York, C. & St. L. R. Co., Reading Co., R. W. Brown and Joseph A. Fisher.

Daniel Mungall, Jr., Philadelphia, Pa., Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for defendants Boston & M. R. R., Canadian Pac. Ry. Co., Delaware & H. R. Corp., Maine Cent. R. Co. and New York, N. H. & H. R. Co.

Myers, McVeigh, Mansfield & O'Brien, Philadelphia, Pa., for defendant New York Cent. Railroad Co.

T. W. Pomeroy, Jr., Pittsburgh, Pa., Paul Maloney, Philadelphia, Pa., for defendants Pittsburgh & W. Va. Ry. Co. and Charles J. Graham.

Saul, Ewing, Remick & Saul, Philadelphia, Pa., for defendant Lehigh Valley R. Co.

White, Williams & Scott, Philadelphia, Pa., for defendants New York, Ontario & W. Ry. and Lewis D. Freeman.

CLARY, District Judge.

The present action involves a suit for an injunction and treble damages under the Sherman and Clayton Anti-Trust Acts, Sections 1 and 2 of the Act of July 2, 1890, 26 Stat. 209, 15 U.S.C.A. § 1 et seq., and Section 4 of the Act of October 15, 1914, 38 Stat. 731, 15 U.S.C.A. § 15, by 41 interstate long-haul truckers and the Pennsylvania Motor Truck Association, hereinafter called "PMTA", against some 35 railroads operating in the northeastern part of the United States; the Eastern Railroad Presidents Conference, hereinafter referred to as the "Conference" or "ERPC", and Carl Byoir & Associates, Inc., a New York public relations firm, hereinafter called "Byoir".

Opinions dealing with preliminary motions to dismiss, discovery matters, and a motion to file an amended answer and counterclaim are reported in D.C.E.D.Pa. 1953, 113 F.Supp. 737; D.C.E.D.Pa.1953, 14 F.R.D. 189, and D.C.E.D.Pa.1956, 19 F.R.D. 146.

The basic allegation in both the claim and the counterclaim is that the defendants on the one hand conspired to obtain a monopoly of and to drive the plaintiffs out of the business of long-haul freight transportation in the northeastern section of the United States by various and sundry means, which will be more fully discussed later in this opinion, and on the other hand the defendants claim that the plaintiffs themselves were engaged in an illegal conspiracy for the identical purpose to obtain a monopoly of the long-haul freight industry in the same part of the United States and to force the railroads out of that segment of the transportation business in the area.

### The Parties

The individual plaintiffs in this case are each engaged in the trucking business, as stated above, and operate regularly through Pennsylvania in intercity and interstate long distance hauling. Nearly all of the plaintiffs are members of the plaintiff, Pennsylvania Motor Truck Association, which is a corporation chartered on April 24, 1928, in the Court of Common Pleas No. 4 of Philadelphia County, having its principal office at the 7th Floor, Telegraph Building, Harrisburg, Pennsylvania. PMTA has chapters in every county of Pennsylvania and its members are primarily operators of motor trucks who operate in or through Pennsylvania, including industries which operate their own trucks as well as those operating trucks for hire.

The first defendant, Eastern Railroad Presidents Conference ("Conference"), is an unincorporated association maintaining offices at 230 Park Avenue, New York 17, New York, and 143 Liberty Street, New York, New York. The membership of the Conference includes the presidents or trustees of approximately 35 railroads in 17 eastern states of the United States, operating north of the Potomac and east of the Ohio rivers. The presidents and trustees officially represent their respective railroads in the Conference, which is supported, maintained and utilized by said railroads. The Conference maintains a permanent functioning organization and a staff of paid personnel. It has regular meetings of its members and a paid executive director, presently one David I. Mackie. The Conference operates through a number of committees and subcommittees, including a subcommittee on public relations, described in detail later in the opinion, and also maintains a Bureau of Information at Grand Central Terminal, New York 17, New York. The respective railroads are regularly assessed for the cost of operating the Conference, assessments being prorated based on the size and income of the respective roads so that the Conference is in large measure supported by the big railroads, the end result being that the larger railroads contribute proportionately a much larger share for the Conference than do the smaller railroads.

The individual defendants who were originally sued were the presidents or past presidents of the several railroads, members of the Conference at some of the times covered by the complained of actions, or were key members of the Public Relations Subcommittee of the Conference.

The defendant railroads are all Class I railroads, most of which operate in Pennsylvania, and all are active members of the Conference.

The defendant Carl Byoir & Associates, Inc. is a New York corporation, engaged in the public relations business, with its principal office at 10 East 40th Street, New York City, New York.

### The Contentions

Plaintiffs in their complaint, after identifying the parties, summarize the respective relations of each defendant in the transportation of passengers and

freight in the northeastern section of the United States. The complaint then alleges that in May of 1949 the defendants embarked upon an illegal conspiracy in violation of the antitrust laws of the United States, the purpose and objective of the conspiracy being to eliminate the plaintiffs as well as others in the same industry as competitors to the railroads in the field of long-hauling of freight, and to carve out exclusive railroad monopolistic spheres of operation in the said industry to the end that the railroads would have a monopoly on freight hauling in interstate commerce. The complaint charges that ERPC appointed a Committee on Competitive Transportation (ER-TC), charged with carrying out the details of the conspiracy, and that that committee retained defendant Byoir as its public relations agent for the express purpose of effectuating the object of the conspiracy. Further, that Byoir in conjunction with the ERPC and the railroads, acting through their presidents and/or trustee, or subcommittee of the Committee on Competitive Transportation, embarked upon a campaign designed specifically to impede the operation of the trucker-plaintiffs in every possible way, and in pursuance thereof, among other things, vilified and defamed the plaintiffs by circulating to the public generally, to public officials, and to suppliers and customers of the plaintiffs, false and malicious reports of and concerning the plaintiffs in the conduct of their business of hauling freight; formed so-called "independent" citizens groups organized to circulate false and malicious propaganda attacking the plaintiffs, which propaganda was in fact the product of Byoir and its employees issued on behalf of the railroads but made to appear to emanate from independent sources; sought to secure the passage of legislation favorable to the railroads and injurious to the truckers through the instrumentalities of the so-called "independent organizations"; attempted to and actually prevented the passage of legislation in Pennsylvania favorable to the truckers (S.B. 615) by using and duping as well as bribing public officials and officials of independent organizations; all to the end that the defendants might bring about the destruction of the plaintiffs' business and the elimination of them as competitors. The complaint charged that the conspiracy continued from 1949 to the date of the institution of the suit on January 17, 1953; has resulted in disparaging the plaintiffs' business in the public mind; has created great public hostility to the plaintiffs; has interfered with the legitimate conduct of their business and the furtherance of their business, resulting in increased cost to shippers and consumers, particularly in areas not served by the railroads; has increased the expense of operation by the plaintiffs, and finally has caused loss of accounts and profits and prospective profits to the plaintiffs.

The defendants originally answered the complaint but did not counterclaim. In their original answers the defendants denied the existence of any conspiracy, alleged that the plaintiffs in competition with the railroads were enjoying enormous public subsidies in the matter of the free use of public highways; that they were unfairly competing with the railroads by carrying loads substantially in excess of the legal weights permitted by the several states; that mere fines for overloading were not sufficiently high to stop the overloading; that the overloaded trucks destroyed the highways; that any effort made on behalf of the railroads to "improve their competitive position in the climate of competition in the field of long-hauling of freight" was ultimately directed to the attainment of legislative measures which involve the right of free speech and right to petition the legislature, both constitutional guarantees and therefore without the orbit of the antitrust laws; and finally that everything done by the railroads was within the "rule of reason" in free competitive enterprise. The railroads also contended that as taxpaying citizens they had the right to point up a growing public abuse in that heavy trucks ruined highways, requiring a greater and greater expenditure of public funds, and that roads and bridges, underpasses and overpasses had

to be reconstructed to provide facilities for the increasing volume of traffic and size of vehicles, all of which was to the detriment of the railroads which had to pay part of the reconstruction costs of such facilities.

Early in 1956, after the case had been assigned on October 1, 1956, trial date and during the pendency of discovery procedures, some of the railroads and ERPC sought permission to and were allowed to counterclaim against the truckers. The counterclaim charged that the truckers themselves were engaged in nefarious practices against the railroads and with the sole purpose and objective of themselves obtaining a monopoly of and driving the railroads out of the long-haul transportation business in the northeastern section of the United States. It averred that the truckers had engaged in identical public relations programs about which the truckers in their complaint had complained of the railroads; that they made use of the same "third party techniques" charged against the railroads; that they used bogus organizations to advance their cause as against the railroads, and, finally, that they in concert sought to so injure the railroads as to eliminate them as competitors in the long-haul transportation field. On these contentions the case went to trial solely as to the issue of liability. Each side has now concluded its testimony with respect to the question as to whether there was a conspiracy on the part of either, or both, to monopolize longhaul freight transportation in the northeastern part of the United States. The Court will in this opinion resolve that question.

### Historical Background

The period in which the factors involved in this case developed has been generally limited in the proofs to the period from 1930 through 1955. The controversy itself involves the loss of business by the railroads to the long-haul trucks in interstate commerce during that particular period. It is candidly admitted by defendant-railroad companies that in the year 1930 the competition for long-haul freight transportation was de minimis. There were only some 28,000 of the so-called "big trucks" in the entire United States. However, in the early 1930's with the improvement of highways and mechanical equipment, it became obvious to the railroads that the carriage of goods by trucks, instead of by railroad, was a growing business with which the railroads had to concern themselves. Accordingly, a joint committee of railroads and highway users was instituted to consider the problem. This committee was comprised of truck manufacturers, railroad officials, and officials of motor federations and associations, representing only the then organized automobile clubs. The truckers, as such, had up to that time formed few associations and those in existence were not very forceful in representing the trucker. In any event the truckers were not represented on the committee. That committee filed a report recommending that users of highways be charged for such use as they made of the highways and that a base construction rate for roads should be determined with reference to the smaller private automobile and so-called pickup truck and that any excess cost should be met in increased fees to the heavier vehicles proportional to the amount of the increased cost. The committee also jointly approved standards of road construction, known as the AASHO standards, promulgated by the American Association of State Highway Officials, which standards recommended a maximum of 18,000 pounds for axle loads for all vehicles. Significantly, however, the recommendation of the Commissioner of Public Roads of the United States of standards for gross weight and size of vehicles to make these standards uniform among the several states was, primarily at the instance of the railroads, not accepted. In the Atterbury-Swayne Report (containing the Committee's findings) it was recommended that limitations as to these two items be left to individual state action.

That the railroads were very seriously concerned with truck competition in the

latter part of the 1930's and lobbied for antitruck legislation, both in Congress and in the Legislatures of the several states, is completely demonstrated in the report of the Committee on Interstate Commerce, pursuant to Senate Resolution 71, (74th Congress) Report No. 26, part 2, rendered on October 16, 1941 to the 1st Session of the 77th Congress, and known as the "Wheeler Report". This report condemned the railroads for what the committee termed as being "more concerned with the selfish interests of a few rather than the needs of the transportation industry as a whole". The report further pointed out that the method adopted by various railroads and railroad associations to combat the inroads of the trucking industry was not a method designed to meet truck competition by improvement of railroad service, nor was it a means for adjusting the railroad industry to the fact that there are certain functions for which motor vehicles are especially adapted. It concluded that the program as developed at that time planned to impede truck and bus competition by the erection and enforcement of legal barriers. The program had its beginning at least as early as 1932. It had two major aims; the enactment of laws and ordinances designed to harass the trucking industry, and the stimulation of enforcement of such laws, ordinances and regulations. The above noted report further condemned the action of the railroads in secretly subsidizing so-called independent organizations and foundations which stated publicly that they were only interested in the objective "presentation of facts" but which were actually either completely subsidized or dominated by the railroads through financial support and otherwise.

Despite the combined antitruck opposition of the railroad associations of the United States, the trucking industry continued to flourish. At this point I must, for clarity in this opinion, state that hereafter when the term "trucking industry" is used, it will be used in connection only with that small segment of the entire trucking industry called the "long-haul truckers" which has to do with vehicles of a minimum of 18,000 pounds axle load and gross weight of 30,000 pounds and upward. The number of this type of motor vehicles or so-called "big trucks", while increasing yearly, at present constitutes only 1% of all vehicles using the public highways. The case under consideration is limited to that group.

The Pennsylvania Railroad itself entered the trucking field during the decade of 1930 to 1940 and operated a fleet of long-haul trucks. In charge of this operation was one Mr. Raymond J. Littlefield, who was at that time, had been for many years before, and still is one of the experts in the railroad business in the analysis and study of the trucking industry in competition with the railroads. This operation was later ordered discontinued, and as testified to at the trial, based largely on the premise that the weight restrictions of the State of Pennsylvania prevented operation of these units at a profit. With the advent of World War II and because of government restrictions on the manufacture and operation of motor vehicles, the trucking industry as such and as a competitor to the railroads collapsed. The railroads during World War II carried 95% of all freight and 90% of all passengers. Antitruck activities during this period on the part of the railroads were completely abandoned. With the conclusion of World War II and with the truck manufacturers again in operation, bigger and better trucks appeared on the market and were put into operation by the trucking industry. From 1946 to 1949 marked inroads were made by the truckers in the competitive market of longhaul interstate freight. This was apparent to the railroads and they frankly admit in this action that the competition was obtaining business from shippers who for many years had used railroad facilities exclusively. There was a marked reduction in carloadings in many particular commodities even though the total production of that commodity in over-all manufacturing totals exceeded

by far the production of previous years. It was clearly apparent to the railroads that not only the flexibility of movement but the saving of time were important elements in this erosion of railroad business, despite the uniformly much higher rates which the shippers were forced to pay to the truckers as contrasted with the railroad rates. It was clearly apparent to every railroad official concerned with the question that steps had to be taken to preserve the economic status of the railroads in the competitive market.

The trucking industry in the meantime had not rested on its oars. After the Atterbury-Swayne Report the truckers banded together in a national organization, known as the American Trucking Association, and State Trucking Associations, similar to PMTA, were organized in every state. These associations became very active in their respective states, lobbying for increased weight limits so as to permit the carrying of greater "pay loads". In general, their activities resulted in success in raising the minimum weight limits and permitting the carrying of heavy loads. In Pennsylvania the weight limit as of 1941 was 18,000 pounds for axle loads. In 1943, as a temporary war measure, they sought and obtained a limit of 20,000 pounds per axle load. In 1945 by Act of the Pennsylvania Legislature 75 P.S. § 453 the temporary war measure became a permanent measure and remained as the axle load limit throughout the period involved in the present proceeding. Again in 1947 and 1949 the truckers sought an increase of weight limits in Pennsylvania, which limitations were actively opposed by the association of railroads as well as several other organizations to be discussed later. The bills were never passed by the Legislature. During this period many unscrupulous truckers violated the weight limits rather consistently on the theory that it was cheaper to pay the nominal fine of $50 for overloading than to keep the weight of the truck at legal limits; the excess load paying far greater dividends than the charges in the nature of fines for overloading. It was in this setting that the activities hereafter related occurred.

### Railroad Activities

As aforesaid, the use of long-haul trucks for interstate hauling of freight had increased so enormously by May of 1949 that it was a matter of immediate and vital self-interest to the railroads to do something about the erosion of what had been up to this time almost an exclusive monopoly of long-haul freight transportation. At first blush, to the ordinary person it would appear that the primary concern of the railroads might have been directed to improving service and to attempt to meet by more flexibility and speedy delivery the growing competition of the truckers. The evidence in this case has disclosed there were certain areas wherein the trucks could not compete. It was testified that the trucks could not compete with the railroads in taking the coal out of the mountains of West Virginia since one diesel engine could take a great number of cars on the downgrade of the West Virginia mines to the Norfolk breakwater. That the railroads would continue to enjoy this type of business was completely self-evident. On the other hand, the greater flexibility of the truck and the speedier delivery of goods were elements in the competitive market which the railroads might themselves have attempted to meet by the use of trucks or otherwise. The door-to-door feature of truck delivery was also important. However, the record in this case is barren of any attempt on the part of the railroads to adjust their thinking and their actions to meet this definite threat to a segment of business theretofore enjoyed by them. They engaged in what has been termed throughout the trial of this case as a "concert of action" to "improve their position" in the long-haul freight competitive market. And here is how they did it.

In May of 1949 the evidence discloses that the top executives of the Pennsylvania Railroad, before attending the May 19, 1949 meeting of the Conference,

were considering a campaign for Federal and State taxes against users of highways, waterways, etc. The recommendation which came out of this consideration was that they should explore the possibility of organizing private motorists and other groups to be held out to the public as completely nonrailroad inspired for the sole purpose of restricting the truckers by making their operations so expensive that they could not operate at a profit. The obvious corollary is that the railroads would be the beneficiaries of these restrictions. On May 19, 1949, at a meeting of the Conference, there was appointed a Competitive Transportation Committee with Subcommittees designated Legal, Research, and Public Relations. David I. Mackie, then vice-president of the Delaware & Lackawanna Railroad, was made Chairman of the Legal Committee. Raymond J. Littlefield, tax agent and later general agent of the Pennsylvania Railroad, was made Chairman of the Research Committee. Thomas J. Deegan, Jr., then executive vice-president of the Chesapeake & Ohio Railroad, later staff vice-president of the Allegheny Corporation, operators of the New York Central Lines, was made Chairman of the very important Public Relations Subcommittee. While these three subcommittees maintained an effective liaison, the most active and most potent of the committees was the Committee on Public Relations. Deegan and his subcommittee determined on a plan of operation. The single objective of the campaign was harassment of the long-haul truckers. One of the objectives was the enactment of legislation, not under the sponsorship of the railroads but by others acting on their behalf, by what was called in inoffensive and pleasing language, "The third-party technique".

The campaign was to begin in New York, New Jersey and Ohio, and other states were to be brought in later as the program developed, consistent with the degree of success of the program. It was also determined that the campaign should be handled through an independent public relations firm. A number of public relations firms were interviewed and of the four or five selected for interview, all were leaders in that particular field. It may be noted in passing that of those interviewed and who submitted proposals, about which proposals testimony was given at the trial, each and every one of the suggested programs provided for a campaign of publicity to put the truckers in a bad light with the public; to encourage normal public resentment of the motoring public to the operation of big trucks on the highways; to secure the assistance of organizations which were apparently "independent and public spirited" in the campaign against the truckers, and to create a demand for legislation penalizing the truckers either by limitation of size and weight or the imposition of user taxes which would make their operation unprofitable.

A presentation was made by the defendant-Byoir firm prior to the execution of the contract on August 15, 1949. Byoir's presentation laid great stress on the success of that firm in prior legislative campaigns, particularly its success before the Louisiana Legislature in reducing a tax on sulphur; in the Spring of 1938 before the New York Legislature in opposing a chain store tax; in connection with A & P activities which will be discussed later in the opinion; in 1948 before the Congress of the United States in connection with the distilling industry, and finally in connection with the manufacturers of floor and wall tile with regard to building code changes which Byoir claimed his firm had secured for that industry in some two thousand cities. After the contract was awarded a memorandum of agreement was executed providing for payment to Byoir of $75,000 a year, plus reimbursement of each and every expense of any sort involved in the campaign. Byoir immediately organized a staff to put the program into effect and execution. The understanding of the Byoir organization as to its duties in connection with the campaign, set forth in extenso in Exhibit P5, is entitled "The Objectives".

While the ultimate objective is shrewdly set forth as legislation affecting the truckers, the intermediate goals are also set forth, all designed and aimed at injury to the truckers. These objectives, including the crystallization of motorist resentment arising from commercial heavy truck operations over the roads, were designed to arouse the public generally of the need to obtain new methods of financing public highways and by methods which would not appear to emanate from railroad sources. The total objectives were ostensibly set forth in a memorandum to the Department Heads of Byoir by Reynolds Girdler, Account Executive of the ERPC Account, dated September 13, 1949, in which he paraphrased the National Transportation Policy of Congress to suit his own needs, interpreting it for the purposes of the campaign as a National Legislative Policy and that (1) airlines should be used for speed; (2) trucks for short hauls and (3) only railroads for long hauls. He pointed out that if this program could be made effective through public relations the railroads' financial troubles would be at an end. He also pointed out that "our" newspaper stories, magazine articles, pictures and radio programs will be concerned with what the national transportation policy should be, dramatizing highways and heavy trucks in the following particulars: (1) highway construction costs; (2) highway safety and the part trucks play in lack of safety on the highways; (3) highway damages by trucks; (4) state revenue and expenditures; (5) general taxation stories; all geared to reflect discredit upon the heavy truck industry and all to be done without attribution to the railroads. The magazine department of Byoir was directed to "plant" stories in magazines for later use in the campaign as authoritative sources of factual information. More will be said of this later in the opinion.

It was estimated that the cost for the first year would exceed $350,000. Girdler's memorandum was circulated to the railroads and rather glowing commendations were received from several of the committee members involved, particularly from Walter Franklin, President of the Pennsylvania Railroad; Raymond J. Littlefield, who has been introduced above; and Walter Touhy, President of the Chesapeake and Ohio Railroad, Chairman of the Competitive Transportation Committee; as well as others.

While it would be very interesting to outline the Byoir campaign over the period 1949 to 1953, the details of which were testified to by the many witnesses called in this proceeding, it would unduly prolong this opinion and such an outline of details is unnecessary for a complete understanding of the case. Therefore, the campaign as inaugurated and carried out by Byoir and the Committee on Competitive Transportation of the Conference and its total effectiveness will be only briefly outlined under activities embracing: (1) The State of New Jersey; (2) The State of New York; (3) The State of Ohio; (4) Magazine Activities; (5) Road Test One—Maryland and its connotations; (6) The State of Pennsylvania; and (7) The Campaign of Vilification.

### New Jersey Activities

While the program was geared for operation throughout the 17 states in the northeastern part of the United States, the Committee on Competitive Transportation determined to center its efforts in three states—New York, New Jersey and Ohio. At the outset, one C. Coleburn Hardy was selected as the Byoir representative to inaugurate the New Jersey campaign. Hardy had for many years been in the public relations business and had served several terms as a New Jersey Legislator. Liaison was effected with the President of the Associated Railroads of New Jersey, one Blackson, and his assistant, one Simpson, with David I. Mackie, vice-president and general counsel of the Delaware & Lackawanna Railroad; one Pevler, vice-president of the Pennsylvania Railroad, and one Viviano, general counsel for the Lehigh Valley Railroad. It was determined to reactivate an organization known as the New Jersey Automobile Owners, Inc. of which

one Stelljes was executive vice-president, and one Fred Fox, secretary. Its offices actually were in the Byoir organization headquarters at 10 E. 40th Street, New York City, New York, with a mailing address from a small apartment in an apartment house in East Orange, New Jersey. In addition there was organized a new group, the New Jersey Citizens Tax Study Foundation, an organization whose dominant member was Hardy, its secretary.

The general purposes of the campaign were: (1) to stir up as much resentment against the trucking industry as was possible among highway users, with special emphasis upon the motorists, farmers and local truckers; (2) the lowering of truck weights and the increase in truck fees; (3) a weight-distance tax whereby users of New Jersey roads would be charged a mileage fee based upon weight carried and distance traveled on the highways of New Jersey. Hardy with his knowledge of New Jersey politics was in a key position to be extremely effective in such a campaign. He had the help of Blackson, David I. Mackie, above mentioned, who was no stranger to legislative halls, and the research facilities of the Eastern Railroad Transportation Committee headed by Raymond J. Littlefield. Macwithey, president; R. J. Stelljes, vice-president, and Robert Fox, secretary, of the New Jersey Automobile Owners, Inc., were all avid publicity seekers who lost no opportunity to make speeches, give press releases of the speeches and demand of the legislative restrictions on the trucking industry. In this they were ably assisted by Hardy who paid all of their expenses, wrote practically all of the speeches, sent out thousands of publicity releases, prepared and printed in New York but mailed in New Jersey by a representative of Byoir. Copies of each release, however, were sent to the three officers in order that they be kept currently informed of Byoir's activities on their apparent behalf. Not one word of the railroads' part in the picture ever seeped

through to the objects of their consideration—the long-haul truckers.

Another suggestion which was made part of the campaign was to create by grass-root methods, through editors of weekly papers, The Grange and other organizations, a demand for more highway funds. The object of this was clearly to point up increasing costs of road building and maintenance, and after having created the demand to suggest and then campaign for the weight-distance tax. The organization of the New Jersey Citizens Tax Study Foundation in this posture of the campaign began to pay dividends. One Fred K. Goodwin was the Executive Director and he was paid by Byoir and worked very closely with Hardy. A questionnaire was prepared and circulated to obtain "independent public reactions" to possible sources of tax money. The questionnaire was so devised with the help of the Byoir organization to make certain that a weight-distance tax would be the least painful choice to the general public. With that as a statistic and from an apparently independent authoritative source, Byoir was able to step up among editors, writers and other media of communications the clamor for a weight-distance tax. It must also be remembered that all during this time a campaign of vilification against the trucking industry generally was going forward, the outline of which campaign will be later referred to in this opinion.

New Jersey had two years earlier adopted a new constitution. One of the elements was a tax study commission headed by Dr. John S. Sly of Princeton University, who also headed the Princeton Surveys. Dr. Sly was apparently, to the public at least, one of the most outstanding and disinterested persons in the State of New Jersey in connection with the tax study. It was the committee headed by him that made recommendations to the Governor and to the Legislature with respect to taxes in the State of New Jersey. However, the evidence in this case clearly indicates that Dr.

Sly was working in the interest of the railroads. According to documents from Byoir files he worked in so close an association with Hardy that he was perfectly willing to accept Hardy's recommendation to place before his committee the virtues of the weight-distance tax, and in such a manner that the connection of the railroads therewith would be completely concealed or obscured. The results of this campaign were extremely pleasant insofar as the railroads were concerned. Without elaborating too greatly upon the details of the campaign it will be sufficient to state that because of the ostensible grass-root campaign emanating from persons apparently with no railroad ties, the maximum axle load permissible on the highways of New Jersey was reduced and a marked increase in truckers' fees was obtained. While the campaign was not completely successful in that no weight-distance tax was imposed upon the trucking industry, the responsible officials of ERPC expressed their complete satisfaction with the results actually obtained.

In connection with the campaign to persuade editors to take an antitruck position, Byoir through Hardy subsidized an apparently independent journalist who distributed a column of political news to the editors of weekly newspapers in New Jersey. Byoir provided complete coverage during the legislative season of eight weeks for all of the weekly newspapers of New Jersey, at no charge. Needless to say the columns so syndicated did nothing to advance the cause of the trucking industry and the columnist was well compensated by Byoir for his efforts on behalf of the railroads, whose connection with the activity was carefully concealed not only from the public but from the editors who used his material.

Representations were made to the then Governor of New Jersey, Alfred E. Driscoll, on behalf of the New Jersey Automobile Owners, Inc., protesting against a rise in the regular gasoline taxes; a rise conceived in the mind of Byoir and one which this record fails to disclose had ever been proposed by any responsible organization. The purpose of this, of course, was to again deliver a broadside against the trucking industry and to urge the imposition of a weight-distance tax against it. Hardy himself together with Stelljes traveled the length and breadth of New Jersey speaking before civic organizations, such as, Lion, Rotary and Kiwanis Clubs, and not one of the thousands of the businessmen of New Jersey who heard these speeches and violent denunciations of the trucking industry had the faintest conception that the ERPC was paying for the very gasoline that brought the speaker to the door of the meeting hall. All in all Hardy and his railroad friends were eminently successful in their attempt to arouse the people of New Jersey to strike out at the trucking industry through the method of weight limitations and higher fees, and that work was not done to help the railroads but to injure the truckers. There was nothing of a constructive nature done by Hardy at any time to obtain better public relations for the railroads nor to secure any legislation favorable to the railroads. The truckers throughout remained the target of this subterranean campaign to place them in a light with the public which was anything but favorable and wholesome.

One final observation on the State of New Jersey and the limits to which Hardy went to conceal the railroads' participation in this campaign. One astute editor questioned the sincerity of the New Jersey Automobile Owners, Inc. and in effect called it a paper organization "fronting" for some unknown principal. Not only did Hardy answer the letter denying any connection, particularly with the railroads, but he circulated his reply to every editor of every newspaper in the State of New Jersey in words of his own choosing on letterheads and in envelopes of Automobile Owners, Inc. paid for by the railroads and with postage paid for by the railroads. The ostensible writer of the letter was Stelljes, but the thoughts and words were Byoir's and Hardy's. The contents of

the letter were nothing but complete fabrications and falsehoods. Many other illustrations of the type of campaign engineered by Hardy, Mackie, Littlefield, and others might be given but they are not necessary to a decision in this case.

### New York Activities

When Byoir undertook to represent the railroads in the summer of 1949, it found in New York State that the railroads had already enlisted the aid of many civic organizations and were themselves utilizing the "third-party technique". Outstanding were two organizations: The Citizens Tax League of Rochester, New York, whose secretary A. J. Menzie apparently delighted in public controversy, and The Citizens Public Expenditure Survey, Inc., an independent public-spirited organization originally formed for the purpose of scrutinizing the budgets of all governmental political divisions and subdivisions from the state itself to the smallest municipality.

Through agricultural agents employed by them the railroads had been able to enlist the sympathetic cooperation of many prominent Grange members to present their viewpoint against the truckers to the public. But they were in need of statistics to bolster their contentions and it was important that any review come from an apparently independent source. They decided that should a survey of highway users and the revenue derived from them for road construction and maintenance be sponsored by the railroads it would be of little, if any, value. Therefore, it was determined to have such a survey made by an independent source. Griffinhagen & Associates, consultants in public administration and finance, with offices in Chicago, New York, Boston and Los Angeles, were chosen to make the survey. The sponsor was The Citizens Public Expenditure Survey, Inc. This survey which was completed and documented in February of 1950 again had no apparent railroad relation and seemingly was what it purported to be, a completely objective independent analysis of the highways and highway use and revenue conditions in

the State of New York. To put it in its proper perspective, however, the evidence in this case discloses that during the years 1951, 1952 and 1953, substantial "subscriptions" in uneven amounts were made to the Citizens Public Expenditure Survey, Inc. by the Pennsylvania Railroad. The evidence also discloses that Mr. Littlefield, after the passage of the weight-distance tax bill on trucks in New York, sought a vote of thanks for Mr. Dugan of the New York Central for his efforts in bringing Griffinhagen to New York for the survey and the results of the survey. Over and above that, weekly reports of Kiely, Byoir's New York representative for the ERPC, clearly indicates that Kiely directed the activities of both Walter Howe, executive director of Citizens, and one Finke, head of its so-called research department. The closely knit cooperation of these three individuals was such, together with the "subscriptions" which appear rather to be "assessments", that the inference is inescapable, and the Court so finds, that the railroads paid for the survey and subsidized the activities of Messrs. Howe and Finke.

With the Griffinhagen report as a basis, Kiely toured New York State and "sold" the railroad story to editors, the Mayors Conference, County Supervisors, Chief of Police Associations, Rural Letter Carriers, Members of the Grange, and other organizations. He also worked closely with The Citizens Tax League of Rochester, New York, and used that organization for the dissemination of literature unfavorable to the truckers. Byoir absorbed all of the costs of this distribution and paid the secretary Menzie a substantial fee of several hundred dollars for the so-called research, which the Court finds was for the use of his position. In order to obtain more extensive publicity Byoir formed the Empire State Transport League, a strictly paper organization, with its principal office at a desk in a Public Stenographer's office in Albany, New York. Byoir induced many prominent New Yorkers to lend their names to this paper organization. The amount of antitruck literature and

news releases critical of the truckers put out by this organization was prodigious. Of course, it was all at the expense of the railroads without any attribution of responsibility to the railroads.

While there is naturally a scarcity of evidence as to the connection of Byoir with the Legislative Committee of the New York State Senate, which had the weight-distance tax bill before it in the year 1950, it is significant that when Senator Manning, the head of that committee, came up for election in a later year he became extremely resentful of rumors that Byoir had written the Senate report recommending the weight-distance tax and refused to let Byoir relate any further remarks to him. The inference is again inescapable, and the Court so finds, that Byoir's representatives were working in close contact with his office during the pendency of this particular piece of legislation and were responsible for many of the news releases which came out under his authorship.

As in the case of Stull in Ohio, who will be later discussed, and Hardy with Pevler and Mackie in New Jersey, Kiely did a magnificent job of grass-root selling. He persuaded the Rural Letter Carriers, the Grange, and the Mayors Conference to adopt resolutions at their state conventions, several of which were actually written by him, denouncing the truckers and urging strict enforcement of the weight-distance tax. Under the letterhead of the Empire State Transportation League he urged the Sheriffs of every county of the state to enforce the strict penal provisions of the weight-distance tax, particularly with regard to overloading. He sought out legislators, particularly members of the Highway Committee, and solicited the introduction of and urged the passage of an act giving local communities, through their local police organizations, the right to arrest the drivers of overladen trucks and impound the trucks if necessary. The bait held out was that local communities could profit from the high penalties set forth in the weight-distance tax law for

overloading. He worked also with his friends in the Grange, in the Mayors Conference, and in other organizations to put pressure upon the political leaders to see that the Legislative Committees were composed of legislators favorable to the railroad point of view.

In addition to the Griffinhagen report, the Byoir organization was able to obtain further statistics against the heavy trucks by so-called public opinion polls. The media for obtaining this information was Fact Finders, Inc. and the Princeton Polls, the latter headed by Dr. Robert Sly, head of the New Jersey Tax Study Commission. The questions were framed in the light of a demand carefully nurtured by Byoir, through the Grange, the Mayors Conference and others, to obtain a greater allotment of state funds for local community roads. While very astutely, and apparently innocently worded, the bold import of the questions presented to individual persons ran substantially as follows: Since more money must be obtained for roads, do you prefer: (1) increase in passenger car registration fees; (2) increase in the motor fuel tax; (3) increase in the charges made for the use of the highways by the heavy trucks? It would certainly be less than human if an overwhelming majority of the people approached would not vote for the third proposition, to wit: tax the truckers! These public opinion polls at the cost of many thousands of dollars were inaugurated by and subsidized by Byoir on behalf of and at the expense of the railroads. The results of these polls received the widest publicity that Byoir could give them both on the metropolitan level of all the larger cities of the State of New York, in National magazines, where possible, and with particular emphasis on the country weekly newspapers. In that regard it might also be noted that Kiely was also able to obtain the cooperation of a few editors of weekly newspapers who printed strong editorials against the truckers.

Defendants argue that these antitruck statements contained the considered

opinion of the editors and that it was merely another facet of the freedom of press and speech guaranteed by the 1st Amendment to the Constitution of the United States. This argument would certainly carry great weight were it not for the fact that Kiely, a highly placed and highly paid employee of Byoir, had written the editorials himself in furtherance of the Byoir-railroad objective. In accordance with standard operating procedures, these skillfully written diatribes against the truckers received the widest possible publicity and became part of a Byoir kit for presentation to the next editor.

In this posture of the case it might be well to also note that much of the success of Kiely and the others in "planting" these ideas with editors was due to the fact that apparently independent writers of recognized stature had written articles about the damage that truckers did to roads. As will be related hereafter under the headings "Magazine Activities" and "Campaign of Vilification", these articles in outstanding magazines of national circulation, the names of which will also be hereafter related, were based almost exclusively on data furnished by Byoir and written or edited by Byoir before appearing in these magazines.

To keep the case in proper perspective we must recognize that Kiely, Stull, Hardy, et al., were on the payroll of the ERPC through Byoir; that their entire salaries and expenses were reimbursed by ERPC to Byoir; that their job was to create public dissatisfaction with the truckers, arouse animosity against the truckers, and all to the final purpose that the railroads might at the least limit the activities of the truckers in the long-haul industry or if completely successful destroy them as a competitive factor with the railroads. Bluntly stated, all were working to accomplish injury to a business competitor within the prohibition of the Sherman and Clayton Antitrust Acts.

The results of Byoir's work in New York in conjunction with Messrs. Little-field and Deegan were extremely gratifying to the Research Subcommittee of the ERPC. In its report dated June 20, 1951 to Mr. Walter Tuohy, Chairman of the Special Transportation Committee, the following pertinent language is found:

"7. Research Committee has acted more or less as liaison between State Railroad Associations and the Carl Byoir group. In June, 1949, the Policy Committee named the states of New Jersey, New York and Ohio as trial states. The Carl Byoir group, under the direction of Mr. Girdler, placed the facts before state administrations and otherwise gave the states a vast amount of help, resulting in favorable truck legislation in New Jersey and New York.

"8. The Mileage Tax Bill, which passed the New York legislature in April of this year, was of outstanding importance. This is the first state east of the Mississippi to put a substantial mileage tax on trucks. Other states are watching this development. The New York authorities advise that they expect to build 50 weighing stations scattered throughout the State.

"9. After the New York Bill passed, the Carl Byoir people concentrated on Ohio. A Bill was passed increasing truck license fees about 30%. There is much more to be accomplished and the campaign will be resumed at the next session of the legislature.

"10. The first of June, the railroads of Pennsylvania unanimously requested the help of the Carl Byoir people, and a man has been assigned."

### Ohio Activities

The State of Ohio posed one peculiar problem to the Byoir organization. Representing the Goodrich Tire & Rubber Company, which of course was vitally interested in automotive equipment and the sale of tires, Byoir found itself in the predicament of representing opposing in-

terests. Nevertheless, following the pattern of New Jersey, Byoir threw the weight of its organization behind Donald Stull, who had charge of the Ohio activities. The success of Stull in Ohio in advancing the interests of the Byoir-ERPC plan was little less than phenomenal. T. J. Kauer was Director of the Ohio Department of Highways; Harold Cohen was the Chief of the Bureau of Public Relations for the Ohio Department of Highways. Kauer was also Chairman of the Interregional Council on Highway Transportation which had charge of the Maryland Road Test. Stull had complete access to their offices and worked closely with them. He also, through Kauer, apparently had entree to the office of Governor Lausche. Building up a grass-root campaign against the truckers through the use of "independent factual data" obtained from sources apparently independent but based completely on Byoir material, he was successful in creating a wave of indignation towards the truckers which resulted in an increase of fees to the truckers in 1951 of approximately 30%. Again, through Kauer, he was able to "educate" the members of the Ohio Legislative Highway Investigating Committee. In 1952, according to a Byoir report, Stull had done such "an efficient job of education" that there arose a public demand for taxation on heavy trucks.

There was also a gubernatorial campaign in Ohio that year. Charles Taft, the Republican candidate, adopted the proposition that trucks should pay higher taxes "based on weight carried and miles traveled". Stull reported to Byoir that up to three weeks before Election Day, Lausche, the incumbent, had planned to campaign solely on his record and was backing away from the ton-mile tax as a too-familiar story and one already chosen by his opponent. What he needed, he told his aides, was "a dramatic story that could be told over TV". That was all Stull needed (according to Byoir). Using newspaper clips, editorials, magazine articles, etc., which as will be demonstrated later were practically all Byoir-inspired and paid for by ERPC, Stull

demonstrated the apparent widespread public interest in the ton-mile tax. He also had available a Harper magazine article by Senator Neuberger of Oregon entitled, "Who Shall Pay For Our Roads?", for the writing of which Byoir "research" had been made available, and which will be referred to in detail under the heading "Magazine Activities". Lausche campaigned just fifteen days. According to reports found in Byoir's files, in all but one speech he talked only the ton-mile tax; in every TV program he centered attention on truck taxation; waving copies of the Harper magazine article before the camera; pointing to placards showing the justice of heavy taxes on trucks; displaying Public Utility Commission records of violations by explosive-hauling truckers (the results of a Byoir-inspired investigation) and repeating the results of the Maryland Road Test (a distorted Byoir interpretation) to prove how badly big trucks damage highways. Again, according to Byoir, the data and, in many cases, the words and props were supplied by Stull. The Cleveland Plain Dealer stated categorically "Lausche's astonishing victory, against the political tide, can be construed as an endorsement of his highway program". Stull did his job so well that the truckers were forced to abandon their early charges that the "bills were railroad inspired"—which they were.

In addition and as part of his program Stull introduced into Ohio the "Save Our Highways Club". This was an organization founded by railroad employees in Tennessee and its entry into Ohio was completely financed by Byoir for which it was reimbursed by the railroads. Literature in profusion was mailed to legislators, granges, farmers' organizations and automobile clubs. All of it was critical of the trucking industry. All of it was calculated to and did bring the trucking industry into public disrepute. Again, a magnificent job was accomplished in keeping any information as to the true position of the railroads in this campaign from the general public. The rise in fees and the campaign for the weight-

distance tax in Ohio were two of the outstanding accomplishments of Byoir for the railroads in the entire campaign.

Two other aspects of the Byoir-Stull campaign are worthy of mention. The records of the Byoir organization introduced in this case demonstrate clearly that copies of Governor Lausche's correspondence with protesting truckers were in the hands of Byoir before the correspondence even reached the United States mails, and to quote Stull, it "contained our poison". This again points out that Kauer and Cohen were working diligently for the interests of the railroads.

While defendants have vigorously argued that the term "poison" was nothing but public relations jargon, I find that Stull meant exactly what he said and in the ordinary context of the words used. It is clearly apparent that the political campaign against the truckers was based on slanted statistics created by Byoir for the railroads and that most of the data used in the speeches, if not the speeches themselves on both sides, Republican and Democratic, stemmed directly from the Byoir organization. While the trucking industry and its members were intellectually certain that this apparent grassroot uprising against the industry was definitely railroad inspired, so well did Stull and Byoir work that it was impossible to document and prove it. The net result was that the trucking industry faced a hostile public opinion in Ohio because of the method of distortion and over-emphasis of the admitted shortcomings of the industry on the part of Byoir. This statement will be amplified in the heading "Vilification Campaign".

### Magazine Activities

One of the most unusual of Byoir's employees, the head of the Magazine Department, was Patricia Lochridge Hartwell. Mrs. Hartwell, whose professional name while she was with Byoir was Patricia Lochridge, joined the Byoir organization in November of 1949 and was assigned to the ERPC account. She thereupon set out to develop magazine articles which would portray the railroads' point of view and would be unfavorable to the trucking interests. Her method of operation was to interest an editor of a magazine in a story and if the editor thought it had sufficient merit he might assign one of his staff writers or editors to do the piece. In that event Mrs. Hartwell would furnish the writer with the data which Byoir had compiled, which data of course was always slanted against the truckers. She also made use of free-lance writers. She would interest them in a particular story and pay them while they researched the proposed story at Byoir's or at other places, which amounts in many instances ran into several hundreds of dollars. Since the ultimate aim was to hurt the truckers, any such payments were reimbursed by the railroads, and should the free-lance writer be able to sell the article to a magazine the entire fee went to the writer. In other words, Byoir paid the writer during the preparation of the article and the magazine paid him for writing it. In the extremely limited number of instances that a writer contemplated an article which would be favorable to the railroads' point of view with respect to the truckers, Byoir extended every facility it possessed for use of the writer and at no cost to the writer.

The worth of such a project in the attainment of the ERPC goal cannot be minimized. In addition to the ordinary extensive circulation which the magazines themselves possessed, it was possible, at railroad expense, to circulate reprints of the articles widely to civic organizations, state, city and government officials, as well as to legislators and other individuals who were concerned with public opinion. While it is true that her efforts in every case did not meet with complete success, she was successful in having enough magazine articles released to make an important contribution to the railroads' antitruck campaign. Without attempting to individuate the details of each article, it will be sufficient to recount some of the articles published and Byoir's connection with them.

The first article, "The Giants Wreck Highways" with a subtitle "Heavy

Trucks Are Making Their Runs On Your Tax Dollars", appeared in the April, 1950 issue of Everybody's Digest. It was based almost completely upon Byoir's research and development. In the same month Byoir claimed credit for having furnished minor research and comment for an article by Senator Joseph C. O'-Mahoney entitled, "What Bad Roads Are Costing Us", which appeared in the April, 1950 issue of the American Magazine.

Early in 1950 Mrs. Hartwell presented an outline of a story about truck damage to roads to the editor of Harper's magazine. This outline was very extensive and Harpers evinced interest in it. Thereafter Mrs. Hartwell contacted Myron Stearn, an independent free-lance writer, interested him in the story, furnished him with all the Byoir data on the trucks, and the completed product appeared in the September, 1950 issue of Harper's magazine under the caption, "Our Roads Are Going To Pot". At approximately the same time an article entitled, "The Rape Of Our Roads", by Frederick Brownell, a Byoir protege, appeared in the Reader's Digest. This article was condensed from a Buffalo Evening News story. These two articles became the first authoritative sources of so-called independent public attacks upon the trucking industry.

Through the good efforts of Clinton Johnson, Director of Publicity for the Maryland Roads Commission, and a close associate of the Byoir organization, David G. Wittels, an outstanding writer for the Saturday Evening Post, in the September 16, 1950 issue of that magazine wrote a very critical article entitled, "Are Trucks Destroying Our Highways?" Byoir furnished extensive national research in a five thousand word background memorandum to round out his story on the Maryland State Highway Commission Program. It was the same Clinton Johnson who persuaded Mr. Wittels to go to Maryland and actually research the story in the field; live with the highway crew, meet the highway commissioner, and find out what the problems were for himself. While the article justifiably was critical of a certain class of truckers, it must be realized that the initiative for the article stemmed from railroad-inspired sources and portrayed a particularly venal type of trucker as representative of the entire trucking industry. The distortion, however, was so skillfully done and so subtly written as to make a profound impression upon a casual reader of the article. Again, it is a variation of third-party technique approach, which technique in its application to this case will receive further attention.

Hardy Burke, "a sometime employee of Byoir" and a sometime independent free-lance writer, wrote an article in the April, 1952 issue of the National Grange Monthly entitled, "History, Trucks and Money". This article was actually authored by a Byoir ghost writer, James Miller, and according to Mrs. Hartwell "skillfully developed all the major points in the ERPC campaign". This article, which pictorially highlighted the collapse of a bridge due to an overladen truck attempting to escape a weighing station on a main highway and the destruction of a detour on a main highway over a country road, was skillfully designed to arouse the farmers in opposition to the trucks.

Again, in the August, 1951, Sunday issue of Parade magazine, which is a supplement to hundreds of Sunday newspapers throughout the country, Clinton Johnson assisted Byoir in obtaining the insert of an article entitled, "Trucks: Help or Headache?". This article completely critical of trucks contained the words and pictures of the Byoir organization.

In the July 30, 1952 issue of People magazine appeared an article entitled, "Trucks Wreck Your Roads". This article again critical of the trucking industry was not only "planted" by Byoir but extensive circulation of reprints was made with the article appearing as the lead article on the cover of the reprint whereas the original magazine cover contained no such reference.

An article which represented an extremely important item in the railroads' campaign against the truckers was that which appeared in the April, 1952 issue of the Country Gentleman. This article by Emilie Hall, described as "You Can Have Better Roads" was referred to by the magazine as a "new chapter in the farm roads story". The writer was discovered by Horace Lyon, a Byoir employee assigned to the ERPC account, and Mrs. Hartwell did most of the research and editing for the article, with Jim Miller and Dick Strouse of Byoir helping in some last minute rewrites. Quoting Mrs. Hartwell's appraisal of the publication of this article: "This was a difficult job to put across, entailing two complete rewrites of the article to satisfy both a pixie author and a difficult editor. This was accomplished without too much pain and the underlying philosophy of the ERPC account came through in the final draft." After various complications Lyon and Lochridge were able to get the article endorsed in a box which appeared on the first page of the article by the president of the all-important Association of American State Highway Officials. This article received widespread distribution at the hands of Byoir but more importantly a motion picture based on this article was made for distribution to farm groups throughout the country. The story of how this motion picture came into existence, the purpose behind the picture, and the ultimate success of the endeavor is significantly interesting.

For some seventeen years one Fred O. Bailey had served as reporter and farm editor of the United Press Association. During the years 1945, 1946 and 1947 he had served as Legislative Counsel of the National Grange. Subsequent to 1947 he served a number of national magazines in the farm field as a reporter and columnist. According to the testimony of David I. Mackie, one of those magazines served was the Country Gentleman. During the year 1951 Bailey had discussed the formation of a Farm Roads Foundation but nothing came of it during that year. However, the general idea of such a Foundation was to cooperate with and assist farm organizations and farm groups in planning for an adequate balanced roads program to serve their needs. The first and only function of the Farm Roads Foundation up until May of 1953, the date of Mr. Bailey's deposition in this case, was the distribution of a film, "Highways and Byways, U.S.A.", based upon the story in the Country Gentleman magazine, "You Can Have Better Roads". The evidence in this case discloses beyond peradventure of doubt that the moving force in the making of this film was the Western Association of Railroads. Bailey was approached by representatives of that association and offered an outright grant of a picture for distribution. It was not until this offer had been made that the Farm Roads Foundation was incorporated and came into being. The evidence is also crystal clear that Byoir, in conjunction with representatives of the Western Railroads Association, had been working on a script for this picture. In fact, Byoir edited the script. Dudley Pictures of Hollywood were commissioned by the association of railroads to make the picture and the cost of making the picture was divided between the Eastern, Western and Southern railroads on a basis of 18% to the Southern railroads and 41% each to the Eastern and Western railroads. The assessment to the Eastern railroads was $62,500. Based on the above percentages of assessment it would appear, therefore, that the cost of the film to the three railroad associations exceeded $150,000. This film, the cost of the public distribution of which (and it was most extensive) has always been borne through a grant by the railroads, was exhibited at the trial of this case and the film and a transcript thereof have been filed of record. The film is professionally and skillfully done. It demonstrates clearly the needs of the farmers for auxiliary roads and suggests united, combined, intelligent community efforts to obtain the necessary funds to bring about this very desirable

result. The lasting impression, however, created by the picture is contained in a very few sentences of the dialogue and as the picture concludes; the lasting impact of the film is that big trucks do not pay their fair share of highway construction and maintenance. While extremely expensive it constituted a very important piece of propaganda carrying a terrific impact upon its viewers. Mr. Bailey whose cooperation had been sought in the editing of the script was completely unaware of the very important role played by Byoir. He had no idea of the cost of the film nor of the cost of distribution which was borne by the railroads. Two distribution companies were employed to distribute the film through their regular agencies to farm groups and other interested parties. It was distributed free of charge for showing in regular moving picture houses. 186 colored prints were made in 16 millimeter size and 10 black and white 16 millimeter size copies were made for showing on TV. The testimony indicates that considerable use was made of the film on TV. Four 35 millimeter copies were made for showing in regular motion picture theatres. To a viewer of the picture it would appear that the sponsors were the Country Gentleman and the Farm Roads Foundation. No suggestion either in the title, dialogue or screen credits indicated the connection of the railroads with this film. Viewed as it was by millions, the effect was most certainly to build up prejudice in the public mind against the trucking industry.

The final article which appeared shortly before the institution of this suit was an article, "Who Shall Pay for Our Roads", by The Honorable Richard L. Neuberger, United States Senator from the State of Oregon. Mr. Neuberger before entering politics was a capable newspaperman and writer. He was also a Legislator in Oregon when the first weight-distance tax on heavy trucks was passed in that state. It would follow naturally that he should be an expert in that field. Hearing that Harper's magazine had discussed the writing of an article in connection with highway financing with the Senator, Mrs. Hartwell telephoned him at his home and discussed the article with him. She suggested that Byoir had splendid material on the national picture and suggested that such material might be useful to him in his article. As a result of this conversation the Byoir material was mailed to Mr. Neuberger in Oregon where he was working on the article. That he availed himself of the material is clear from a reading of the article. Byoir had been pyramiding data, mostly "planted" material, for a period of approximately three years and this was the authoritative material submitted to Mr. Neuberger. His article included generally the same "statistics" as every other article admittedly "planted" by Byoir. Byoir, of course, took no part in the reviewing or editing of the article but the impact of its "help" is clearly discernible throughout.

In commenting upon the above magazine articles it is not intended to convey the impression that the above represented the sum total of the Byoir efforts in the magazine field. They cannot and do not reflect the further extensive efforts of Byoir's Magazine Department and its success in putting over the railroads' point of view in other magazines of lesser importance and circulation. They merely outline the importance of the work of the magazine department in this field, since once articles were published they were extensively used by Byoir's representatives in selling their antitruck story to persons concerned with public opinion.

### Road Test One—Maryland

In 1949 the Governors Conference requested the Council of State Governments to study and report upon the matter of reasonable and uniform standards of motor-vehicle maximum-size-and-weight limitations. At the call of Governor Lausche of Ohio and cosponsored by highway officials from 14 midwestern and eastern states a conference was held at Columbus, Ohio, on December 5 and

6, 1949, to consider the size and weight problem as a matter of interregional concern. Early in the deliberations of the conference, it became apparent that an objective determination of the effects of *axle loads* of various magnitudes would afford the only possibility of eventual agreement of the entire membership on the important question of axle-load limitations.

The conference formed itself into the Interregional Council on Highway Transportation and appointed a Committee on Test Roads. This special committee met in Baltimore, Maryland, on January 9 and 10, 1950, to inspect a test-road location proposed by representatives of the Maryland State Roads Commission. After visiting the site of the proposed test road, the committee decided that the project identified as Road Test One— Maryland was feasible and recommended that tests be conducted at the joint expense of the participating state highway departments and with Highway Research Board direction of the project. The highway departments of the following states: Connecticut, Delaware, Illinois, Kentucky, Maryland, Michigan, New Jersey, Ohio, Pennsylvania, Virginia, Wisconsin and the District of Columbia, executed contracts with the National Academy of Sciences, of which the Highway Research Board was a component part, agreeing to participate financially in the cooperative venture. The project was administered and supervised by the said Highway Research Board through a small Project Executive Committee and an Advisory Committee. The Advisory Committee included one representative from each participating state, the Bureau of Public Roads, the Automobile Manufacturers Association, the Petroleum Industry, the American Trucking Association, and the Department of the Army. The Bureau of Public Roads provided personnel and instruments for measurements of surface roughness, slab strains and deflections caused by the test loads, soil surveys, and other necessary instrumentation and testing services, and also

provided the services of the project engineer and three assistants.

The principal object of the test was to determine the relative effects on a particular concrete pavement of four different *axle loadings* on two vehicle types. The loads employed were 18,000 and 22,400 pounds per single axle, and 32,000 and 44,800 pounds per tandem axle. The tests were conducted on a 1.1-mile section of Portland-cement-concrete pavement constructed in 1941 on U.S. 301 approximately 9 miles south of La Plata, Maryland. The pavement consisted of two 12-ft. lanes, each having a 9–7–9-in. cross-section and reinforced with wire mesh. The road at the beginning of the test was in fairly good condition and insofar as the records of the Maryland Road Commission could determine the entire length of the test site was constructed on good granular subbase material.

There were four separate test sections. The first, which was the west lane of the southern half mile of the pavement under test, was subject to 18,000 lbs. single axle load; the second, which was the east lane of the southern half mile, was subject to 22,400 lbs. single axle load; the third, which was the west lane of the northern 0.6 mile, was subject to 32,000 lbs. tandem axle load; and the fourth, which was the east lane of the northern 0.6 mile, was subject to 44,800 lbs. tandem axle load.

The test truck operations began on June 12, 1950, for Sections 1 and 2, single axle loads, and the tandem heavier trucks on the eastern end began operation on June 23, 1950. Operations of all test trucks were continuous, on a 24-hour day, seven-day week basis, except when necessary to interrupt operations for vehicle and pavement maintenance and service, meals and rest stops for drivers, and special tests, such as strain and deflections. In addition, operations were suspended for 24 hours for three holidays during 1950: July 4, Labor Day and Thanksgiving Day. The drivers worked three 8-hour shifts and were al-

lowed a 10-minute rest period each hour and 30 minutes for a meal in the middle of the shift. The 18,000-lb. axle load totaled 111,889 miles; the 22,400-lb. axle load totaled 111,792 miles; the 32,000-lb. tandem axle load totaled 106,668 miles; and the 44,800-lb. tandem axle load totaled 59,256 miles due to cessation of operations during the month of November occasioned by excessive damage to that part of the test highway.

This was to be, and was insofar as the Highway Research Board was concerned, a completely objective test. Mr. Herbert S. Fairbanks, Deputy Commissioner of the Bureau of Public Roads and Chairman of the Highway Research Board, estimated in his testimony in this case that the stress placed on the road during the pendency of this test would approximate 40 years of normal usage of the same road. Contrary to the general understanding of the content of the subsoil of the road, it became very evident as the test progressed that certain portions of the road, particularly that over which the heavier trucks ran, had a subgrade which consisted in great part of fine grain soil. When water permeated the fine grain soil the deflection caused by the weight of the trucks would push the water and solid matter from the subbase of the road and eventually this would create a hole or pocket under the road. The weight of the truck would then crack the concrete immediately over the hole or pocket. The water which would lodge in these pockets or holes would be "pumped" up through the expansion joints of the road. While test procedures might have allowed normal maintenance of the roads, such as filling in and reinforcing these cavities under the road, deliberately and in the interest of scientific knowledge minimal maintenance was indulged in throughout the entire period of the test. Naturally this resulted in much faster deterioration than would be the case had normal maintenance been carried out.

It will be recognized that the impetus for this test came from Governor Lausche of Ohio. His Director of the Ohio Department of Highways, T. J. Kauer, Chairman of the Interregional Council on Highway Transportation, as such, had extremely close contacts with all features of the test. It will also be recalled that Harold Cohen, Chief of Public Relations of the Ohio Department of Highways, was a very close associate of Stull, Byoir's representative in Ohio. The purpose of this test was a scientific determination of what a road of this character could carry safely. The distortion of this aim and purpose, and the peculiar conduct of Messrs. Kauer, Cohen and Clinton Johnson, Director of Publicity for the Maryland Roads Commission, makes an interesting chapter in the Byoir-railroad antitruck campaign. It was the purpose of Byoir to obtain as early as possible any information from this test which would support their theory that the *gross weight* of the truck (whereas the test was an examination of the effects of *axle-load weights*) was alone responsible for breaking up roads. With this in mind close liaison was kept with Kauer, Cohen and Johnson. The records of the Byoir organization show that Johnson during the course of this test was a frequent visitor at the Byoir offices in New York and that the expense of his visits were borne by Byoir and reimbursed by the railroads. There also appear in the evidence many vouchers which indicate that the railroads reimbursed Byoir for entertainment of Johnson and his wife. Ultimately he became an employee of the ERPC, receiving $1,000 per month plus expenses from December of 1952 through September of 1953. A further inference may be drawn from the fact that in an undated memorandum (P-121) from Hardy, Byoir's New Jersey and Pennsylvania agent, to Mr. Deegan, Hardy noted that in checking over the agenda of an ERPC meeting it occurred to him that Deegan might not want to discuss Johnson at the open meeting. He further mentioned that he talked to Littlefield about this and that he was interested in Deegan's idea. Hardy's explanation that the reason they might not want to discuss Johnson at

the open meeting was because it was a mere matter of slight detail does not satisfy the Court. (R. 745.) While out-and-out bribery of Mr. Johnson has not been proven by a preponderance of evidence, the Court is satisfied that the plaintiffs have proved that Mr. Johnson because of the above-mentioned factors was not an objective public employee, but rather was working for the interests of the railroads in order to further his own personal goal of obtaining a lucrative position with the ERPC.

There is no doubt and the record abundantly proves that Byoir actually did get information about the test as it progressed. It was the purpose of Mr. Fairbanks and his associates that no conclusion be published until the full committee had time for a mature consideration of all of the factors involved in the test. From time to time, however, Byoir put out releases which indicated that big trucks, in the sense of gross weights rather than axle loads, were the primary factor in destroying the roads and highways of this country. Byoir even released pictures terming the Maryland Road Test as a "Crackathon"; pictures which showed the pumping action when heavy trucks ran over joints where the subsoil was of fine grain sand rather than the granular subsurface which withstood the test of all of the weights with remarkable durability. If a "Crackathon" is a highly technical and scientifically controlled attempt to crowd into a period of several months the effect of roughly four decades of road use in order to determine what factors ultimately result in the break up of roads, Byoir used the proper appellation in describing the Maryland Road Test. But this Court finds that Byoir meant, and the reading public so interpreted it as meaning, that a "Crackathon" was the result which invariably followed from the use of heavy trucks on concrete roads. In a word—big trucks are the sole procuring cause of road destruction, rather than the true nature of the test which was to crack the road under controlled conditions.

Mrs. Hartwell likewise entered into this picture. She spent about a week at the site of the test, taking notes and watching the progress of the test, and did her best to get releases which would favor the railroads. She also sent a woman free-lance writer to the scene with instructions to represent herself as an editor of Colliers, which she was not. As such purported editor she was well received by all at the site including representatives of the American Trucking Association and she was accorded every courtesy possible. Her report to Mrs. Hartwell is a masterpiece of the venomous approach which any one connected with Byoir took toward the heavy trucks.

One particular feature of the test and Byoir's approach to it deserves special mention. A running motion picture of the test at selected times was made for the Bureau of Public Roads. At the conclusion of the test and with the approval of Mr. Fairbanks, this motion picture was edited and narrated by a competent Washington, D.C. news commentator. The original so-called "long version" of the motion picture was shown at the trial of the case and the Court was impressed with the completely objective approach to the problem and the fair comments of the narrator. Viewing the motion picture at the end of one day's session, the Court felt that the picture clearly demonstrated that the most important cause of cracking of concrete highways was the presence of a fine grain silty or clay soil subgrade. One important statement was made in the long version of the film:

"The test shows conclusively that a concrete pavement, of the strength and dimensions of the test road, will support indefinitely, without structural failure, single-axle loads as great as 22,400 pounds—*if* there is a subgrade, of adequate thickness, of non-plastic, granular soil. The equivalent of such support must be supplied by the design of roads *in the future.*"

Among others, this important statement was carefully removed from the later shortened version of the film.

The film was in three parts. The first part showed pictures at the actual site with the narrator explaining methods of operation, the purpose, and some of the results. The second part was devoted almost entirely to a precise engineering explanation of the test and its purpose, illustrated by model trucks and drawings. The third part was the conclusion in which the narrator summarized the test, its purpose, and results. It was at this point that Byoir directly entered the scene. One of the Byoir representatives in Washington called upon Mr. Fairbanks and told him that the Byoir organization representing the railroads would like to have a copy of the film for distribution and showing to selected groups. Mr. Fairbanks demurred at the suggestion of Byoir that a shortened version of the film would be adequate to show the purpose and results of the test. Under considerable pressing by Byoir, Mr. Fairbanks said he would consider a shortened version of the film, if it could be demonstrated to him that it did not distort in any way the purpose of the test and the results obtained therefrom. Byoir then suggested that certain portions of the film be shown consisting of the first part of the film and the last part of the narrator's summary. The shortened version of the film was thereafter shown to Mr. Fairbanks and his associates and after one viewing Fairbanks approved the release of the shortened version of the film to Byoir for the railroads. It was only when Mr. Fairbanks received a proposed brochure from Mackie, representing the railroads, which brochure was intended to be sent out with the film, that he realized there might be possible distortion. His statement in a letter dated April 3, 1953 to Mr. Mackie makes that extremely clear:

"However, we do not regard the film as an indictment of large or even heavy trucks *per se*; and certainly, it would be foreign to our purpose were the film in any way to become an instrument of partisan attack upon highway transportation or the trucking industry."

In addition, he suggested that the Bureau of Public Roads should not appear as the sponsor of the picture, if such use was intended to be made of it. Mackie thereupon agreed not to distribute it with the brochure and asked permission to exhibit the shortened version of the film already purchased by Byoir on behalf of the railroads. Since Mr. Fairbanks was honestly of the opinion at that time that the film did not distort the purpose and the results of the test he agreed that they might retain the copies and exhibit them.

As stated above, the long version of the film was exhibited on one of the trial days. On the next day the shortened version of the film was exhibited. The profound impact on the Court of the short film was that big trucks per se were the sole cause of damage to the highways. Important language which would have made clear the results of the test, particularly with respect to bad subgrade soil and pumping, were entirely eliminated. The impression left with the Court at the conclusion of the short film disagreed entirely with the sworn statements of Mr. Fairbanks regarding the results of the test. His statements agreed with those made in the long version of the film as previously set forth. That the distortion was intentional as well as effective is clearly evident from an overall reading of this record. Mr. Fairbanks viewed the exhibition of both films in the courtroom. On the basis of his sworn testimony the Court finds that Mr. Fairbanks was fooled by Byoir and tricked into approving a distorted film. This particular episode in the Byoir-railroad antitruck campaign is a classic example of the "use" of public officials by the Byoir organization in furtherance of its campaign. Such was an everyday occurrence in the Byoir approach to public officials in this case, and I have particular reference to the above situation as well as the "use" of Governor Lausche and Messrs. Taft, Manning, Dimit and Schmidt; the latter two being referred

to under "Pennsylvania Activities". On the other hand, any "use" of individuals such as Clinton Johnson, Menzie, Kauer, Cohen and "Cappy" Thomson (of Pennsylvania) was with their complete knowledge and for the purpose of advancing their own personal interests rather than those of the public that they represented. These and other instances will be referred to in more detail in other headings of this opinion. It is only fair to Mr. Fairbanks at this point to say that the Court considered him a fine, honorable and dedicated public servant, who in giving permission for the shortened version of the film never contemplated that it would be used for the very purpose which he decried in his letter of April 3, 1953 as "an instrument of partisan attack upon highway transportation or the trucking industry".

Needless to say, Byoir made full use of its publicity outlets to tell the world that big trucks crack roads. It was a complete distortion not only of the test but of Mr. Fairbanks' opinion that the road tested could carry gross weights without danger as high as 73,280 pounds (R. 3318).

On or about January 8 of 1951 there was distributed to the members of the Advisory Committee a proposed copy of the findings or in other words the tentative committee report of Road Test One —Maryland. Kauer's copy was in the hands of Byoir within a remarkably short time after its receipt by him despite the Advisory Board's decision that the data was not to be issued to the general public at that time. Byoir summarized the tentative findings and gave them to News Week, where they appeared as completed studies, although the final report was not approved until May of 1951 and the printed copies not available until sometime after October of 1951 (R. 3322–3326). The results as given to News Week and printed in a box in that magazine completely distorted the purpose and results of the test and attributed all road damage to big trucks, the position taken by Byoir from the outset and entirely

false insofar as the objective findings of the test are concerned.

It might be well at this point to set out what the actual conclusions of the officials in charge of the test were as officially reported in Publication 227 of the National Research Council. There were 19 technical findings which are carefully set out in technical engineering language. Briefly stated with respect to the point under discussion in this case that big trucks break roads, they are as follows: (1) That where the road was built on granular soil very little damage occurred no matter what type of vehicle was used; (2) That where the test road was built on fine grain soil, there was no damage until the fine grain soil became permeated with water; (3) That in the presence of water, the subsoil was pumped from under the concrete slab through joints in the road; (4) That the degree of pumping was faster and the amount greater upon the application of the heavier vehicles; (5) That with the subsoil removed the concrete would and did crack, with the heavier vehicles doing the greater and quicker damage.

As publicized by Byoir, both in its releases and in the shortened version of the film, one conclusion was bound to be reached by the ordinary observer from the reading of the releases or viewing of the short film—that only big trucks did damage to the highways and that without regard to any other contributing factor.

Pennsylvania Activities

As stated at the outset of this opinion, after 1943 the attempts of the trucking industry to increase axle loads and gross weights in the legislative sessions of 1945 and 1947 failed. In the 1949 session the then Governor, James A. Duff, ordered the Chairman of the Legislative Committee on Highways not to send any bill to his desk increasing the said weights. With complete administrative support the railroads had no difficulty in controlling the restrictions on trucks and by legally acceptable means.

Pennsylvania had a lower gross weight than all of its surrounding states and the net result was that many of the trucks could not legally carry through Pennsylvania loads which would be legal in other states. One incongruity of that situation was that at the western end of the state in shipments from steel mills only the first 60 miles of a trip to surrounding states of many hundreds of miles was off limits for a full load. Naturally it created a considerable problem for the truckers engaged in the long-haul steel industry. That the situation was favorable to the railroads was fully recognized and every attempt was made on behalf of the railroads to keep that weight limitation by statute, and of course for the express purpose of helping railroad revenues. Again, this was entirely proper. The situation was such that in 1949 Pennsylvania did not need the services of Byoir. William A. Reiter, Chairman of the Associated Railroads of Pennsylvania, had a good working team operating in Harrisburg. Joab K. Mahood, Secretary of the Grange, together with H. A. Thomson, better known as "Cappy" Thomson, Secretary of the Pennsylvania State Association of Township Supervisors, worked in close cooperation with Mr. Reiter. However, improper activities were also present. That the Pennsylvania Railroad used the Byoir third-party technique in creating ill will against the trucks when House Bill 560, The Big Truck Bill of 1949, was pending, is clear from two advertisements printed during the months of March and April of 1949. While it is true that one advertisement designated as 3P-5192 was put out under the Associated Railroads of Pennsylvania, two advertisements designated 3P-5205, "You Can't Satisfy A Road Hog", showing a big truck in the form of a hog at a large trough marked House Bill 560, and 3P-5203, "Mr. Taxpayer and Motorist We've Had Enough * * * Haven't You?", were put out under the name of the Pennsylvania State Association of Township Supervisors, H. A. Thomson, Secretary. The advertisement 3P-5202, Road Hog,

appeared in 135 Pennsylvania newspapers, while advertisement 3P-5203, Mr. Taxpayer, was limited to the newspapers of the larger cities of Pennsylvania. The Pennsylvania State Association of Township Supervisors is created by statute. Public monies are appropriated for its support and it would be impossible for that association under statutory budgetary requirements to use public money to pay for advertisements of this sort. Mr. Reiter's naive explanation was that Mr. Thomson wanted to run the advertisements and that he had Al Paul Lefton, P.R.R.'s advertising agency, prepare them for the association, had them inserted in the respective newspapers, and did not discuss the payment of the charges until sometime thereafter; then, out of the goodness of his heart and so as not to embarrass Mr. Thomson, he persuaded the railroad to pay the charges of preparing the ads and inserting them in the newspapers. That explanation the Court does not accept. To the contrary it finds that they were prepared with prior financial and academic approval of the same Mr. Reiter. These advertisements were in line with the Byoir technique designed to vilify the trucking industry as such.

It is apparent from the record made in this case that Mr. Mahood and Mr. Thomson were both members of Mr. Reiter's team in opposition to any increase in truck sizes or weights. They had worked together for a good many years and had worked well together. However, in 1951 after the introduction of The Big Truck Bill in May of that year in the Legislature, it became evident to all three that Senate Bill 615 had a good chance of passing and being signed by the Governor of the State, then the Honorable John S. Fine. At a dinner-meeting, paid for by Reiter, it was decided to call upon the services of a publicity agent to help them in their campaign against the bill. Reiter went to Littlefield and as a result of that conference, the Carl Byoir organization was called upon to move into Pennsylvania in the fight against The Big Truck Bill.

With almost three years of experience in this particular field behind it, Byoir, through Colburn C. Hardy, assisted at times by Kiely, Marine and Stull, immediately started its third-party technique operations. It was not necessary in Pennsylvania to set up bogus organizations. As aforesaid, Reiter had working closely with him the Secretary of the Pennsylvania Society of Professional Engineers, the Pennsylvania Grange, and the Pennsylvania State Association of Township Supervisors. These three organizations, but principally the latter two, were the springboards for the publicity in Pennsylvania. The state was divided into sections: Stull in the western, Hardy in the central, and Marine in the northeast. Every editor of every newspaper was contacted and personally wherever possible. The Byoir "kit", a composite of all statistical information created by Byoir, was made available to these editors. Release after release denouncing S.B. 615 was given to the newspapers. It was also at this time that it appeared Mr. Mahood would retire as Secretary of the Pennsylvania Grange to be succeeded by Dr. B. H. Dimit, who was retiring from the profession of teaching at one of the State Teachers Colleges. Investigation by Reiter, et al. showed that one of his close personal friends and associates was Robert K. Fisher, an attorney on retainer by the New York Central lines. Their first connection with Dr. Dimit was through Mr. Fisher, and through Fisher the Byoir "kit" was made available to Dimit. Dr. Dimit was an ideal associate to have join the team since the considered opinion of the "team" was that Dr. Dimit was a person who would be very glad to have someone else do his research for him. From that time Dr. Dimit was putty in the hands of Byoir. Completely unknown to him Byoir so manipulated him that no speech, letter, or news release was delivered, sent out, or released until it had been carefully edited by Byoir and in at least one instance cleared with Mr. Littlefield of the Pennsylvania Railroad.

Hardy took up his quarters in the office of the Grange, used Grange stationery, and the bills for publicity were sent to the Pennsylvania Grange c/o Mr. Hardy. The caption of the bills clearly indicates that the printing houses and newspaper services regarded Hardy as a member of the Grange. Hardy also had an address attacking the bill made over a Lancaster Broadcasting System station under the name Pennsylvania State Association of Township Supervisors. Although the station must have known, since Byoir was billed for the broadcast, that it was made under the auspices of at least Byoir and not the association, nevertheless, and in violation of the Federal Communications Act, 47 U.S.C.A. § 151 et seq., no mention was made at the conclusion of the broadcast that it was being paid for by an independent organization. This bill as well as the other bills above referred to were paid in the first instance by Byoir and all reimbursed by the ERPC.

The Trucking Bill had hard sledding due to this organized opposition. However, on the agenda of the Legislature was another bill that caused tremendous difficulty—The Pennsylvania Sales Tax Bill. Controversy over this kept the Legislature in session until the end of the year. Despite the terrific resistance created by Byoir and its third-party technique as well as the opposition of the railroads, the bill passed by a resounding majority of each House and was sent to the Governor. Exhibit P-53 contained in a memorandum of Reynolds Girdler, the account executive of ERPC, dated February 15, 1952, to John Stahr, summarized Byoir's accomplishments from Byoir's viewpoint in helping to bring about the ultimate veto of the bill. It is well worth repeating it at this point in toto:

"To: John Stahr
"From Reynolds Girdler
February 15, 1952
*"Nomination for December Award*
"Achievement: Defeat of 'Big Truck' bill in Pennsylvania.

"The state of Pennsylvania has one of the lowest gross road limits for heavy trucks in the East. Spe-

cifically, Pennsylvania will not permit any truck on its highways which weighs more than 50,000 pounds with load, as compared with 73,000 pounds allowed by New York, New Jersey, and most other Eastern states.

"This low maximum in Pennsylvania is very irksome to the heavy trucking industry because it keeps them from getting a large share of the very profitable steel hauling business between major cities in Pennsylvania and Ohio.

"Consequently, the trucking industry started back in the middle of 1950 to lay the groundwork for a piece of legislation which would increase the Pennsylvania maximum from 50,000 to 60,000 pounds. The trucking industry bought an elaborate system of television and radio programs blanketing Pennsylvania. They went through the major cities of Pennsylvania and worked out promotional special trucking sections with all the important newspapers, thus giving each important newspaper very substantial and profitable advertising. In addition, the trucking industry smartly inveigled the Pennsylvania Railroad into a discussion of their agreeing on an increase in the allowable maximum, and the Pennsylvania Railroad very stupidly agreed not to oppose an increase up to 50,000 pounds. This agreement was thoroughly publicized throughout the political world of Pennsylvania.

"The trucking industry went further. It got up a committee and $200,000 for the campaign for the Republican candidate for governor, and he was elected. The trucking industry also heavily subsidized various members of the Pennsylvania legislature during the November, 1950, election.

"When January, 1951, opened there seemed every reason to believe that the truckers would get their bill through, increasing the allowable weight to 60,000 pounds.

"The 17 railroads of Pennsylvania then started fighting—without our help. They fought the bill for four months, and then threw up the sponge. They reported to their superiors that they were licked. Even so, the lobbyists in control of the railroad activity continued to oppose allowing the C. B. & A. people to operate in Pennsylvania.

"Their superiors then thrust us down their throats.

"The team went to work in Pennsylvania beginning in June, 1951. Not only did they begin to generate publicity against the bill, but they were successful in getting a long list of organizations and individuals publicly to oppose the bill. Those organizations ranged from the CIO to the Pennsylvania State Grange. The individuals ranged from a 'crusading coroner' of Pittsburgh to John L. Lewis. The clamor against the bill grew and grew. Even so, the Republican majority in the Pennsylvania Legislature was so thoroughly committed to the trucking industry that the bill finally went through both the lower and upper houses. However, so violent was the fight that it kept the Pennsylvania legislators in session for nine months—a record in Pennsylvania.

"Even after the bill was passed by both houses, the clamor against the bill continued. Day by day went by without the Governor's signing the bill. Finally, he announced that the opposition was so great that he would have to hold a public hearing. He scheduled the public hearing to be held in his own chambers.

"The C. B. & A. team thereupon went out and organized 21 witnesses for 21 organizations against the bill. They prepared their statements and the publicity together with it.

"The public hearing was one of the biggest news events in Pennsylvania.

Major Pennsylvania newspapers placed the eight-column streamers front page, over national and international news involving Truman and Churchill. Six minutes before the bill automatically would become law in the absence of a Governor veto, Governor Fine vetoed the bill.

"The repercussions on the trucking industry were nationwide, and embittered comments went into newspapers all over the country. In Ohio the truckers were so stupid as to state publicly that 'All the ATA money didn't do (them) any good.' They went on to say that they thought they had the bill bought.

"Veto of this bill meant that some $5,000,000 worth of freight was retained on the Pennsylvania Railroad, because the trucking limit was not raised.

"This represented one of the most dramatic illustrations of the power of organized public opinion that anybody could hope to find. While the award must go to Colburn Hardy as head of the team, he must share the award with Lyon, Stull, Marine and Kiely, because it was a team job.

"I attach as evidence copy of the letter written by the top railroad lobbyist, who originally fought hardest to keep us from being allowed to operate in Pennsylvania. I don't think anybody in the history of Byoir ever received a more impressive tribute.

"RG/et Reynolds Girdler
"Enc."

While the record in this case clearly discloses that some of the statements constituted "puffing", Hardy himself admitted on cross-examination that the veto was his greatest accomplishment in the public relations field up until that time and that it constituted "his finest hour". However, the record and the Governor's veto message also clearly indicate that Byoir was extremely effective and that its organized opposition had much to do with the Governor's veto. And how was that accomplished over and above the use of the third-party technique?

To begin with Pennsylvania was one of the constituent states of the Maryland Road Test. The Governor's veto, P-282, was dated January 21, 1952. It will be recalled that the first tentative draft of the Maryland Road Test Report was to have been issued on January 15th of 1951. Byoir had obtained advance copies and had publicized the railroad theory that big trucks alone break roads. The final draft was not printed and distributed until 1952. The State Highway Department of Pennsylvania through the Secretary of Highways was against the bill. One of the reasons that the Chief Engineer was against the bill and urged the Governor to veto it was based upon statistics drafted by his own department. An objective analysis of the statistics presented, however, finds that they came in the first instance from the desk space organization created by Byoir in New York, the Empire State Transport League. In the second place one Mr. Marine, the same Mr. Marine of Byoir, a statistician of great merit in presenting trucking statistics in such a way as to damn the trucking industry, was the chief source to Mr. Van Riper, Assistant Chief Engineer of the Pennsylvania Highway Department, of the trucking statistics upon which Mr. Schmidt, then secretary, relied in urging the veto to Governor Fine. It will be seen that there was here, as there was in the United States Bureau of Public Roads, considerably less than complete objectivity in the presentation of facts to public officials, upon which facts public officials were urged and did exercise executive judgment favorable to the railroads and injurious to the truckers.

In addition to the above, Byoir, at the request of Reiter, wrote speeches for legislators in opposition to the bill. Hardy also prepared all of the press releases of Dimit and Thomson when they appeared at the Governor's open public hearing on the bill. These releases, skillfully drawn, stressed those elements

chosen by Byoir and the railroads for particular attack.

There is no doubt that Dr. Dimit admitted on the stand that he had, without his knowledge, been "used" by the Byoir organization. The effect of the testimony of "Cappy" Thomson on cross-examination, even though he attempted to vehemently deny the fact, was that he too had been "used" by the Byoir organization. From his appearance, manner and testimony, the Court was persuaded that Mr. Thomson knew he was being used by the Byoir organization and was perfectly happy in that status.

Having successfully repulsed the truckers in their efforts to clear Pennsylvania as a bridge state, for the next year and up until the institution of this suit the record is abundantly clear that Byoir worked hand-in-hand with Littlefield and with Reiter to promote the introduction and passage of a weight-distance tax, using exactly the same methods that had been used in the other states of the program. While there is no direct testimony on that subject, it is the opinion of the Court that it was the institution of the present suit which prevented further action along that particular line of attack. However, up to a few days before the institution of this suit, extensive plans were being made for Byoir to again enter Pennsylvania and to push its campaign with the utmost vigor and backed by whatever funds were necessary. It may be remarked at this point that neither Byoir nor the railroads were ever short on funds in this campaign.

### Campaign of Vilification

The whole tenor of the antitruck campaign, originated by the railroads in the thirties, abandoned during the war, and thereafter reactivated in 1946, was based upon the use of third parties to "front" for the railroads. As noted, in New Jersey, the New Jersey Automobile Owners, Inc. and the New Jersey Tax Study Foundation were two shining examples. In New York, the Citizens Tax League and the Empire State Transport League are two further examples.

In Ohio, Save Our Highways Clubs were used. In Pennsylvania, the good offices of the State Grange and the State Association of Township Supervisors were exploited. The above examples are quoted to demonstrate that Byoir merely accentuated and accelerated the campaign of the railroads by forming bogus front organizations and perfecting the use of existing ones. The base of the pyramid of accomplishment on the part of Byoir for the railroads was the arousing of resentment in the ordinary citizen against the trucks. To this end Byoir shrewdly chose the obvious shortcomings of the trucking industry and by use of dramatic segments of truth distorted them into complete falsehoods. While Byoir chose the appellation of "third-party technique" for its activities, I prefer to treat the whole procedure in its true light, which is the technique of the "Big Lie".

How was public resentment aroused during the period 1949 to 1952? Byoir as early as 1949 had started a collection of photographs of sensational truck accidents. Immediately upon the happening of such an accident, no matter in what part of the country, Byoir would find some person not averse to publicity to issue a news release and use the picture as representative of usual day-by-day traffic events rather than the unusual, which it was. In some few instances trucks carrying weight far beyond the loaded capacity of a bridge would attempt to cross, would fall through and actually destroy the bridge. While these were few in number, Byoir saw to it that these few were so publicized as to create the impression that it was a matter of great frequency, if not of daily occurrence. Byoir also highlighted the obvious shortcomings of the truck, which were slow speeds on steep mountainous grades causing traffic tie-ups; the racing of the truck down the opposite grade thereby preventing the unblocking of the tie-ups; the obstruction of the vision of the motorists following large trucks; the "gunning" of the motors of the trucks in residential areas,

and other actions of some drivers in order to bring all truck drivers into disrepute. The breaking down of secondary and country roads by the use of large trucks was highlighted pictorially throughout the country and to the point where the casual motorist was convinced that a tremendous percentage of our secondary roads were being broken down and absolutely destroyed by heavy trucks as pictorially represented. While it is true that on occasions some venal truckers did use back roads to escape weighing stations on main roads, in a vast majority of the instances, represented as typical, the damages resulted from detouring by State Officials of heavy trucks over roads not capable of carrying the weight and solely for the purpose of making repairs on main highways fully capable of bearing or carrying the weight of the trucks in question. All of these publicity releases, pictures, etc., were furnished by Byoir to all the civic organizations previously mentioned. In addition, and ostensibly as an independent news source, Byoir utilized wholly owned subsidiary corporations which made newspaper mats of a group of pictures which were distributed at nominal cost to thousands of newspapers throughout the country. These newspapers were primarily in the smaller communities and, of course, they could not afford that type of photographic coverage. And what were these photographs so furnished?

Reproductions of a few typical instances were exhibited at the trial. From Byoir's Central States News Views in Chicago came sex, sports and a truck breaking up a road. First, a picture of a plunging neckline; next a picture of the new Notre Dame basketball coach (side by side at the top of the mat). On the bottom half of the mat was a truck "bogged down" breaking up a road.

Again, another Central States News Views showed at the top of the mat Joe Louis, Jr., 2½, being given a boxing lesson by his famous father, retired heavyweight champion at that time.

Next, "Miss Continuous Towel of 1949", a shapely model honored by linen-supply industry. In the lower half of the picture was a truck and a broken up highway caused by heavy trucks on detour.

Finally, People, Spots In The News, a New York subsidiary of Byoir sent out for immediate release, exclusive in a particular city, a 2-column 13-EM mat, showing royalty, sports and trucks. The top of the mat on one side showed the then Queen Elizabeth of England on her 50th birthday. On the other top side is shown a recalcitrant race horse in the starting gate at Detroit's Hazel Park track. Finally at the bottom of the mat appears a picture of the Maryland Road Test showing engineers measuring deflections at a joint and termed in the mat picture "Crackathon" —"Scientific tests to measure road damage inflicted by heavy trucks are under way on this mile-stretch of highway in Maryland sponsored by 11 states alarmed over road deterioration". In the light of what has been said before about the Maryland Road Test this amounts to almost complete distortion.

Another very effective method of inflaming a large segment of the public which always has been influential in the formation of public opinion was to put on the Byoir payroll for purely propaganda purposes Mrs. Bessie Q. Mott, Vice-Chairman of the New York State Federation of Women's Clubs and Chairman of the Public Affairs Department of that same group. Mrs. Mott, described as "a typical American clubwoman", made quite a profitable career out of being the typical American clubwoman. In addition to receiving a sum substantially in excess of $13,000 (reimbursed by ERPC) over a relatively short period of time, she was successful in infiltrating into the programs of most of the important women's groups in New York and New Jersey, programs arranged by Byoir, which included speakers furnished by Byoir, for the purpose of arousing resentment against the truckers. It was necessary to make Mrs. Mott an expert in that field so Byoir made her an au-

thor. Byoir wrote a pamphlet entitled, "Are We Being *Railroaded* Into Socialism?" "A Survey of what's wrong with national transportation policy and how it affects each of us." A foreword was written by Charles L. Bergmann, Chairman of the Railroad Securities Committee, Investment Bankers Association of America. This brochure contained all of the favorable aspects of the railroad story and damned the truckers. While no witness of Byoir at the trial definitely would concede that the entire publication was Byoir's handiwork, and not Mrs. Mott's, the purported author, there is no doubt in the mind of the Court that Byoir conceived and executed the entire transaction. Mrs. Mott was not new in the propaganda field. Byoir had occasion in the past to use her expensive services in the same field of propaganda in the A & P situation, which will be discussed *infra*.

By the use of these various media of arousing public resentment, including newspapers, magazines, radio broadcasts and television, Byoir in the area of its operation built a strong base of public resentment. During this period they created so great public resentment against the trucks that it was then a relatively simple problem for Byoir in the public relations field to sell their "poison" against the truckers, and by the use of already existing organizations friendly to the railroad story, and by reactivating and setting up other organizations, as already noted, to convince people and legislators that everything the trucks did was wrong and that any restriction suggested should be placed upon them.

The cap of the pyramid, of course, was the projected legislation and the cap of the pyramid differed in each state. In New Jersey it was increased license fees and lowering of weights. In New York it was the weight-distance tax. In Ohio it was first a substantial increase in license fees and next the campaign for the weight-distance tax. In Pennsylvania it was the veto by Governor Fine of the so-called Big Truck Bill to be immediately followed by a campaign for the weight-distance tax.

Counsel for all defendants have argued strenuously that since everything done was geared to ultimate legislation, then anything done to accomplish that end was within the protection of the 1st Amendment to the Constitution of the United States and without the orbit of the Sherman and Clayton Antitrust statutes. But this was more than merely an attempt to obtain legislation. *It was the purpose and intent* of Messrs. Deegan, Littlefield and Mackie on the one side, and Byoir on the other, *to hurt the truckers in every way possible even though they secured no legislation; it was their purpose to restrict the activities of the truckers* in the long-haul industry *to the greatest extent possible,* and finally, if possible, *to drive them out of that segment of the entire transportation industry.* This feature of the action, which must always be carried in mind and represents the considered finding of the Court in this case, will be discussed at greater length in the legal discussion to follow. However, this particular section of the opinion is of great importance in the overall consideration of the case since it constitutes the original basis of activity of Byoir and the railroads against the trucking industry.

### The Counterclaims

A review of the evidence presented in this case by which the defendants attempted to establish a conspiracy on the part of the truckers to monopolize the long-haul transportation industry in the northeastern part of the United States reveals consistent and persistent activities on the part of the truckers which in many respects parallel the activities of the railroads in the field. It is the contention of the railroads on the basis of that testimony that if, in the opinion of the Court, an illegal conspiracy on the part of the truckers has not been established, the evidence of the truckers' activities as presented in the defendants' testimony shows a course of conduct which justified every

activity of the railroads as reasonable competition in a free enterprise competitive system.

There is no doubt that between 1936 and 1954 there was a marked increase in the use of heavy trucks in the northeastern section of the United States and in the distances traveled by said trucks. While railroad revenues increased to some extent, the percentage increase did not approach the percentage increase of the revenues of the heavy trucks. Although in the northeastern part of the United States and in the country as a whole the percentage of the total production transported by railroad increased moderately, that of the trucks increased very appreciably. When it is considered that trucks receive about 6¢ for each ton mile carried by them, where the railroads receive 1.4¢ per each ton mile, the disparity in cost to shippers will appear in a more vivid background. The truckers contend that their fast services and flexibility, despite their higher charges have been the principal factors in the increase of their business. The railroads insist that public subsidy in the building of roads is the answer.

There is no doubt that since 1943 PMTA has actively sought to attain legislative objectives through a broad-scale public relations program. Actually since 1941 it has employed public relations personnel which later developed into a public relations department under the guidance of a competent public relations director. Part of plaintiffs' program was to establish close liaison with members of the Pennsylvania Legislature in order to achieve PMTA's objectives. It encouraged its members to take an active part in party politics to aid in obtaining or defeating legislation. Originally most of its activities were directed at the county level and political contributions were sought and delivered to the respective parties at that level. There is no doubt that PMTA was at all times, through its officers, committees and public relations director, fully aware of the continuing railroad campaign, particularly in Penn-

sylvania, to convince the public that the heavy truckers did not pay their proportionate share for road building and road maintenance. The contentions of the railroads throughout this case was that the truckers have enjoyed the aforementioned public subsidy. The railroad campaign through newspapers, magazines and speeches since the 1930's has been directed at "educating" the public that the railroads paid taxes on everything that they used in the transportation of freight and passengers including stations, freight yards, etc. Parenthetically it may be here remarked that the railroads enjoy under the laws of Pennsylvania certain advantages not accorded truckers, such as, rights-of-condemnation and freedom from local taxation on rights-of-way; it is also a matter of common knowledge that railroads in earlier years received many subsidies at the hands of the public through the State and National Legislatures in the form of land grants and otherwise. It should also be observed at this point that initially roads were not built for trucks. They were and still are important in our scheme of national development, national safety and security, as well as benefiting the driving public. Roads were already in existence when the trucking industry was born. It may also be remarked that there has never been a declared national policy or a state policy as advocated by the highway users association based on the recommendations contained in the Atterbury-Swayne Report. That report, it will be remembered, recommended that all costs for the construction of highways, over and above that necessary to carry the weight of the passenger car and the small pickup truck, should be assessed against the heavier vehicles which made use of the roads by assessment against them of user taxes. However, the matter of weights and sizes, as aforesaid, was left to the respective states, primarily at the insistence of the railroads. And up to 1955 upon the passage of the latest truck bill in Pennsylvania, the railroads were com-

pletely successful in Pennsylvania in eliminating a considerable amount of truck competition. It must also be borne in mind at this time that the railroads had interpreted the National Transportation Policy of the Congress of the United States to their own advantage, i. e., airlines for speed; trucks for short-haul, and railroads for long-haul. As interpreted, this has never been and is not now the National Transportation Policy. It must also be borne in mind that the counterclaims are based on events that occurred in Pennsylvania. The record is bare of any activities on the part of the truckers in any of the other states resisting the railroad activities. Apparently the truckers of Pennsylvania were the only ones who actively resisted and did something about the railroad-Byoir campaign.

With the above factors in mind, it will be seen that through the decade of 1940 to 1950 there was a distinct clash between the railroads and the truckers in the State of Pennsylvania over any legislation which would be favorable to the truckers. That the truckers and PMTA attempted to do everything possible to attain their legislative objectives and aims is amply established by this record. While the defendants in this case attempted to label the legislative efforts as an attempt to divert business from the counterclaimants, it was actually an attempt by the truckers to obtain legislative approval to enter into competition with the defendants and counterclaimants in a field in which up to that time by legislative action they had a complete monopoly. The record establishes that the truckers wrote to and made personal contacts with legislators in support of bills increasing the weight of trucks; that they had representatives of other industries write and make personal contacts with legislators in Harrisburg without disclosing trucker connections; and that they had such persons intentionally refrain from advising the legislators and the said officials that the letters and contacts had been solicited; that they solicited from legislators statements in support of their position and had news releases issued thereon. There is no doubt also that in every way possible the truckers tried to eliminate the opposition to its legislative program of the Pennsylvania State Grange and the Pennsylvania State Association of Township Supervisors, and even the railroads. The latter was a suggestion that shippers route through other lines rather than the Pennsylvania Railroad. It is clear, however, that the suggestion from the truckers was made in order to weaken P.R.R. objections to the Big Truck Bill and was not designed to drive the P.R.R. from the transportation field.

About the middle of the decade PMTA had a tax manual prepared charging that the railroads of Pennsylvania themselves did not pay their fair share of taxes as compared with other states and made a wide distribution of it to legislators, banks, security investment houses, etc. That this action was directed against the railroads running through Pennsylvania is entirely clear. However, the truckers had been the target of a strong campaign directed to the public with the purpose of convincing the public that trucks did not pay their fair share of taxes. In such a competitive situation it is well within reasonable limits of competitive practice that the truckers, if they could do so, be permitted to likewise show the public that their competitors, the railroads, were actually guilty of the fault charged against the truckers. Further, this material was sent out with attribution to the PMTA, something the defendants never did in this campaign.

During this time it became evident to the leaders of PMTA that there was a need for a change in legislative approach and general public relations. In fact, it was decided that contributions from the truckers for political purposes should be centralized. Instead of making contributions at the county level, the knowledge of which would be known only casually by the respective leaders of the Republican and Democratic par-

ties of Pennsylvania, it was determined to make a substantial contribution at the state level directly to the State Political Chairman of each party. Accordingly, depending upon political affiliation, all truckers were solicited for political contributions to the party of their respective choice. The combined totals were then taken to Harrisburg and delivered to the chairmen of the respective parties. In total they represented sizable contributions, in one year approximating $40,000 to each political party. The Court considers this practice a rather sad commentary on the way political campaigns are financed in this state and makes no attempt to condone it. It is, nevertheless, a fact of political history in Pennsylvania.

A firm of consultants, Wilder & Associates, was also employed to make a study of the activities in the public relations field of PMTA, express an opinion thereon, and make recommendations for a change of policy. This completely objective study, completed and published in December of 1949, showed clearly the attitude of the public toward the truckers as to the areas in which they were deficient and made recommendations looking to the elimination of such deficiencies. It is most impressive to the Court, sitting as a jury in this case, that no part of this 81-page report is critical of the railroads or any suggestion made that the truckers might obtain further business at the expense of the railroads; and certainly there was no suggestion of any conspiracy to attain such ends. The report is extremely critical of certain faults of a segment of the trucking industry as such. It shows that the acute problem (as related to public opinion) of road hogging, double parking in congested areas, creeping uphill and speeding down, and noise and vibration in residential areas, had pyramided through repeated application of each unfavorable stimulus occasioned by a small segment of trucks and had resulted in associating in the public mind these particular trucks with all trucks. Again, parenthetically, it may be remarked

that that unfavorable association of the small segment with all trucks had always been skillfully nurtured by the railroads and had been brought to fruition by Byoir.

The PMTA then expanded its public relations department and attempted to do a straight selling job to the public and to the legislature based upon what it considered the real merits of its case. It will be recalled that it was just at this time that Byoir began its national campaign, as above described under Vilification Campaign, and the full impact of this campaign was not realized by PMTA or those in charge of its several committees. The trucking industry had supported a great number of successful candidates for the state legislature, both Senate and the House of Representatives, and looked forward to favorable action in 1951. As aforesaid, with the opposition of the administration of the out-going Governor Duff, they had realized that under his administration there was no possibility of favorable action upon their legislative aims. It has been alleged and established to the satisfaction of the Court that in the gubernatorial campaign of 1950 the truckers had in large measure supported the candidacy of many members of the legislature who in that year were elected to office. The railroads had definitely opposed and the truckers had supported candidates known to be favorable to their (truckers) point of view. While several of the candidates who had voted in favor of the truckers were defeated through railroad opposition, there were many others elected with the support of the truckers. Ironically, one of the defeated candidates in a later year, because of railroad opposition, was Samuel B. Dennison, a representative at the sessions from 1941 to 1951, who, from 1947 to 1951, had been Chairman of the House Motor Vehicle Committee. He later appeared at Harrisburg as Legislative Consultant to the truckers.

As stated above, under Pennsylvania activities, the Big Truck Bill was passed with a resounding majority in both

Houses. Eventually the Bill was vetoed by the Governor as above outlined. Defendants contend strongly that PMTA in arranging for support of the Bill was guilty of such unfair concerted action against them as to amount to substantial evidence of conspiracy on the part of the trucking industry to drive the railroads out of business. The fallacy of that reasoning lies in the fact that the truckers were striving to accomplish an end in support of their own industry in order to allow that industry to compete with the railroads, and everything done in this connection was well within the limits of fair competition in private enterprise. There is not nearly sufficient evidence to convince the Court sitting as a jury in this case that the truckers intended by this action anything other than self-help, and any action taken was not calculated to destroy the railroads but merely to obtain an opportunity to compete for the business with the railroads in a field theretofore denied them by statute.

With the veto of the Big Truck Bill in 1951 a change did come over the truckers in their attitude towards the railroads. All of the governing officials of PMTA were intellectually certain that the undercover attacks of the previous three years which had held the trucking industry up to scorn and the distorted views fed the public as to the results of the Maryland Road Test had been railroad inspired. But up to then they had no legal proof. So incensed were the truckers that it was decided in February of 1952 to investigate the possibility of a suit against the railroads. To quote the President of Noerr Motor Freight, Inc.: "We were trying to find out who was stabbing us in the back." Asked "What did they have to do with this suit?" Answer, "Well, if we found out who was stabbing us in the back, we were authorized to institute suit to pull out the dagger." With that thought in mind it was determined to employ a public relations firm to make a complete investigation of the whole transaction. The testimony of Mr. David B. Charnay,

President of Allied Public Relations Associates, Inc., a New York public relations firm retained by PMTA in April of 1952, as to the purpose of its retainer, and which testimony is believed by the Court, is as follows:

Mr. Kohn.

"Q. You said you did not personally seek legislation as a lobbyist. One of the things you did not do in that situation was that you did not personally contact legislators."

Mr. Charnay.

"A. Let me make it clear. If I were able to get legislation, I certainly would try to get it for them. We were not hired for that. We were retained for one specific purpose, and that was to balance the scales between the railroads and truckers. The railroads were having a field day; we were retained for one specific purpose, and that was to balance the scales between the railroad and truckers. The railroads were having a field day; they were wiping the floor with the truckers, and the truckers were not fighting back. The truckers would turn the other cheek every time the railroads smeared them. It was all in the press and everywhere. The truckers did not try and answer back. Our job was to counteract that. There were others in the Pennsylvania Motor Truck Association who were working possibly directly on legislation for the truckers."

The record amply sustains the finding that Charnay and Allied immediately began to attack, by publicity releases, the Maryland Road Test; complained of an improper relation between the Bureau of Public Roads and the railroads; charged that public officials in connection with that test used railroad money, citing Messrs. Johnson and Cohen, to corrupt public information relative to the subject matter of the Maryland Test film; and made other and serious charges intimating that these same

public officials might possibly have been the subject of corruption and bribery by the railroads. At this point the Court will indicate its finding on the question of bribery of both public officials and the officials of independent organizations. The record indicates beyond peradventure of doubt that Byoir using railroad money worked in close liaison with public officials, lavishly entertained them at the expense of the railroads, and used them as dupes in the railroad campaign against the truckers. However, the Court feels that no inference should be drawn from the testimony that such bribery and corruption actually occurred in that these charges are not supported by a sufficient weight of the evidence to justify such a finding. On the other hand, it is perfectly clear to the Court that these same persons were working to further the railroads' point of view because of their own personal interests and to the detriment of the public they were purportedly representing. In that light and on the basis of the information then in the hands of the truckers it is entirely reasonable that they suspected such an illegal association and that they would ask responsible government officials to investigate to determine whether or not there was such a connection. It would scэm in the then state of their knowledge to be an entirely common-sense request. The defendants have asked the Court to find that all of these allegations on the part of the truckers were false and were made for the purpose of destroying the railroads' position in the transportation industry. Nothing could be farther from the real fact. The actions were taken to protect themselves from serious and unwarranted in fact attacks. They charged that the edited film inaccurately put the trucking industry in an odious light, which it did. They charged that the United States Government, through the Bureau's sponsorship of the edited film, was devastatingly and inaccurately critical of the trucking industry, which it was. They charged also that on April 13, 1953 it was the purpose of the railroad industry to distribute a pamphlet in connection with accomplishing the same sinister purpose, which at that time it was. While the charge that the tentative findings of the Highway Research Board were fraud from beginning to end, originated by paid railroad agents using railroad money, is not supported by the evidence, the interpretation as distorted by Byoir and released to the public as the official findings did constitute a fraud upon the public and even constituted a fraud on the Chief Executive of the Commonwealth of Pennsylvania, through the Secretary of the Highway Department. The Court also finds as a fact that a deliberate distortion of a fine scientific achievement, Maryland Road Test—One, was used as one of the instruments in the campaign of the railroads to either severely limit or destroy the heavy trucking industry.

Charnay's investigation of the Byoir activities (one public relations firm investigating another) convinced the truckers of something they had suspected from the outset—that the railroads and railroad money were behind the continuous attacks upon the trucking industry. Charnay also attempted in a limited degree to use the Byoir technique of phony organizations. He set about to form a completely fictitious organization to be known as the Pennsylvania Motor Safety League. While its purpose was ostensibly to help the trucking industry, its ultimate purpose was to attack the railroads. Fortunately in this case wiser heads within the organization of the PMTA and wiser counsel prevented the formation of such an organization and its utilization by the truckers in a compaign against the railroads.

It is also worthy of note at this point that although the truckers sought out and made a collection of all railroad accidents and were in a position to magnify them in a campaign against the railroads, they were never used, but were merely held in reserve for defensive use should the railroad again start their publicity barrage about truck accidents.

Also in 1952 the truckers implemented the tax manual of the mid-forties and had printed an entirely new brochure indicating to municipalities that the railroads were not paying their fair share of taxes in the State of Pennsylvania, contrary to a decision of the Supreme Court of Pennsylvania, and pointing up the fact that notwithstanding such decision, no action had been taken by the public officials concerned to revoke charters. This was a frontal attack upon the railroads and over 10,000 copies of this manual were distributed urging the taxation of railroads. However, there was no attempt to conceal its origin and its purpose was to counteract the propaganda of the railroads that the truckers were receiving enormous subsidies at the expense of the taxpayers. The Court, sitting as a jury, finds as a fact that there was no purpose or intention in putting out this tax manual to destroy the railroads in the long-haul industry, but the action taken was purely defensive of the three year old campaign of the railroads against the truckers and comes within the rule of reason in free competitive enterprise. That the truckers spent great sums of money in support of their public relations program by subscription of members and others in support of the trucking industry is amply established by the evidence in this case. That PMTA sought out and received a grant of $100,000 from the American Trucking Association to assist in its campaign and to underwrite the expenses of this lawsuit is also amply established by the evidence in this case. It is also clear to the Court from what happened during the preliminaries of this case, prior to the trial, that the establishment of the plaintiffs' case depended in large measure upon the Sonya Saroyan papers turned over to the American Trucking Association by a former employee of Byoir.

It is also clear, as stated in a previous memorandum opinion, that these papers enabled the truckers to establish what they had long suspected—concert of action on the part of the railroads in a deliberate attempt to keep the truckers from a large segment of the long-haul industry or, if possible, to destroy their effectiveness in this particular field and eliminate them as competitors. It follows therefore, from what has been said above, that the truckers with the one exception above noted, in every instance acted only in support of their own industry, and without any intent to restrain commerce.

 Among the complaints made by the defendants against the plaintiffs is that they engaged an emeritus professor of engineering of the University of Michigan, one Dr. John S. Worley, who, although a consultant engaged and paid for by PMTA, was held out to the public as an independent highway engineering expert. The purpose of his employment was to testify at the expense of PMTA and without attribution *in favor of* the Big Truck Bill. It will be noted that here again is emphasized the difference in approach to their respective problems by the two competing industries. Dr. Worley was not engaged to injure the railroads but to help the truckers. It is certainly within the rule of reason in competing industries that either one may engage outside help and seek allies to further its own respective aims, provided however, that such friends and allies are not used in a conspiracy to destroy the competitor. A concert of action which has for its purpose the crippling of competition in a particular field and if possible of effectively destroying that competition is prohibited by the Sherman and Clayton Antitrust statutes. The Court sees no violation of the statutes in the Worley episode.

 Another charge of the railroads against the truckers which should be disposed of at this point is that the present action, its pleadings, depositions, and even the testimony taken at the trial have been used by Charnay as a vehicle of publicity for the sole purpose of bringing the truckers' story to the public. As a corollary thereof, the railroads charged that this action constitutes virtually malicious abuse of legal proc-

ess. The railroads also point out that this suit was financed wholly from a public relations program fund as indicative of the fact that the suit was purely for publicity purposes. This contention does not impress the Court. The result of the action clearly indicates that the plaintiffs herein had a valid cause of action which was brought in good faith and on sound factual and legal grounds. Naturally, in a case of great magnitude, it could be expected that the expenses of litigation would be rather large. How the plaintiffs individually and in concert raised the money to support the litigation is of no concern to the Court. That they chose to finance it out of the public relations fund is also unimportant. As to the charge that the pleadings and depositions, and even the testimony taken at the trial, were commented upon and in the public press by the plaintiffs or their agents is likewise of no concern to the Court. This Court has no intention of restraining the use of public documents or interfering with the right of the press or individuals to comment upon events which happen publicly in a court of law, provided such use is not part of an illegal conspiracy in restraint of trade or commerce.

█ It was a matter of first impression with the Court upon the original reading of the complaint when this suit was instituted some four and one-half years ago that the charges made were of a rather incredible nature and that the plaintiffs herein would have a most difficult task to establish their contentions by a fair preponderance of the evidence. It is now apparent that with the exception of proving by a preponderance of the evidence actual bribery of public officials and bribery of officers of public organizations, the plaintiffs have proved by a great preponderance of the evidence that a conspiracy in violation of the Sherman and Clayton Antitrust Acts actually existed; its formation, its purpose, and the means by which it was effected, and generally in the form and manner as alleged in the complaint.

Defendants as part of their counterclaim attempted to introduce certain evidence with respect to the highway systems in the northeastern part of the United States; the effect of the use of heavy trucks thereon; the increasing cost of construction, including changes of geometric designs to meet the requirements of heavy traffic; and other evidence with respect to the economic phases of the trucking industry, all of which will be referred to briefly hereinafter. All of this testimony was excluded by the Trial Judge as being either cumulative or not relevant to the issues in the case. From what has been said before and after a review of the evidence, it is clear that the counterclaims filed are without merit and, therefore, will be dismissed.

Summary

The review of the record in this case, developed in practically continuous trial from October 1, 1956, to January 28, 1957, covering well in excess of 6,000 pages of record with some 968 exhibits, nearly all of which were offered and received in evidence, has of necessity been extremely time-consuming. It is impossible in this opinion to advert specifically to every detail of the testimony of the many witnesses or the content of the exhibits. From a consideration of the record as made in this court, together with the exhibits, the Court has stated the facts and conclusions which it deems necessary to a decision. However, the Court has examined carefully on more than one occasion the entire record and has given consideration to all of the testimony, the exhibits, the briefs and arguments of counsel thereon as well.

Without in any wise limiting the findings of fact contained in the above narrative description of the facts adduced in this case and the Court's comment thereon, a useful purpose may be served at this point in reviewing in summary form the findings of the Court in this case as a preliminary to a discussion of the law of the case and the application of the law to the facts as found.

The Court has found as a fact that the railroads and Byoir entered into a conspiracy in unreasonable restraint of trade, the nature and purpose of which was to injure the truckers in their competitive position in the long-haul freight industry in the northeastern section of the United States. This, of course, involves interstate commerce. The immediate purpose was to create public resentment to the truckers, not only in the minds of the general public but in the minds of those who utilized the services of the trucks and in such a manner as to interfere with business relations between shippers and truckers. There is no doubt that the railroads prior to the development of the long-haul truck industry had an actual monopoly of that field. A new industry in competition had appeared. That industry by reason of more flexibility and faster service had made great inroads in that particular competitive field and its business had increased a thousand fold. Both were regulated industries. The truckers could not operate without a certificate from the Interstate Commerce Commission showing the need for the service in a particular locality. While it is true that "contract carriers" as distinguished from "common carriers" might be utilized by an individual shipper (and these carriers form a large part of railroad competition), most of these carriers are likewise regulated by the Interstate Commerce Commission and only in the case of carriers of agricultural products is there any exemption from regulation. Common carriers, of course, are in the same status as railroads. Goods offered has to be transported at published rates. There is further no doubt that at this time there was "erosion" in great measure of previous railroad business to the truckers. That such erosion would "injure" the railroads in their revenues is likewise clear. That injury, however, is not a legal injury. It is merely a diminution of revenue because of a better competitive method of transportation evolved by the trucking industry. That the railroads recognized the problem and knew the underlying factors causing their loss of revenue is abundantly clear from this record. The railroads knew, despite the higher charges of the truckers, 6¢ per mile as against 1.4¢ per mile, that the truckers were rapidly gaining business because of extreme flexibility. They knew also that even without a show of necessity on their part before the Interstate Commerce Commission they (railroads) could be licensed to establish equally flexible truck routes. (See the opinion of Mr. Justice Reed in I. C. C. v. Parker, 1945, 326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051, and dissenting opinion of Douglas, J. re the effect of majority decision.) Instead of meeting the competition in the field and giving the shippers what the shippers wanted, they determined upon another course of action—to injure and/or destroy the truckers and thereby force the shippers to their detriment to continue to use the railroads. This, of course, would be to the shippers' disadvantage in this great area of flexibility which was clearly so vital to the shipper but would eliminate the fundamental cause of the railroads' loss of revenue. It was with this very thought in mind that the combination of Byoir and the railroads occurred in August of 1949 and a definite program for accomplishing this desired result was instituted with the full knowledge and consent both of Byoir and every defendant railroad. Briefly restated, the plan was first to create hostility to the truckers. With that as a base the rest of the plan evolved. This plan generally had 10 fundamental objectives:

(1) To seek out or create "independent" organizations favorable to the railroads' point of view and opposed to the truckers.

(2) Through Byoir and the ostensible independent organizations create a hostile public using the method detailed under the heading, "Campaign of Vilification".

(3) Through the organizations and at the instigation of Byoir create a demand for more tax revenues by govern-

ment at all levels, particularly the local level.

(4) Through Byoir and railroad contacts have one of these organizations hire a recognized and ostensibly impartial statistical group to make a study of revenue-producing methods most palatable to the public; the statistical group would be supplied by Byoir with the questions to be asked the public and the answers to these questions would form the basis for the conclusions in the study. These questions by Byoir would be so framed that only the desired answers would be forthcoming—that the truckers must be more heavily taxed. Another use of these so-called independent survey organizations was to focus attention upon the trucks as destroyers of the highways and emphasize by "statistics", based on the false premise that truckers are the prime users of roads, that the truckers were the recipients of enormous public subsidies.

(5) With these statistics on hand have the "independent" organizations through Byoir publicize them from one end of the United States to another, through speeches, magazines and news releases.

(6) Interest writers of important magazines in articles attacking the truckers and present the writers with all the statistics compiled by the "independent sources".

(7) With an outstanding magazine article have the organizations, through Byoir, intensify their campaign and then seek further articles with the ever-growing research material as a basis.

(8) While all of the above was being carried out to aid financially and in every other way legislators disposed to the railroads' point of view.

(9) Present the research packages and a hostile and aroused public to the Legislature and then propose the type of legislation determined by the associated railroads of that particular state as the type of legislation desired, and which to the associated railroads appeared feasible under the circumstances.

(10) Make absolutely certain that the general public attributed the entire compaign to public-spirited organizations only, keep the railroads in the background, and conceal particularly from objective-minded public officials interested in the problem the fact that the entire campaign was a creature of the railroads, the whole cost of the campaign being borne by the railroads, and for the purpose of hindering and destroying the trucking industry as a competitor to the railroads in the long-haul transportation industry.

It is clear from the above, regardless of the success or failure of legislation proposed by the railroads unfavorable to the truckers, that a real private injury to the truckers was accomplished. There was definitely a loss of good will to the trucking industry and in some instances that loss of good will was extreme. In the use of the term "good will" in this opinion I refer not only to the definition of Lord Eldon, who defined good will as "the probability that the old customers will resort to the old place", but also to the more comprehensive definition of Judge Story, "that good will is the advantage or benefit which is acquired by an establishment beyond the mere value of the capital stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers on account of its local position, or common celebrity, or reputation for skill, or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices." 24 Am. Jur. § 3, p. 803, and cases there cited. Therefore, the use of the term "good will" in the instant case relates not only to the direct damage done to the truckers, i. e., the refusal of truck users, because of the campaign, to avail themselves of that form of transportation (loss of business), but refers also to the more subtle type of injury done the entire trucking industry by discrediting it in the eyes of the general public, the 99% users of the highways, and eliminating

the likelihood of public appreciation of the trucking industry as such or sympathy with the truckers' position which would be fundamental in gaining general public support to avoid the imposition of crippling burdens and restrictions.

The defendants' actions destroyed to a large extent the public confidence which the truckers had earned by their own efforts and which they might have won additionally, especially in the light of the innumerable beneficial accomplishments of the truckers in the field of long-haul transportation. We must assume that most people are honest law-abiding citizens, and that includes those engaged in the trucking field. It certainly has not been proved in this case that all or even a substantial number of truckers are lawbreakers. To the contrary, the evidence in this case clearly shows that, except for a small segment, the truckers are decent law-abiding citizens who obey the law, but as a result of this campaign they were categorized as lawbreakers, road-hoggers, completely indifferent to the safety of others on the highway and moochers on the public through failure to pay their way.

As a final note it can be remarked at this point that, although not outlined above, overt acts to accomplish the objectives of this conspiracy were committed among others in the states of Connecticut, Indiana and Illinois. This feature is mentioned at this point to show that this was not a series of individual conspiracies but was one large ever-growing conspiracy with the single objective of "improving the competitive position of the railroad in the field of transportation", but by the illegal means of limitation of or destruction of the trucking industry. Restated in extremely simple form I have found the following:

1. That the defendants combined in and about May 19, 1949 with the intent and object of substantially lessening ·competition in the long-haul carriage of freight in unreasonable restraint of trade.

2. That they were joined in this combination by the Byoir organization on or about August 15, 1949 for the same purpose and with the same intent and for a handsome remuneration.

3. The instrumentality or means by which this object was to be achieved was primarily by a campaign designed to destroy the good will of the truckers and, secondly, by fomenting governmental restrictions obtained by virtue of the methods outlined in the factual phase of this decision.

4. Hundreds of overt acts in furtherance of this plan were carried out throughout the country, and all in furtherance of the same object and design.

### The Law of the Case

A discussion of the law of the case must involve a consideration of the following legal questions:

(1) Was there a conspiracy in violation of the antitrust statutes? This question, of course, involves legality of means; legality of object; illegality of means and illegality of object.

(2) The rule of reason in free competitive enterprise:

(3) Whether, if a conspiracy is shown to exist, the defendants' activities complained of caused injury both to the plaintiffs and to the public:

(4) Whether the defenses interposed by the defendants justify the activities complained of; this includes a determination of the question as to whether, as contended by the defendants, plaintiffs in instituting this action were motivated by a desire to bring the defendants into disrepute in furtherance of an objective on the part of the plaintiffs to acquire a monopoly of the long-haul freight business:

(5) Whether, if an illegal conspiracy existed, the evidence presented is insufficient to link certain of the defendants with the activities as coconspirators:

(6) Damages and relief.

After full consideration of the above problems the Court has determined its legal conclusions as follows:

(1) The defendants in this case formed a conspiracy in violation of the Sherman and Clayton Antitrust Acts for an illegal objective (injury to the truckers' business and good will and, if possible, the elimination of the truckers as competitors); that in concert and as co-conspirators the defendants attempted to use both legal and illegal means to accomplish their illegal objective.

(2) As to the rule of reason, the activities of the railroads and Byoir constituted unreasonable competition in a free competitive economic system.

(3) The activities of the railroads and Byoir caused injury to the trucker-plaintiffs and injury to the public.

(4) The defenses interposed by the defendants in this case are not available to the defendants under the facts of the case nor were the plaintiffs in instituting this action motivated by a desire to bring the defendants into disrepute in furtherance of an objective to acquire a monopoly of the long-haul freight business.

(5) The Court, sitting as a jury, has found the evidence to be sufficient to link all of the defendants as co-conspirators in this case.

(6) As to damages and relief, the Court holds that all of the plaintiffs are entitled to injunctive relief against continuing illegal activities of the defendants. In addition, PMTA is entitled to compensatory damages, to be trebled as provided by statute, together with reasonable costs and attorney's fees; the remaining individual defendants are entitled only to nominal damages by virtue of a stipulation filed in this action and which will be later fully discussed. But before proceeding to a discussion of the several legal questions involved a few general observations are in order.

The pertinent sections of the Sherman and Clayton Acts in this case are as follows:

Sherman Act, § 1.

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: * * *."

Sherman Act, § 2.

"Every person who shall monopolize or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, * * *."

Clayton Act, § 4.

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides * * * and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

Fortunately antitrust law is living law. Being far from static, it, like the Constitution, is dynamic law to be adjusted to the times and to new situations. As Chief Justice Hughes aptly remarked in Appalachian Coals, Inc., v. U. S., 1933, 288 U.S. 344, 359–360, 53 S.Ct. 471, 474, 77 L.Ed. 825:

"As a charter of freedom the Act has a generality and adaptability comparable to that found to be desirable in constitutional provisions. * * * The restrictions the act imposes are not mechanical or artificial. Its general phrases, interpreted to attain its fundamental objects, set up the essential standard of reasonableness."

The court further pointed out that the Act should be construed in a broad and practical conception of the common law of restraint of trade and monopoly. As such the Act constitutes a flexible public policy directed against all undue limitations on competition, both in the form

of realized monopolization as well as partial but significant restraints of trade tending to the same end, or attempts to reach the prohibited end.

In a very comprehensive opinion in the case of American Tobacco Co. v. United States, 1946, 328 U.S. 781, at pages 809–810, 66 S.Ct. 1125, at page 1139, 90 L.Ed. 1575, Mr. Justice Burton speaking for the court set forth the nature of the prohibitions of the Sherman Act in the following language:

"It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns. It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition. No formal agreement is necessary to constitute an unlawful conspiracy. Often crimes are a matter of inference deduced from the acts of the person accused and done in pursuance of a criminal purpose."

As has been said, a conspiracy is not made out in so many words but must be gathered from the four corners of the evidence and the inferences to be drawn therefrom. Intelligent businessmen, aided by expert legal counsel, simply do not say, or put in writing, that they are going to drive a competitor out of business. And, of course, they did not in this case. However, courts today are aware of the subtle and tacit agreements now used to effectuate business conspiracies. That foregoing statement is made with the full realization that certain phases of the Byoir campaign were something less than subtle. The picture of conspiracy as a meeting by twilight of a trio of sinister persons, with parted hats and close together, belongs to a darker age. McConnell, The Treble Damage Action, U. of Ill. Law Forum 659, 661 (1950). The

distinct impression of the Court, sitting as a jury, in drawing the inferences from the evidence presented, is that this was a carefully calculated plan under the guidance of competent legal counsel which sought to choose a means of injuring and, if possible, destroying interstate truck competition that would afford the greatest amount of constitutional protection and thereby seek to render it immune from the coverage of the antitrust laws. A further inference to be drawn is that the plan was to be cast in the guise of a gigantic legislative campaign in order to attempt to surround it with the protections of the right to assemble, the right to petition the legislature and freedom of speech. With that thought in mind a calculated risk was taken that the plan adopted was the safest means of carrying out the predetermined object of seeking to maintain a monopoly in restraint of trade. Unfortunately, the gamble proved unsuccessful. The campaign of vilification upon the long-haul trucking industry, which was the real instrumentality for carrying out this conspiracy, far exceeds the factual patterns presented in the Slick Airways case which will be discussed *infra* in detail. This was a deliberate attempt to injure a competitor for an illegal purpose by destroying public confidence in it. And that places this case into an area long denounced by the antitrust laws.

The factors bringing about the present action are new in the field of antitrust litigation and must be examined in the light of the climate of competition as it then existed. It is a battle between two great leaders of a highly competitive industry, both staffed with capable and expert legal counsel. Public relation techniques are closely interwoven with every facet of this case. The chief device used by the railroads, and to a lesser extent by the plaintiffs, which latter did not involve violation of the Sherman and Clayton Antitrust Acts, is one long known to political experts under the term, "The Big Lie". This technique, as it appears from the evidence in this case,

has been virtually adopted in toto by certain public relations firms under the less insidious and more palatable name of "The third-party technique". Its sole means and its effectiveness is to take a dramatic fragment of truth and by emphasis and repetition distort it into falsehood. That was the technique employed almost without exception by Byoir and the railroads throughout the campaign.

We will now proceed to discuss the legal questions in the order set forth at the opening of this section of the opinion.

The Conspiracy—Means and Objectives

An unlawful conspiracy has been defined as a combination between two or more persons to do an unlawful or criminal act, or to do a lawful act by criminal or unlawful means. Duplex Printing Press Co. v. Deering, 1921, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349. A lawful act may, when done by many in concert, become a conspiracy and public wrong and may be prohibited. Bedford Cut Stone Co. v. Journeyman Stone Cutters' Ass'n of North America, 1937, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916. An unlawful conspiracy may be formed without simultaneous action or agreement on the part of the conspirators. Interstate Circuit, Inc., v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610. The civil liability for acts of conspiracy flows from the damages caused by the acts committed pursuant to the formed conspiracy; accurately speaking, there is no such thing as civil liability for conspiracy as such; and unless something is actually done by one or more of the conspirators which results in damage, no civil action lies. 11 Am.Jur. § 45, p. 577, and cases there cited.

Let us look at the record in this case. The acts committed by the defendants in pursuance of their plan reveal that the defendants formed an illegal conspiracy for an illegal object—injury to the truckers' business and good will and, if possible, the elimination of the truckers as competitors. By illegal means (the destruction of the truckers' good will) they sought to obtain their illegal objective. By what they claimed were legal means—appeals to the legislature —they also sought to accomplish their illegal objective.

The defendants have strenuously contended that all of their activities were geared to a legislative program and that none of their activities come within the orbit of activities proscribed by the Sherman and Clayton Antitrust Acts. It has been noted and the Court here restates that the entire campaign and its objectives did not constitute a mere appeal to the legislature; nor was it a large-scale lobbying campaign. True, one phase of the activities was of a legislative nature—but a rather new approach to legislation, to say the least. The other phase, and the more important one of the campaign, was one of vilification designed to destroy the good will of the long-haul trucking industry. Hence, the Court has rejected the contention of the defendants that their combination was entirely legislative. I have further determined that the railroads were not acting as the guardian of the public welfare, as they have so earnestly asserted. Even counsel for the defendants at R. 2853 had to admit that the defendants were not motivated by "altruism".

It is in a situation such as this that the power and force of group action comes into play and the remarks of Mr. Justice Burton, supra, become very pertinent. When such group action is reinforced, as it was in this case, by unlimited financial resources to accomplish its objectives, it may very well and does in this case present a picture of activities proscribed by the Antitrust statutes. On the facts as found, a common-law conspiracy has been made out.

The defendants in their arguments in this case have confused means and objectives. This problem was presented to Chief Judge Forman in the case of Slick Airways v. American Airlines, D.C.D. N.J.1952, 107 F.Supp. 199, appeal dis-

missed, American Airlines v. Forman, 3 Cir., 1953, 204 F.2d 230, certiorari denied, 1953, 346 U.S. 806, 74 S.Ct. 54, 98 L.Ed. 336. At page 207 Chief Judge Forman made this pertinent comment:

"The defendants misconceive the nature of the complaint by confusing the means allegedly used with the result to be achieved * * *. It is in this that they fall into error for these alleged acts rather constituted the means and methods by which the defendants conspired to drive the plaintiff out of business in violation of the antitrust laws."

A similar argument to the defendants' contention that their activities with regard to legislation were the only activities for which they combined (which is untrue) was made before Judge Forman. The defendants there claimed that their appearance in that case before the Civil Aeronautics Board to block and delay the issuance of a certificate of convenience and necessity to the plaintiff to act as a common carrier was proper and legal. Judge Forman disposed of that contention in the following language in 107 F.Supp. at page 214:

"While it may be questioned whether any of this alleged activity by defendants of itself constituted illegal conduct, it is fundamental, as previously noted, that legal means may be utilized to accomplish the unlawful objective of conspiracy, American Tobacco Co. v. U. S., supra, 328 U.S. at page 809, 66 S.Ct. 1125, 90 L.Ed. 1575, and this court cannot deprive the plaintiff of its right to attempt to prove that these alleged acts were part of the total acts undertaken to effectuate the alleged conspiracy."

The most recent decision dealing with the problem of confusion of object and means is Parmelee Transportation Co. v. Keeshin, D.C.Ill.1956, 144 F.Supp. 480. The plaintiff in that case was a transportation company which for over a quarter of a century was in the business of transporting (for the defendant railroads) from one to another of the eight railroad stations in Chicago, passengers and baggage in the process of interstate journeys. The plaintiff alleged that one Keeshin promised a member of the Interstate Commerce Commission a valuable consideration if he would persuade the individual railroad presidents to use their influence to cause their lines to eliminate plaintiff from the transfer business in Chicago and grant the contract instead to a corporation to be formed by Keeshin. This was to be accomplished by the ICC member representing to the railroad presidents that he would exercise influence on the ICC in their favor. The complaint avers that the new company was formed, that the plaintiffs were not allowed to compete for the contract and that a less favorable contract than the one under which they formerly operated was entered into by the railroads with the new corporation in pursuance to the agreement. The defendants argued that the fact that the contract with the new corporation was an exclusive one did not make it illegal as a monopoly—which is true. They further argued that the contract made by the railroads acting together did not indicate the existence of a monopoly because they were not competitors and were therefore in a position to deal with whom they pleased. In reply to these contentions Judge Sullivan noted, at page 484:

"The flaws in the proposition lie in the minor premise; the assumption that the railroads could lawfully act together to grant a transfer contract ignores completely the complaint's allegation that the purpose and effect of that joint action was and is to prevent competition in bidding for contracts for terminal service. Acts otherwise lawful are 'within the proscription of the antitrust statutes, *if done for the purposes prohibited by the anti-trust laws, i. e., to eliminate competition.*' "

This Court is not condemning the field of public relations. It is only condemning it as it was used in this case, as an instrumentality of destruction rather

than one of promotion. Neither does the Court determine it illegal for an industry to seek any and every proper legislative goal; nor to enlist the support of other persons in obtaining legislation. But it is illegal to use the practices and methods shown by the record of this case to destroy a competitor's good will and to use third parties as fronts to carry out a conspiracy to destroy a competitor.

The proofs in this case have definitely established joint action on the part of all of the defendants to destroy the good will and injure the business of the plaintiffs. They have proved the formation of so-called "independent citizen groups" which were mere pawns in circulating information derogatory to the plaintiffs; dissemination of false information to customers of the plaintiffs for the same purpose; the organization of groups to protest the use of the highways by plaintiffs' "Big Trucks", and the duping and using of public officials and officials of independent organizations to accomplish the same purpose of driving the plaintiffs out of competition with the defendants. The actions of the defendants do not fall within legal bounds of either proper means or proper objectives and consequently such activities must be condemned.

### Rule of Reason

With the distinction between objectives and means disposed of, we now apply the facts as found to the climate of competition as it existed at the time the defendants embarked upon their illegal plan. A restraint may be unreasonable either because a restraint otherwise reasonable is accompanied with a specific intent to accomplish a forbidden restraint or because it falls within the class of restraints that are illegal per se. The plaintiffs have strenuously argued that per se violations have been made out in this case. I do not so find. The activities of the defendants were not such as to bring them within the purview of price fixing, refusing to deal with nonmembers of an association, thereby excluding a competitor from a substantial

market, and the other classes of cases covered by that rule of law. See United States v. Insurance Board of Cleveland, D.C.Ohio 1956, 144 F.Supp. 684, 697.

The record discloses that both sides used, or wanted to use, fronts and/or the propaganda technique. However, there is one very important distinction in the use of the technique by the parties; *the plaintiffs always used the technique for the affirmative purpose of seeking legislation which would be beneficial to themselves rather than to burden the railroads.* As they so often stated, and as the Court has found, they were seeking to remove what they called "The Chinese Wall" of low weight limitations which isolated it from the surrounding states. The plaintiffs engaged in the negative approach (which seeks to injure your competitor) only as a *defensive* measure after they were severely hurt in the public mind and the legislative halls by Byoir and the railroads. On the other hand, the defendants did not go out and seek to meet the new mode of competition by adjusting their facilities to the public demand, but rather *sought to destroy the good will built up by this new competitor through the campaign as outlined. This public relations battle of bogus organizations and distortion of facts and vilification was not a climate of competition into which the defendants were injected. They created it.* They were faced with the budding seeds of competition growing in an area that was once a railroad monopoly in the long-haul freight business. Once the seeds started to flourish because of the flexible service given to shippers, the railroads resorted to the negative approach of injuring the competitor rather than adjusting their facilities to meet the growing seeds of competition. And they certainly could have met this competition on the field of *service* with their extensive facilities and ability to enter the trucking business in places where flexibility was desired and required by the shippers even at an increased cost. See I. C. C. v. Parker, 1945, 326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051. Neither the railroads nor

Byoir were new at this "propaganda" approach. As noted, the railroads had been harshly criticized for its use by the Wheeler Report, supra. Byoir received even harsher treatment for his use of the technique. He was found guilty of violating the antitrust laws in a suit growing out of his activities on behalf of the A. & P. which was one its major selling points in seeking and getting the ERPC account. Byoir's prior activities in the field are well pointed out by Judge Lindley in the case of United States v. New York Great A. & P. Tea Co., D.C. Ill.1946, 67 F.Supp. 626, at pages 673 and 674, where he alludes to the false front activities. On appeal Judge Minton, later Mr. Justice Minton, also spoke harshly of Byoir's illegal activities in furtherance of a scheme to violate the antitrust laws at 7 Cir., 1949, 173 F.2d 79, 89, 90.

It was Carl Byoir's view of antitrust law that there was no stigma attached to a violation thereof, and that "if you got caught you just ran into the wrong judge." In commenting upon the A. & P. decision Carl Byoir stated to Mr. Dilworth, then attorney for plaintiffs, in his deposition:

> "Now, you know and I know, Mr. Dilworth, that antitrust is not a law like going through a stop light, that it is a law on which you can go into twenty federal courts and get twenty different opinions on different matters, and this was pursued. The antitrust people didn't like Carl Byoir and they pursued me through five courts until they found a judge who had their view of antitrust. And I am not critical of it; it was his view; but as far as I am concerned I think every one of these organizations was a perfectly proper organization, *and if there is criticism that it wasn't publicized, sometimes you can't always get printed what you want to get printed.*" R. 2451; also see R. 228, 229. (Emphasis supplied.)

The above quotation, in the light of Byoir's previous conflicts with the statutes, shows a studied, consistent and contemptuous attitude toward the Antitrust Laws of the United States and his willingness to flout them at will, if the price was right.

In arriving at the conclusion that the defendants' conduct was unreasonable I have considered and alluded to: (1) The economic conditions peculiar to the industry, including the fact that both industries are heavily regulated; (2) The practices which have obtained; (3) The nature of the defendants' plan; (4) The reasons which led to its adoption; (5) The probable consequences of the carrying out of that plan in relation to market prices and other matters affecting the public interest in interstate commerce and transportation. It follows logically that the ultimate effect of this plan would have been to deprive the shipping public of the great advantages of the flexible services provided by the trucking industry and would have relegated shippers to the use of railroad transportation only which was rapidly being proved out-dated (unless it adjusted itself, which it was in a position to do) to the modern demands of that same shipping public. See Appalachian Coals, Inc. v. U. S., 1933, 288 U.S. 344, 361, 53 S.Ct. 471, 77 L.Ed. 825; Board of Trade of City of Chicago v. U. S., 1918, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683, and Standard Oil Co. of New Jersey v. U. S., 1911, 221 U.S. 1, 57, 31 S.Ct. 502, 55 L.Ed. 619 for the factors to be considered in an application of the rule of reason. Applying these criteria the Court, sitting as a jury, finds that the defendants acted unreasonably in their campaign against the long-haul truckers.

### Proximate Cause

Prior to any discussion of the public and private injury which is necessary to support the plaintiffs' cause of action it is necessary to examine a stipulation of counsel. This stipulation was entered into on 17 May 1956 and, after approval by the Court, was filed of record as docket paper 460.

The stipulation in its pertinent sections reads as follows:

"2. No plaintiff (except plaintiff Pennsylvania Motor Truck Association) has paid any counsel fees or expenses in connection with this suit, except as stated in paragraph 4." (Note: the importance of this section and section 4 will become apparent in the "Relief" phase of this decision.)

"3. The only damages claimed by the plaintiffs (except plaintiff Pennsylvania Motor Truck Association) are those that each of them may have suffered because of its inability to carry more than the weight limits fixed by the laws of Pennsylvania prior to the change in the law in 1955."

"4. Since 1949 plaintiffs (except plaintiff Pennsylvania Motor Truck Association) have supported the activities of the Pennsylvania Motor Truck Association by making contributions to the cost of such activities and none has objected to any such activities."

A reading of section 3 of the stipulation might at first give the impression that the plaintiffs have limited the proof of private and public injury to such that might flow from the veto of S.B. 615. This is far from the case. Proof of *monetary* (as contrasted with injury-type) damages and injunctive relief were the subjects of several pre-trial meetings of counsel with the Court. In the interest of limiting proof of *monetary* damage (as contrasted to injury to public and plaintiffs) and to shorten the trial of the case, counsel for the parties entered into the aforesaid stipulation. It is in that context and only that context that it is to be read. In that light it becomes apparent that its importance does not become a matter for legal discussion until we arrive at the "Relief" and monetary (actual amount) damage phase of the decision.

In an action of this nature the plaintiff must allege and prove a violation of the act and damage to his business or property proximately resulting from the acts and conduct of the defendants which constitute a violation of the act. Injury to the plaintiffs in and of itself is not sufficient to warrant a civil action for injunctive relief and/or damages. There must be harm to the general public in the form of undue restriction of trade and commerce as a result of the wrongful contract, combination or concert of activity. However, the injury to the public need not be nationwide in geographical scope. If it involved monopolistic effect upon interstate commerce it may be narrow in geographic scope. It must, however, injuriously and appreciably affect the public interest. Shotkin v. General Electric Co., 10 Cir., 1948, 171 F.2d 236, 238, 239.

However, the Supreme Court has permitted plaintiffs in treble damage suits to rely on inferential and comparative evidence on the ground that the wrongdoer should bear the risk of the uncertainty which his wrong has created. See Bigelow v. RKO Radio Pictures, Inc., 1946, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652; Story Parchment Co. v. Paterson Co., 1931, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544. The Court made it clear that there is a great public interest involved in civil antitrust litigation since it forms one of the greatest deterrents to the violation of the antitrust laws by virtue of the prospect of a large money recovery by a plaintiff. Accordingly, and as noted by the Court in the Bigelow case, difficulties of proof are no longer confused with the right of recovery.

## A.

### Public Injury

The Court finds that defendants' activities were a substantial factor, and the proximate cause of injury to the public. The plaintiffs have shown a resultant increase in the cost to shippers and consumers of all commodities necessary to life, including clothing and food, a high percentage of which reaches consumers only by carriage in motor trucks. If the effect of the conspiracy is to increase the cost of operation of the truckers, thereby increasing consumer's costs, an injury to the public is effected.

The loss of business suffered by and expense entailed to each and every plaintiff and the industry as a whole in counteracting the undermining of public confidence was tremendous and quite obviously resulted in higher costs to the consumer. This in and of itself is a sufficient injury to support the cause of action. There is further public injury which flowed from the so-called legislative phase of the combination. Because of the legislative activities of the defendants, as set forth in the facts, the public was deprived of the flexible service and convenience supplied by this mode of transportation in certain of the states involved. Although a sufficient show of public injury has been made out on the basis of the prior discussion, this is an added proof that should be mentioned.

## B.

### Private Injury

The plaintiffs have satisfied the Court by a preponderance of the evidence that the defendants' activities as set forth constituted a substantial factor in injuring the plaintiffs in their business and property. The private injury was two-fold, either part fully satisfying the requirement that defendants' actions constituted a proximate cause of private injury sufficient to support the plaintiffs' cause of action. The former has already been mentioned in the "Summary" section of the opinion. It was the tremendous loss of good will flowing from the defendants' efforts to undermine public confidence through its campaign of vilification. The damages flowing from the expenses entailed by PMTA in counterbalancing the defendants' campaign fully satisfy the Court of ample private injury. The damage to the individual plaintiffs through the loss of good will is also certainly present and fully meets the requirements of showing private injury. Darden v. Besser, D.C.E.D.Mich.1956, 147 F.Supp. 376, 382.

The second phase of the injury pertains to the legislative end of the conspiracy. Defendants' counsel in his opening argument admitted that the passage of S.B. 615 would have enormously increased the gross revenues of trucks using the roads at a trifling increase in cost (R. 42). A Byoir study distributed in the name of the Pennsylvania State Grange reported that fifteen typical motor carriers would have increased their gross annual earnings by more than 3½ million dollars for added license fee payments of only $26,-352. (R. 704–710; P–112.) This information was buttressed by a study of I.C.C. records which showed that five of the present plaintiffs would have grossed approximately one million dollars more in one year had S.B. 615 been passed (R. 1316; P–169). The Byoir study further indicated that the veto meant that some five million dollars of freight was retained by the Pennsylvania Railroad because the truck limit was not raised (R. 411; P–53). Mr. Mackie testified that in a typical area, defeat of the bill would result in a loss of revenue of $9,270 per truck per year (R. 1452), and one of the plaintiffs, Mr. Noerr, gave concrete illustrations of the injury to his own company's business (R. 5473–5476). All of these losses stem from the legislation in question but they are not necessary to a decision in this case. The injury to the individual plaintiffs and the PMTA flowing from the campaign of vilification fully satisfies the requisites of a valid cause of action made out by a preponderance of the evidence. The Court realizes that some of the money and expense which was expended in self-defense in counteracting the defendants' campaign would have been spent for publicity purposes without the railroad-created climate of competition. That point will be discussed in detail later in the opinion. Another important question which will be discussed at that time is whether the individual plaintiffs, except for the PMTA, have precluded themselves from recovering anything but nominal damages because of the stipulation limiting their claim to compensatory (as contrasted with injury and proximate cause)

damages to those flowing from an executive act—the veto of S.B. 615.

### Defenses

The defendants seek to sustain their theory of the case on the basis of certain legal contentions which fall into six general categories. While the present discussion will not comment upon all of defendants' case law, every contention and every case has been thoroughly examined, and it is the Court's opinion that a review in this opinion of the said contentions will be adequate for a proper disposition of the case. Each will be outlined and discussed individually in the order in which they appear, which is as follows:

1. A judicial tribunal may not invalidate a duly promulgated legislative or executive act.

2. The doctrine of separation of powers precludes a search for executive or legislative motives in carrying out their respective functions.

3. A monopoly created by virtue of duly enacted state legislation is without the ambit of the antitrust laws.

4. The defendants' activities merely constituted an appeal to the legislature; that to deprive them of the right to act in the manner set forth in the facts would be to deprive them of the constitutional rights of freedom of speech, freedom to assemble and freedom to petition the legislature.

5. The plaintiffs in instituting this action were motivated by a desire to bring the defendants into disrepute in furtherance of their own objective to acquire a monopoly of the long-haul freight business.

6. A certain group of the defendants assert that even if an illegal conspiracy is found to exist (which they deny) they cannot be included as co-conspirators in spite of their membership, contribution to and general acceptance of the ERPC plan of attack, since they had no part in planning the details of the campaign, attended only a few of the ERPC meetings, and hence the evidence is insufficient to link them as co-conspirators.

1 & 2. These defenses relating directly to separation of powers of government are best understood by a joint discussion of the problems presented. The defendants place great reliance on the cases of State of Arizona v. California, 1931, 283 U.S. 423, 455 Note 7, 51 S.Ct. 522, 75 L.Ed. 1154, and Fletcher v. Peck, 1810, 6 Cranch 87, 3 L.Ed. 162 to sustain their theory of the case. They argue that no inquiry may be made concerning the motives or wisdom of a state legislature or state executive acting within its proper scope of powers. By analogy they seek to carry these principles over to the case under consideration. In the opinion of the Court the analogy is not a valid one. This Court is in complete accord with the principles set forth in those cases. The plaintiffs do not seek to invalidate any legislation nor do they seek to inquire into Governor Fine's motives in vetoing S.B. 615, at least at this state of the discussion. To the contrary, they seek to inquire into defendants' motives in seeking to have Governor Fine veto the measure. Further, the conduct in question preceded and was independent of the executive and legislative acts and was exerted against the entire public; it is for that reason that they are faced with the above suit. They attempted to effect a restraint forbidden by the Sherman Act and hence are not protected by legislation which helps to effectuate the conspiracy.

There may be some force and validity to defendants' argument concerning injury flowing from a legislative or executive act when we reach a discussion of the compensatory damage and relief stage of this opinion. But such argument has no valid place at this point of the discussion. The defendants' contention with respect to the two defenses under consideration is well answered by the Supreme Court in the case of Angle v. Chicago, St. Paul, Minneapolis & Omaha Railway Co., 1894, 151 U.S. 1, 18, 19, 20, 14 S.Ct. 240, 247, 38 L.Ed. 52. In that case there was legislative grant to the Portage Company to construct a railroad. The defendants bribed the offi-

cials of the grantee Portage Company to break their contract with the plaintiffs to construct the railroad for the Portage Company. Then by false representations the defendants induced the legislature to revoke the grant. Fletcher v. Peck was argued by the defendants as precluding any recovery by the plaintiffs. The Court first quoted from the Fletcher case in order to properly focus upon the law in question. It then applied those legal principles to the facts as found in the Angle case and stated:

"The rule upon which this decision (Fletcher) rests has been followed in many cases and has become a settled rule of our jurisprudence. The rule, briefly stated, is that whenever an act of the legislature is challenged in court the inquiry is limited to the question of power, and does not extend to the matter of expediency, the motives of the legislators, or the reasons which were spread before them to induce the passage of the act. This principle rests upon the independence of the legislature as one of the co-ordinate departments of the government. It would not be seemly for either of the three departments to be instituting an inquiry as to whether another acted wisely, intelligently, or corruptly."

It was the defendants' position in the above case that any wrong done by the Omaha Company to Portage was done by the Wisconsin legislature acting in pursuance of its undoubted power in taking away the land from the Portage Company and giving it to Omaha. Thus, no court could inquire into the influence, motives or information under which those acts were passed. In answering this contention the Court said:

"But it must be remembered that the wrongs of the Omaha Company were done before the legislature passed either the act of 1882 or that of 1883, and it is to redress those wrongs that this suit was brought. Can it be that the legislature, by passing those acts, condoned the wrongs, and relieved the Omaha from any liability to the Portage Company? * * * An executive may pardon and thus relieve a wrongdoer from the punishment the public exacts for the wrong, but neither executive nor legislature can pardon a private wrong or relieve the wrongdoer from civil liability to the individual he has wronged. The wrong was not one done by the state or in the act of the legislature in taking away the land grant, *but in such proceedings on the part of the Omaha Company as put the Portage Company in a position which apparently called for the action of the legislature.* There is no more challenge of the validity of this legislation by suing the Omaha Company for the wrongs it did leading up to this legislation than there is in challenging the validity of a criminal proceeding by an action against the prosecutor for malicious prosecution. * * *" (Emphasis supplied.)

A reading of this language makes it evident that it is applicable to the case at bar and the defendants' contentions in this respect must fall. Obviously, the doctrine of the Fletcher case has been extended to the personal protection of members of a legislative committee from a cause of action under the Civil Rights statutes when acting within the sphere of legitimate legislative activity. The Court is in complete agreement with that legal principle as set down in the case of Tenney v. Brandhove, 1951, 341 U.S. 367, 377, 378, 71 S.Ct. 783, 95 L.Ed. 1019, and the principles applied in Daniel v. Family Security Life Ins. Co., 1949, 336 U.S. 220, 224, 69 S.Ct. 550, 93 L.Ed. 632. However, they simply are not applicable to the case under discussion.

A situation somewhat analogous in principle to the case at bar is found in Hazel Atlas Glass Co. v. Hartford Empire Co., 1944, 322 U.S. 238, 247, 64 S.Ct. 997, 1001, 88 L.Ed. 1250. In that case Hartford was seeking a patent and realized it had no chance before the Patent

Commissioner unless it could prove it had produced a novelty. In order to do so the defendant in support of its application filed an article ostensibly written by the president of the American Flint Glass Workers Union, which in fact was prepared by the Hartford Empire Co. and its agents and attorneys. The Supreme Court ordered the patent set aside despite the fact that the Court of Appeals, in upholding the patent, expressly stated that it had not been influenced by the questionable article. In setting aside the patent the Supreme Court stated:

"* * * Doubtless it is wholly impossible accurately to appraise the influence that the article exerted on the judges. But we do not think the circumstances call for such an attempted appraisal. Hartford's officials and lawyers thought the article material. They conceived it in an effort to persuade a hostile Patent Office to grant their patent application, and went to considerable trouble and expenses to get it published. Having lost their infringement suit based on the patent in the District Court wherein they did not specifically emphasize the article, they urged the article upon the Circuit Court and prevailed. They are in no position now to dispute its effectiveness. Neither should they now be permitted to escape the consequences of Hartford's deceptive attribution of authorship to Clarke on the ground that what the article stated was true. Truth needs no disguise. The article, even if true, should have stood or fallen under the only title it could honestly have been given—that of a brief in behalf of Hartford, prepared by Hartford's agents, attorneys, and collaborators."

It is worthy of note that in the Hazel Atlas case, as in the case under consideration, the activities of the defendants were done without attribution in order to practice a fraud. It is also worthy of note that the Court was not impressed with the fact that the statements contained in the Clarke article might very well have been true. Here we have a situation where the statements sent out by Byoir were distortions of truth rather than truths and always without attribution. It was not only a fraud upon the legislatures and executives for an illegal purpose (to gain a monopoly), but it was also a fraud upon the public to gain that same purpose through the instrumentality of destroying the truckers' good will. Also, it should be kept in mind that the activities under attack also preceded the executive and legislative acts which the defendants claim are the only activities under scrutiny in the case. To the contrary, it is the entire railroad campaign, the destruction of good will, the fomenting of legislation and the vilification that are under attack.

It should always be kept in mind that this Court has no desire to examine Governor Fine's motives in vetoing S.B. 615. This Court is, however, interested in defendants' efforts to create motives. A cursory reading of the facts as found would quickly indicate that the destruction of the defendants' good will was the primary goal of the defendants in their plan to monopolize the long-haul freight business; but even if their activities were found to be limited to attempts to obtain legislation or to seek the veto of S.B. 615, their conduct under the facts as found constituted illegal activity prohibited by the antitrust laws. See also Chief Judge Kirkpatrick's opinion in Singer Sewing Machine Co. v. American Safety Table Co., D.C.E.D.Pa.1949, 88 F.Supp. 260.

3. We find another group of cases which advance the proposition that a legislatively-created monopoly is without the ambit of the antitrust laws. United States v. Association of American Railroads, D.C.Neb.1945, 4 F.R.D. 510; Okefenokee Rural Electric Membership Corp. v. Florida Power & Light Co., 5th Cir., 1954, 214 F.2d 413; State of Georgia v. Pennsylvania Railroad, 1945, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051;.

Parker v. Brown, 1943, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315; United States v. Rock Royal Co-operative, 1939, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446; Mackay Radio & Telegraph Co. v. F. C. C., 1938, 68 App.D.C. 336, 97 F.2d 641; Keogh v. Chicago & N. W. Ry., 1922, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183; Olsen v. Smith, 1904, 195 U.S. 332, 25 S.Ct. 52, 49 L.Ed. 224; and the Slaughter-House Cases, 1873, 16 Wall. 36, 21 L.Ed. 394.

The defendants argue that since they were merely seeking to impose legislation upon the truckers any monopoly that they may have obtained by virtue of such legislation would be a legally protected one. In this argument they ignore the fact that their campaign was far more than a mere legislative scheme. They further ignore the principle that legal means may not be used to accomplish an illegal objective. This Court agrees that a legislature has the right and power to legally create a monopoly for the general welfare of the people, and that the recipient of such a monopoly is legally protected, if his conduct is otherwise legal, as are the responsible government officials carrying out the will of the legislature. Further, the beneficiaries of such a monopoly, within permissible limits, may enforce these rights in the courts. But it is not a mere legislatively-created monopoly that is under attack in this case. It is a conspiracy to destroy a competitor; a conspiracy to destroy his good will; the distortion of facts to further that end; the presentation of distorted and false information to the public and to public officials that are under attack, as well as the fomentation of government restrictions.

All of the cases cited by the defendants to advance the contentions set forth in this category explicitly recognize that the recipients of such a monopoly are not *per se* without the ambit of the anti-trust laws, and certainly not when a legislative campaign forms a part of a conspiracy to gain an unlawful end. The language of the cited cases alluding to this problem is worthy of note:

In United States v. Association of American Railroads, D.C.Neb.1945, 4 F. R.D. 510 at page 524, the Court said:

"It need hardly be observed, and is not questioned by the defendants, that, notwithstanding the important statutory function in the determination of interstate railroad charges, rates, fares, services, and practices of the Interstate Commerce Commission, the Sherman Act applies to interstate common carriers by rail as well as by other means. * * * "

And in State of Georgia v. Pennsylvania Railroad Co., 1945, 324 U.S. 439, at page 456, 65 S.Ct. 716, 725, 89 L.Ed. 1051:

"These carriers are subject to the anti-trust laws. * * * Regulated industries are not per se exempt from the Sherman Act. * * * "

Finally, in Parker v. Brown, 1943, 317 U.S. 341, at page 351, 63 S.Ct. 307, at page 313:

"There is no suggestion of a purpose to restrain state action in the Act's legislative history. * * *

"True, a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful."

The plaintiffs in this case are not seeking to invalidate the legislation itself on the ground that it violates the Sherman Act as in Parker v. Brown, supra, nor are they seeking to undo the action of a state in creating a monopoly. See Slick Airways, Inc. v. American Air Lines, supra; Cf. Forgett v. Scharf, 3 Cir., 1950, 181 F.2d 754, 756, 757; United States v. International B. C., D.C.S.D.N. Y.1957, 150 F.Supp. 397, 404.

The defendants place great reliance on the case of Okefenokee Rural Electric Membership Corp. v. Florida Power & Light Co., supra. That case involved an action against a competing power company, Florida Power and Light Company, the City of Jacksonville, which was also in the power business, and the Commis-

sioner for Utilities for the City of Jacksonville. The plaintiffs alleged that in pursuance of a conspiracy between the defendants they induced the Florida Highway Department to refuse permission to the plaintiffs to construct proposed lines along a state highway (which because of the marshy condition of the land was the only feasible route) by virtue of false arguments and a smear campaign that there were already pre-existing lines over the same route. The District Court found that the transaction was not one of interstate commerce because the sale and delivery to the ultimate consumer was in Florida, in spite of the fact that the plaintiff's power source was in Georgia and the transmission lines carried it from that source continuously into Florida. In the alternative it found that even if interstate commerce were involved, the restraint was insubstantial and indirect. There is no doubt that interstate commerce is involved in the case at bar and further that the effects of the conspiracy upon that interstate commerce are both substantial and direct. The District Court in Okefenokee further found, and the Circuit Court agreed, that the orders complained of were the sole responsibility of the administrative boards, and the subject matter was exclusively within their jurisdiction; hence, the validity of those orders could be attacked only in an action of mandamus or other such remedy in the state court and could not be collaterally attacked in an antitrust proceeding.

The plaintiffs have not here limited themselves in their proofs to those injuries proximately resulting from the veto of S.B. 615 in seeking to sustain their cause of action. Their allegations and proofs go far beyond anything so narrow as that executive act. The effect of the campaign to destroy the truckers' good will had a very substantial and direct effect upon interstate commerce and hence this case is beyond the law of the Okefenokee case insofar as plaintiffs' ability to sustain their cause of action is concerned. Defendants have earnestly striven to convince the Court, sitting as a jury, that the plaintiffs' entire case (not simply their right to compensatory damages) is limited to complaints of the defendants' attempts to seek legislation and the loss flowing from such. Hence, they seek to bring themselves within the purview of the Okefenokee case. In that respect they have failed to convince the Court.

Further, the truckers do not contend that they have an unrestricted legal right to use the highways; nor are they attempting to alter any decision of any responsible public official. But they did have a legal right to be in the transportation business. Unlike Okefenokee, and like Angle, the defendants conspired to destroy the good will of their chief competitor in furtherance of their illegal objective, independent of any legislative or executive act. The limitation of the case to an executive act appears only when the stipulation of counsel comes into the fore upon a discussion of the compensatory or actual damages to be allowed the plaintiffs.

Any discussion of immunity from the antitrust laws because of the alleged presence of a legislative act as the instrumentality for furthering the object of monopolizing a segment of an industry requires an examination of Mr. Justice Holmes' opinion in the case of American Banana Co. v. United Fruit Co., 1909, 213 U.S. 347, 358, 29 S.Ct. 511, 53 L.Ed. 826. This is the last of three cases upon which the defendants place great reliance, the other two being Fletcher v. Peck and the Okefenokee cases. The Banana case has been reviewed on many occasions since it was decided in 1909, and a proper examination of the law as set down in that case requires a reading of that decision in the light of subsequent Supreme Court decisions. The two most enlightening expositions are found in United States v. Sisal Sales Corp., 1927, 274 U.S. 268, 275, 276, 47 S.Ct. 592, 71 L.Ed. 1042 and Steele v. Bulova Watch Co., 1952, 344 U.S. 280, 288, 73 S.Ct. 252, 97 L.Ed. 252.

An examination of these cases makes it apparent that the rule of the Banana

case is not controlling under the facts as found. The court in the Banana case simply held that it was not the Congressional intent in passing the Sherman Act to extend its coverage and prohibitions to an alleged monopoly grounded on a seizure of property in pursuance of a sovereign act of a foreign nation. They then found that the acts in question did not constitute a tort in the place where the activity occurred. In the case under consideration the railroads' activities were in no way limited to securing legislation or influencing executive acts. The principle that no legal damages can flow from the acts as such is important in this case only as to any limitation upon the monetary damages claimed by the plaintiffs. Finally, as opposed to the facts in the Banana case, all of the facts—the destruction of good will, the vilification, the distortion, as well as the attempts to foment legislation, occurred within the United States.

In the Sisal case the court granted an injunction against several individuals and corporations who by virtue of a conspiracy had obtained control of the importation and sale of sisal from Mexico and a complete monopoly of the internal and external trade and commerce in that product. Although sisal was a product of Mexico, a foreign country, and the monopoly was effectuated by securing the passage of discriminating legislation in that country, the court held that the activities in question were in violation of the Sherman Antitrust Act and the Wilson Tariff Act and that the case was not controlled by the Banana decision, pointing to the above-referred-to narrow application of the Banana doctrine.

In the Bulova Watch Co. case, Bulova sought an injunction and monetary damages against an American citizen and resident for acts of trade-mark infringement and unfair competition consummated in Mexico. Learning that the plaintiff, which produced a nationally advertised watch, had not registered its trade-mark under the laws of Mexico, the defendant procured a Mexican registration for himself for the trade-mark "Bulova." He then proceeded to conduct a watch business in Mexico City, where without Bulova's authorization and with the purpose of deceiving the buying public, he stamped the name "Bulova" on watches there assembled and sold same, many of them eventually turning up for repair, in the United States. The defendant argued that the Banana case was controlling and that the plaintiff's cause of action should be dismissed. In refuting this claim the court said in 344 U.S. at page 288, 73 S.Ct. at page 256:

"American Banana Co. v. United Fruit Co., 1909, 213 U.S. 347, 29 S. Ct. 511, 53 L.Ed. 826, compels nothing to the contrary. * * * This Court agreed that a violation of American laws could not be grounded on a foreign nation's sovereign acts. Viewed in its context, the holding in that case was not meant to confer blanket immunity on trade practices which radiate unlawful consequences here, merely because they were initiated or consummated outside the territorial limits of the United States. Unlawful effects in this country, absent in the posture of the Banana case before us, are often decisive; this Court held as much in Thomsen v. Cayser, 1917, 243 U.S. 66, 37 S.Ct. 353, 61 L.Ed. 597, and United States v. Sisal Sales Corp., 1927, 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042. As in Sisal, the crux of the complaint here is 'not merely of something done by another government at the instigation of private parties'; petitioner by his 'own deliberate acts, here and elsewhere, * * * brought about forbidden results within the United States.' 274 U.S. at page 276, 47 S. Ct. at page 594 * * *."

In the light of the above cases and discussion it is evident that the Banana case is not controlling of the outcome of this case, certainly insofar as the plaintiffs sustaining their cause of action.

4. We now come to a contention by the defendants which has been previously mentioned with respect to the

Court's finding concerning the birth of this conspiracy and the calculated risk pursued by the railroads in their campaign against the trucking industry. This Court is most sensitive to the fact that constitutional rights are not to be treated lightly. The desire to insure against any tyranny of law was the moving force behind the creation of our great constitutional safeguards. It is with that thought in mind that the Court approaches this contention, namely, that the defendants' activities or concert of action are protected by virtue of the constitutional rights of freedom of speech, freedom of assembly, and freedom to petition the legislature. The defendants point to the cases of United States v. C.I.O., 1948, 335 U.S. 106, 68 S.Ct. 1349, 92 L.Ed. 1849; Near v. Minn., 1931, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357; U. S. v. Cruikshank, 1875, 92 U.S. 542, 23 L.Ed. 588, among others, in support of their argument. The Court has thoroughly examined the legal principles set forth in those cases, as well as the more recent expositions on those subjects and allied subjects, and finds that they do not extend to the conduct in question. There is no question of a prior restraint involved in this case. The defendants are not being precluded from publishing anything within legal limitations; nor are they being, nor will they be, restrained from petitioning the legislature. Further, the Court is not precluding the defendants or anyone else from seeking out allies. As has already been stated, this is no attack upon public relations or the achievement of a legislative goal through publications, speeches, press releases, or the alignment of friends to seek to accomplish a valid legislative purpose. But when these resources are utilized for the purpose of applying the great power and wealth of group action against a competitor in order to accomplish an illegal objective—the monopolization of the long-haul freight business, they become something more than mere freedom of speech, freedom to assemble, or freedom to petition the legislature—they become an illegal conspiracy. When facts are distorted, allies are "created", public and private officials are "duped" and "used", attempts are made to secure decisions of public officials by virtue of "facts" and "research" which are distortions of truth, and which in the defendants' own language constituted the "planting" of their "poison", we go far beyond the scope of constitutional privilege. Kansas City Star Co. v. U. S., 8 Cir., 1957, 240 F.2d 643, 665, 666. It is not now, and it never has been the law, that a common law conspiracy is within the confines of constitutional protections. The clear and present danger test has never been applied to a conspiracy which reaches the stage of hundreds of overt acts in pursuance of a plan to destroy. This situation has been presented to the Supreme Court before in the case of Giboney v. Empire Storage & Ice Company, 1949, 336 U.S. 490, 69 S.Ct. 684, 685, 93 L.Ed. 834. The legal principles stated there are certainly applicable here. This is a new type of conspiracy carefully planned to circumvent prior decisions. The Giboney case is one of a series of cases involving the application of freedom of speech to peaceful picketing, but is not in any way limited to that state of facts. The case concerned the constitutional power of Missouri to apply its anti-trade-restraint law to the activities of labor unions, and to enjoin union members from peaceful picketing carried on as a course of conduct which was in violation of the Missouri law noted. The State law in question reads as follows:

> " 'Combinations in Restraint of Trade Declared a Conspiracy. Any person who shall create, enter into, become a member of or participate in any pool, trust, agreement, combination, confederation or understanding with any person or persons in restraint of trade or competition in the importation, *transportation*, manufacture, purchase or sale of any product or commodity in this state, or any article or thing bought or sold whatsoever, shall be deemed and adjudged guilty of a conspiracy in restraint of trade, and shall be punish-

ed as provided in this article.' Mo. Rev.Stat.Anno. § 8301 (1939) [Section 416.010, RSMo 1949, V.A. M.S.]." (Emphasis supplied.)

The similarity to the antitrust laws is certainly of more than passing interest. In that case an ice peddlers' union was seeking to break down the resistance of nonmember peddlers who refused to join the union by inducing wholesale distributors to agree not to sell ice to nonunion peddlers. The union's objective was to secure higher wages and better working conditions for its members. When the plaintiff/distributor refused to go along with the union plan, the union resorted to peaceful picketing, the effect of which was to reduce the distributor's business 85%.

In upholding the grant of the state court injunction against a continuation of the defendant's activities in that case, Mr. Justice Black stated in 336 U.S. at pages 501 and 502, 69 S.Ct. at page 690:

"* * * No opinions relied on by petitioners assert a constitutional right in picketers to take advantage of speech or press to violate valid laws designed to protect important interests of society.

"* * * Nor can we say that the publication here should not have been restrained because of the possibility of separating the picketing conduct into illegal and legal parts. * * * For the placards were to effectuate the purposes of an unlawful combination, and their sole, unlawful immediate objective was to induce Empire to violate the Missouri law by acquiescing in unlawful demands to agree not to sell ice to nonunion peddlers. It is true that the agreements and course of conduct here were as in most instances brought about through speaking or writing. But it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed. * * * Such an expansive interpretation of the constitutional guaranties of speech and press would make it practically impossible ever to enforce laws against agreements in restraint of trade as well as many other agreements and conspiracies deemed injurious to society." (Emphasis supplied.)

There is no question but that the language above is applicable to federal as well as state laws which deem a course of conduct to be detrimental to the public good and illegal. The antitrust laws are valid laws. They indicate the public policy of the Congress of the United States in the field of competitive business. The defendants have engaged in a course of conduct which satisfies the requirements of a common-law conspiracy as well as a violation of these laws. Caraway v. Ford Motor Company, D.C.Mo.1957, 148 F. Supp. 776, 777. In that posture it becomes apparent that the defendants' conduct is not within that broad expanse of conduct which is protected by the First and Fourteenth Amendments. What the defendants have combined to do is something more than free speech; something more than freedom to assemble; something more than a petition to the legislature. They have engaged in a course of conduct designed to destroy the good will of a competitor in order to secure a monopoly—all of this in violation of a valid public policy set down many years ago by the Congress of the United States. The Supreme Court has said explicitly that a course of conduct in violation of a strong public policy established either by law or ad hoc decisions may constitute a course of activity without the ambit of constitutional protections. Hughes v. Superior Court, 1950, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985; International Brotherhood etc. v. Hanke, 1950, 339 U.S. 470, 70 S.Ct. 773, 94 L.Ed. 995; International Brotherhood etc. v. Vogt, Inc., 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347.

Much stronger is the fact situation as found by the Court in this case than of those above cited. Further, the Court

finds that the defendants also violated another Federal law in the course of their campaign of vilification. In pursuing this plan the railroads, through Byoir, staged a television program broadcast in the name of the Association of Pennsylvania Township Supervisors over Station WGAL in Lancaster, Pennsylvania, which failed to disclose the railroad sponsorship, in violation of the Federal Communications Act, 47 U.S.C.A. § 317,[1] which reads as follows:

"All matter broadcast by any radio station for which service, money, or any other valuable consideration is directly or indirectly paid, or promised to or charged or accepted by, the station so broadcasting, from any person, shall, at the time the same is so broadcast, be announced as paid for or furnished as the case may be, by such person."

Hardy, the Byoir agent in Pennsylvania, prepared the telecast, and the ERPC ultimately paid for it in full. In accordance with the standard procedure throughout their campaign there was no mention of the ERPC or Byoir. Further, there is ample evidence to warrant the finding that there was no intent to discontinue the above-noted practice. To the contrary, had it not been for this lawsuit there no doubt would have been an increased use of TV and radio by Byoir under the sponsorship of a "front" and, of course, without attribution to the defendants.

Circuit Judge Prettyman in commenting upon this provision of the Communications Act stated that Congress has frequently placed limitations upon the use of the mails and broadcasting. In referring to broadcasts he pointed out that such activity was permeated with a public interest and hence the public was entitled to know who was addressing it over the air. He pointed out that all political parties identify themselves over the air in order to make their appeal useful and that the only reason for anonymity of political broadcasting must be a purpose of deception. Communist Party of U. S. v. Subversive Activities Control Board, 1954, 96 U.S.App.D.C. 66, 223 F.2d 531, 556, reversed on other grounds in 1956, 351 U.S. 115, 76 S.Ct. 663, 100 L.Ed. 1003; cf. United States v. Harriss, 1954, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 and Securities & Exchange Commission v. Morgan, Lewis & Bockius, D.C. E.D.Pa.1953, 113 F.Supp. 85, affirmed 3 Cir., 1953, 209 F.2d 44.

It has been the position of both the railroads and Byoir that the success of their campaign was entirely dependent upon nonattribution to the railroads. In the light of the frequent distortion of facts by Byoir in its news releases, Judge Prettyman's comment concerning deception becomes extremely pertinent. In any event, this is a further example of how the defendants' conduct, although attempted to be shrouded with a legislative cloak, ultimately narrows down to an

---

1. 47 U.S.C.A. § 153 "Definitions * * * (b) 'Radio communication' or 'communication by radio' means the transmission by radio of writing, signs, signals, *pictures*, and sounds of all kinds, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission." (Emphasis supplied.)
(k) " 'Radio station' or 'station' means a station equipped to engage in radio communication or radio transmission of energy."
Subsection (b) of this section defining radio communication includes television as one form of radio transmission and this chapter applies to every phase of television. See Allen B. Dumont Laboratories v. Carroll, 3 Cir., 1950, 184 F. 2d 153, 155, certiorari denied 1951, 340 U.S. 929, 71 S.Ct. 490, 95 L.Ed. 670. At page 155 of 184 F.2d Chief Judge Biggs said:
"Section 3(b), 47 U.S.C.A. § 153(b), defines 'radio communication' as 'The transmission by radio of writing, signs, signals, pictures, and sounds of all kinds * * *'. The television and radio industries have construed this definition to include television as 'one form of radio transmission'. There can be no doubt of the correctness of this construction."

illegal conspiracy to utilize the group power of the ERPC and Byoir to destroy the good will of the trucking industry in order to secure a monopoly in restraint of trade and in violation of the antitrust laws.

Another case dealing with this subject is the Associated Press v. United States, 1945, 326 U.S. 1, 7, 65 S.Ct. 1416, 1418, 89 L.Ed. 2013. The court there stated that it would degrade the clear and present danger doctrine "to fashion from it a shield for business publishers who engage in business practices condemned by the Sherman Act."

And in the case of Kobe, Inc., v. Dempsey Pump Co., 10 Cir., 1952, 198 F.2d 416, 424, 425, certiorari denied 1952, 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed. 651, we find a situation where the defendants had instituted admittedly valid patent infringement suits as part of a broader design to violate the antitrust laws. The court held that in the light of that improper objective the privilege of bringing a valid suit was no longer present and the conduct was found to be illegal. Also see Cape Cod Food Products, Inc., v. National Cranberry Association, D.C.Mass.1954, 119 F.Supp. 900, 907, and Forgett v. Scharf, 3 Cir., 1950, 181 F.2d 754, 756, 757.

In the light of the facts as found and the applicable cases, the defendants' argument that their conduct is constitutionally protected must fall of its own weight.

■ 5. The Court will not go into great detail in examining the question of plaintiffs' motives in instituting this action because that question has been covered extensively under the heading of "The Counterclaims". It will simply be mentioned that neither a finding of improper motives on the plaintiffs' part in bringing suit nor a determination that the plaintiffs were also monopolists would constitute a defense under the circumstances, to plaintiffs' cause of action. See Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 1951, 340 U.S. 211, 214, 71 S.Ct. 259, 95 L.Ed. 219; Moore v. Mead Service Co., 1951, 340 U.S. 944, 71

S.Ct. 528, 95 L.Ed. 681; Foremost Promotions v. Pabst Brewing Co., D.C.N.D. Ill.1953, 15 F.R.D. 128; United States v. Cotton Valley Operators Committee, D.C. La.1948, 75 F.Supp. 1; Higgins v. Shenango Pottery Co., D.C.W.D.Pa.1951, 99 F.Supp. 522, 525; and 29 N.Y.L.Rev. 1463, 1470 (1954).

■■ 6. We come now to the defendants' final contention. This defense is presented on behalf of the following defendants: Boston and Maine Railroad, Canadian National Railways, Canadian Pacific Railway Company, Lehigh & New England Railroad Company, Maine Central Railroad Company, Pittsburgh & West Virginia Railway Company and Charles J. Graham, individually and as President, the Delaware and Hudson Railroad Corporation, The New York, New Haven and Hartford Railroad Company, the Union Railroad Company and Fred W. Okie, individually and as President of that Company. They argue that even if a conspiracy is found to exist, the mere fact of membership in ERPC does not establish concert of action on their part, and that there is not sufficient other evidence to include them as co-conspirators. The Court agrees with the first part of their argument. Mere membership in an unincorporated association, in and of itself, is not sufficient to establish liability for conspiracy. Phelps Dodge Refining Corp. v. F. T. C., 2 Cir., 1943, 139 F.2d 393, 396. If the purposes of an association are lawful on their face its members should not be held for the acts of the association outside its purposes, *unless knowledge of the illegal acts is brought home to the members.* Phelps Dodge Refining Corp. v. F. T. C., supra.

In the light of the italicized reasoning the Court must differ with the latter part of defendants' argument, viz., that the evidence does not prove knowledge on the part of these defendants of the real ERPC objective and purpose. On the basis of all the evidence the Court finds that these defendants, although not involved in the carrying out of the details of the campaign, had full knowledge of its illegal object and general means for

achieving that objective. First of all, the Byoir contract with the ER-TC provided in paragraph 7 that "The party of the second part (Byoir) agrees to consult with and be wholly guided by the party of the first part (ER-TC) on all questions of policy to the end that no material shall be released to the public, or to anyone, giving any impression contrary to the established policies of the party of the first part." (R. 101–102; P–4.) The Transportation Committee (ER-TC) was appointed by and created by the ERPC and these defendants were regular contributing members of the ERPC. Further, the Court finds that the provisions of this section of the contract were followed and that the responsible committee heads of ER-TC were always kept abreast of Byoir's activities and that they in turn reported to all the participating members of ERPC.

All of the railroads were assessed under the Conference budget and it was on this basis that the individual contributions to the Conference were allotted. This same budget contained a specific item for the Competitive Transportation Committee (ER-TC), which was by far the largest item in the entire budget, and that budget was sent to all members of the ERPC including the above-mentioned defendants (P–195).

In order to buttress this evidence we need merely to look at Canadian National Railway Company's answer to plaintiffs' interrogatory No. 3 in which they stated that their payments to ERPC " * * * were made from time to time upon the understanding that the same, together with payments of other members of ERPC were to be used for the requirements of ERPC as from time to time described in its budgets and requests for such payments." The Canadian Pacific Railway Company in answering the same further admitted that " * * * such payments were made from time to time upon the understanding that the same, together with payments of other members of ERPC, were to be used for the requirements of ERPC." (P–264.)

Further, the minutes of the Conference specifically showing appropriations for the Competitive Transportation Committee, including Byoir's activities and such other activities as the rural roads film, were sent to all members of the ERPC (P–190). These same minutes specifically indicate the attendance of Messrs. Okie and Graham, two of the above defendants. An examination of the notes of testimony reveals that Mr. Girdler's (Byoir's ERPC account executive), memorandum setting forth the objectives of the program was sent to all of the railroad presidents (R. 267) and that the entire ERPC approved the Byoir plan (R. 845–846). While it is true that the memorandum obviously did not set forth the details of the conspiracy, it did sufficiently lay the groundwork from which any jury might infer, along with all the other evidence, the presence of knowledge.

The evidence further reveals that Byoir reported to the presidents themselves almost every month (R. 847), and that Mr. Deegan, the Public Relations Subcommittee head, approved the Byoir bills to the Conference. Of course, Mr. Deegan was appointed by and represented all of the Presidents as head of that Subcommittee. There is no question but that ERPC was familiar with the goals which Byoir sought to attain and that the President's Conference never disapproved anything which Byoir did in carrying out the terms of its agreement (R. 224, 225, 1457–1458).

Finally, it must be remembered that competition by nonattribution was not something new to the railroads, as evidenced by the criticism of the Wheeler Report. In the light of that report it becomes more evident that all defendants knew what was meant by the "objectives" and the ERPC "policy".

 The Court points to these specific evidences of knowledge not with the intent of having them constitute the sum total of such evidence. They are merely indicative of some of the more obvious considerations that led to the Court's finding that there was ample evi-

dence of knowledge on the part of all defendants, and that as representatives acting in behalf of their respective companies, all defendants were coconspirators in this illegal plan to ultimately destroy the trucking industry. It is hornbook law that the agreement need not be proved by direct evidence and that conduct pointing to concerted action is sufficient to make out membership in, and the presence of, a conspiracy. In order that one be found guilty as a conspirator it need only be shown that, with knowledge of the conspiracy, he knowingly performed acts designed to promote or aid in the attainment of the object of the known conspiracy. United States v. National City Lines, 7 Cir., 1951, 186 F.2d 562, certiorari denied, 1951, 341 U.S. 916, 71 S.Ct. 735, 95 L.Ed. 1351.

 There has been presented ample evidence to satisfy the Court as to a finding of knowledge, as well as a finding of agency on the part of the presidents to impute their conduct to the respective corporate defendants. As stated by the court in United States v. Morgan, D.C. S.D.N.Y.1953, 118 F.Supp. 621, in a suit under the antitrust laws, once a conspiracy is shown to have existed, only slight evidence is necessary to connect individual co-conspirators with the illegal undertaking. In the case at bar more than slight evidence has been presented to and believed by the Court.

In concluding this phase of the opinion, the Court will summarize and make a few general observations concerning the presence of the conspiracy. It is clear that the plaintiffs proved an intent to unreasonably restrain trade and hundreds of overt acts in furtherance of that illegal object. Without limiting anything that has already been stated there are three important factors of this case which demonstrate defendants' ultimate objective. First, the railroads realized that if truck rates were increased appreciably above their already higher price shippers would have to again use the railroads despite the flexibility and service of the truck. Every phase of the Byoir-railroad campaign was designed to

do that very thing. Secondly, they further realized that any change in the amount the truckers paid in state and local taxes would greatly weaken them as a competitive factor and, of course, their "use" of the independent organizations and distortion of facts was constantly aimed in that direction. Finally, a very interesting situation arose during the Korean conflict which bore directly upon the question of intent to restrain commerce. A discussion arose among members of the ERPC Public Relations Subcommittee concerning the antitruck program being carried out by Byoir and the ERPC in the light of an impending freight car shortage brought on by the Korean War. The participants were fearful of discontinuing the campaign, and yet they wondered how they could justify their efforts to make long-haul trucking more expensive when *with the car shortage they were not in a position to handle any greater volume of business*. The problem was well illustrated in a letter from Mr. Selvage to Mr. Deegan dated August 9, 1950 (D–28). The pertinent section reads as follows:

"The program to date has been largely negative aimed directly at the trucks and designed to curb their more nefarious activities. Now, with a war situation approaching, with the possibility that there would be a shortage of freight cars (and resultantly a demand for using any kind of a vehicle to move cargo), might it not become unpopular to urge curtailment of any form of transportation. It would be like duPont saying we can't make all of the nylon that is needed but protesting anyone else making it."

James G. Lyne, Editor of Railway Age, commented upon the same problem in a letter of September 26, 1950 to Mr. Littlefield (P–251) and noted that the position of the ERPC concerning trucks would certainly be challenged because they "are playing the dog in the manger in that they are trying to make things tough for the trucks, while they (Railroads) themselves cannot handle the traf-

fic." However, in spite of these queries Mr. Deegan stated flatly that there was no alteration in the campaign (R. 1850, 1851). It appears rather incongruous that the self-styled guardians of the public interest should have such an utter contempt for the same interest during a time of emergency. Mr. Lyne, in the above-mentioned letter, after stating the problem gave his own answer which indicated to this Court a completely self-serving attitude. While cast in language indicative of a railroad concern for public interest, its true import was to the effect that "we know what *our* standard answer to the public is whenever we are approached with such a situation."

### Relief

The subject of relief will be discussed under three separate headings for the purpose of clarity, namely, Injunctive Relief, Counsel Fees and Costs, and Compensatory (actual) Damages.

### A.

### Injunctive Relief

On the basis of the facts as found it is apparent to the Court that the plaintiffs, both the individual ones and the PMTA, have been irreparably harmed and that there is a strong possibility that the defendants are ready, willing and able to continue with their campaign to destroy the good will of the long-haul trucking industry unless they are restrained. While it is true that the intensity of the campaign has diminished with the institution of this suit, it is also clear that it will be renewed with equal vigor upon a termination of this litigation unless the Court grants injunctive relief to the plaintiffs. The defendants were ready to extend the campaign to other states and to intensify activities in the states initially chosen as starting points in the campaign to monopolize the industry. In the light of those facts and the defendants' propensity towards the use of the technique set forth in extenso in this opinion, a restraining order will be issued in favor of all plaintiffs and against the ERPC and all the corporate defendants. including Byoir. Georgia v. Penn-sylvania Railroad, 1945, 324 U.S. 439, 462, 65 S.Ct. 716, 89 L.Ed. 1051. All individual defendants will be excluded since they are either officers or employees of the corporate defendants and as such will be bound by the terms of the injunction to be issued.

In government antitrust cases it is customary to allow the parties to submit a form of proposed restraining order to guide the court in the exercise of this equity power. Since there is no difference in principle between a government suit and a private suit under the antitrust laws, the Court will utilize that same procedure in this case. The plaintiffs are to submit a proposed injunction, not inconsistent with the findings as set forth, within 30 days from the filing date of this opinion. The defendants, on the other hand, may file exceptions thereto within 15 days, and after hearing thereon the final order will issue.

### B.

### Attorney's Fees and Costs

In the light of paragraph two of the stipulation of counsel set forth in this opinion, supra, stating that the costs including the attorney's fees were borne by the PMTA only, such fees will not be awarded in favor of the individual plaintiffs. At an appropriate future date the Court, in accordance with the pre-trial discussions concerning injunctive relief and proofs of the plaintiffs' actual damages and costs, will take testimony as to the extent of PMTA's costs and a reasonable attorney's fee. Thereafter, an award of costs and a reasonable attorney's fee will be made in favor of the PMTA and against all the corporate defendants including Byoir; the expense to each railroad defendant (ERPC and the individual defendants will be excluded) will be apportioned according to their 1951 percentage contribution to ERPC. Byoir's contribution will be stated under "Summary of Relief."

### C.

### Compensatory Damages

On the basis of the Court's conclusions of law all the plaintiffs are entitled to

threefold the damages suffered by them due to injury to their business and property flowing from the defendants' conduct. In accordance with the pre-trial agreement that evidence of actual damage would be heard at a later date in the event that plaintiffs sustained their cause of action, plaintiffs limited their proofs to evidence of general injury flowing from defendants' conduct without attempting to introduce evidence of the actual damage to each individual plaintiff. If it were not for the stipulation of counsel referred to, supra, the Court would be prepared to grant damages to each individual plaintiff as well as the PMTA upon a hearing of evidence pointing to the actual damage suffered by them.

The damages to the individual plaintiffs would fall into two main classes— those flowing from the direct loss of good will, prestige and business, as a result of the campaign of vilification and other Byoir activities, and those flowing from the loss of potential revenue and consequent loss of profits as a proximate cause of the defendants' campaign to foment legislation. However, there have been drastic limitations placed on the scope of recoverable damages in this case by virtue of the aforesaid stipulation of counsel which limits recovery insofar as the individual plaintiffs are concerned to *those damages flowing from the loss of potential revenue occasioned by Governor Fine's veto of* S.B. 615. The stipulation specifically excluded the PMTA from any such limitation. Because of these considerations any attempt to ascertain damages will require a distinction between those flowing to the individual plaintiffs and those flowing to the PMTA.

### 1.

### PMTA Damages

As already stated, the defendants' tactics ultimately forced the PMTA, as the representative of the trucking industry in Pennsylvania, to resort to a campaign of self-defense or face increasing difficulties with the ultimate possibility of extinction. The expenditures directly occasioned by that defensive campaign will be returned to PMTA in the form of a money recovery. Evidence of such expenditures proximately resulting from the defendants' *illegal* activities will be heard at a later date along with the evidence of attorney's fees and costs. In determining the extent of recovery to PMTA the Court will take into consideration the fact that PMTA would have expended considerable sums for publicity purposes independent of the railroad activities; it will also consider the fact that the PMTA budgetary trend in the field of publicity was an upward one, again independent of railroad activities. Since the stipulation of counsel, which will be again referred to in detail, does not apply to PMTA they shall recover any damages that they may prove at the appointed time. These damages shall be assessed against all the corporate defendants, including Byoir, but shall not extend to ERPC and the individual defendants. All the damages plus reasonable attorney's fees and costs shall be assessed in the following manner: twenty percent to be borne by Byoir, said amount not to be reimbursed by the ERPC; the remaining eighty percent to be assessed against the remaining railroad-corporate defendants on the basis of their percentage contributions to ERPC for the year 1951.

### 2.

### Plaintiffs Other Than PMTA

These plaintiffs were injured as a proximate result of the defendants' activities in two ways: (1) All of Byoir's and the railroads' activities other than the fomentation of governmental restrictions resulted in a substantial loss of good will (business losses) to these plaintiffs; (2) the fomenting of governmental restriction when done in the manner set forth in the findings and as part of an unlawful object of maintaining a monopoly caused injury to these parties by increasing the cost of operation and/or preventing the carrying of greater loads. Either or both of these injuries are legal injuries insofar as

the *fact* (proximate cause), as contrasted with the amount of injury is concerned. However, the second type of injury, in the light of the stipulation of counsel, cannot be regarded by the Court as a legal injury insofar as the calculation of *amount* of damages is concerned.

While it is true that the damage flowing from the loss of good will is difficult of ascertainment, such difficulty has never been associated with impossibility of ascertainment. The Court in view of its conclusions would (absent the stipulation) grant actual damages to each of these plaintiffs upon the presentation of evidence of their individual losses. Darden v. Besser, D.C.E.D.Mich. 1956, 147 F.Supp. 376, 382. However, the presence of the stipulation completely alters the case at this point and severely limits the amount of recovery on the part of these plaintiffs.

The standard to be applied in ascertaining the *amount* of damages in treble damage actions was set down in the case of Story Parchment Co. v. Paterson Co., supra, 282 U.S. at page 563, 51 S.Ct. at page 250:

" 'The general rule is, that all damages resulting necessarily and immediately and directly from the breach are recoverable, and not those that are contingent and uncertain. The latter description embraces, as I think, such only as are not the certain result of the breach, and does not embrace such as are the certain result, but uncertain in amount.' "

 Subsequent decisions have clarified the standard and indicated that a liberal interpretation is to be applied to that rule. In effect, these subsequent cases, such as the Bigelow case, supra, establish the rule that the measure of proof for the fact of damage is identical with the measure of proof of the amount. Either may be sustained upon a showing of any substantial evidence in the record to support such a finding. See McConnell, The Treble Damage Action at 667, 668, supra. As a practical matter the courts have come close to applying the

damage rule applicable to the tortious confusion of goods (let the wrongdoer's liability for damages be measured by the value of the entire mass unless he can introduce evidence of the separate values of the tortiously acquired property and the finished product). This rule was applied in a case where the defendant motion picture operator mixed the receipts from the monopolized shows with the non-monopolized ones and the plaintiff relied on the *defendant's mixed* gross profits as his measure of damages. The court allowed the mixed amount as the measure, less the leasing rental cost, relying on the equitable doctrine that the defendant's wrong caused this difficulty of proof, and therefore he should not be heard to complain of the liberality of proof. See Milwaukee Towne Corp. v. Loew's Inc., 7 Cir., 1951, 190 F.2d 561, certiorari denied, 1952, 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680; also McConnell, The Treble Damage Action, supra, at page 668.

 However, throughout this thread of liberality in the ascertainment of actual damages (with which the Court is in agreement) there is an absence of cases dealing with a fact situation as presented here because of the stipulation limiting recovery in favor of these plaintiffs to damages proximately flowing from the executive act in vetoing S.B. 615. And it is that factor, and that factor alone, which necessitates a different result in this case. It is undoubtedly true that this Court must apply the same standard to the ascertainment of the *fact* of damage as it does to the ascertainment of the *amount* of actual damage. However, superimposed upon that rule is the rule that legal injury cannot flow as a proximate result of a duly constituted legislative or executive act. A governor acting pursuant to his authority in vetoing a bill cannot be the proximate cause of monetary injury to a party who would have benefited by the legislation in question. And yet that is what this Court would be required to do in order to grant full compensatory damages to these plaintiffs. As

has been noted, this stipulation was entered into by all counsel in the interest of a speedy determination of the issues presented at the trial as to liability only without any coercion by either the Court or opposing parties. Hence, it must be read and interpreted in that posture and *in the light of the plain meaning of the words* chosen by respective counsel *with due regard to the knowledge of the same counsel as to their respective theories of the case.*

It is plaintiffs' theory of the case, with which the Court is in agreement, that they may sustain their cause of action on two basic grounds—first on the basis of the defendants' wrongs done before and independent of Governor Fine's veto of S.B. 615, and that it is to redress those wrongs that this suit is brought; within that group counsel includes increased expense of operation, the loss of business and the like; secondly, that they have been injured by the fomentation of restrictive legislation, and the attempts at such, in all of the states referred to in the findings of fact. Plaintiffs, then properly conclude that their case with reference to ground one is without the protection of the Fletcher v. Peck type of case because such activities constitute something far and beyond mere legislation enacted in pursuance of a plan to monopolize. They then further conclude that they may also sustain their claim on the basis of the above-referred-to fomentation of legislation in that it is the *attempt to influence such and the overt acts carried out in pursuance of that illegal purpose* that constitute the wrong; and the fact that some segment of the material used might not have been distorted or that it may not have actually succeeded in influencing either legislative or executive acts is immaterial. Hence, plaintiffs contend there is no need to inquire into either the legislative or executive motives to sustain their claim—first, because the activities other than legislative ones sufficiently make out their case, and secondly, because the attempts to secure such legislation and the overt acts in pursuance of a plan to monopolize are sufficient to again sustain the cause of action independent of the real reasons for the legislative or executive acts. Again, the Court is in agreement and has sustained the cause of action on those grounds and also has found that such activity individually and/or jointly resulted in injury (fact of injury) to the plaintiffs. However, the plaintiffs seek to carry over this theory of the case into an ascertainment of actual damages caused to the individual plaintiffs other than PMTA by the so-called legislative program. This the Court cannot do because the presence of the stipulation in question prevents a continuation of the application of plaintiffs' theory to a finding of actual damages flowing to the plaintiffs other than PMTA. Restated, the stipulation is as follows:

"3. The *only* damages claimed by the plaintiffs (except plaintiff Pennsylvania Motor Truck Association) are those that each of them may have suffered because of its inability to carry more than the weight limits fixed by the laws of Pennsylvania prior to the change in the law of 1955." (Emphasis supplied.)

There is but one logical interpretation of the words contained therein in the light of the circumstances, and that is that the damages claimed are those resulting as a proximate cause of Governor Fine's veto of S.B. 615. Further, it is clear, and has been already stated, that the stipulation in question is limited in its application to the determination of the *amount* of actual damages and has no application with respect to the *fact* of damages and injunctive relief. For that reason it has no bearing on the plaintiffs' ability to sustain their cause of action. However, the only valid interpretation of the language insofar as the *amount* of actual damage is concerned is that plaintiffs have excluded any consideration of damages flowing from the loss of good will to these plaintiffs which resulted directly from the defendants' campaign. Accordingly, they have specifically limited themselves

to those damages proximately flowing from the veto of S.B. 615. The Court under the decided cases cannot award money damages for injuries proximately resulting from a duly promulgated executive act. The basis of recovery in antitrust suits is set forth by Judge Maris in the case of Gordon v. Loew's, Inc., 3 Cir., 1957, 247 F.2d 451, 456, as follows:

" * * * the person injured by reason of action forbidden by the antitrust laws recovers the measure of the injury to his business or property and by statutory direction is the recipient of the punitive award. The total recovery is arbitrarily computed; it takes cognizance of the actual loss only as a base. According to the statutory direction the defendant must pay an amount three times that base."

Unfortunately, these plaintiffs are without a base. Darden v. Besser, supra. The damages flowing from the loss of good will other than nominal ones have been excluded, and the damages proximately flowing from an executive act are unobtainable. Hence, the Court will grant nominal damages in the sum of six cents to each of these plaintiffs and, of course, as stated, include them within the protected group being accorded injunctive relief.

### D.

### Summary of Relief

1. Injunctive relief is granted to all plaintiffs and is to run against the ERPC and all corporate defendants, including Byoir, but will exclude the individual defendants. Proposed decree will be submitted by plaintiffs as previously stated.

2. Reasonable attorney's fee and costs shall be awarded to the PMTA, and such fee and costs shall run against all corporate defendants, including Byoir, according to the ratio as set out in the succeeding paragraph. ERPC and the individual defendants shall be excluded.

3. Damages shall be awarded to the PMTA for the loss occasioned by the expenditures required because of the defendants' campaign of destruction of good will, and as determined, trebled. Eighty percent of such damages shall be assessed against the corporate defendants other than Byoir in the manner noted, and 20 percent against Byoir, which 20 percent shall not be reimbursed by ERPC nor by any defendant railroad or railroads. No damages shall be assessed against the individual defendants and ERPC.

4. Nominal damages in the amount of six cents, to be trebled as provided by statute, shall be granted to each and every plaintiff other than PMTA and shall be assessed in the same manner as the damages flowing to the PMTA.

5. Testimony and evidence with respect to the attorney's fees, costs, and the damages flowing to the PMTA shall be heard at a future date to be determined by the Court.

### Evidentiary Rulings

Because of the magnitude and importance of the case the Court permitted great latitude in the introduction of evidence. The trial court in any antitrust case has wide discretion in the admission or exclusion of cumulative and collateral evidence; United States v. General Motors, 7 Cir., 1941, 121 F.2d 376, certiorari denied, 1941, 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497; Kansas City Star Company v. U. S., 8 Cir., 1957, 240 F.2d 643. The evidentiary problems arising at trial may be placed in six distinct categories. The first relates to the admission into evidence, over the strenuous objection of the defendants, of proof of activities in the railroad-Byoir campaign which occurred outside of Pennsylvania. Since the conspiracy was not originated in Pennsylvania, the proof of outside activities was important, not only to show its formation but to show its method of operation, all of which had a great bearing on the fundamental question of intent and injunctive relief, if an illegal conspiracy actually existed. The complaint charged an overall conspiracy in the whole of the northeastern part of the United States. Because the plaintiffs

limited themselves to proof of damages only within the State of Pennsylvania, the defendants contend that plaintiffs should be likewise limited in proof of the conspiracy. Such result, of course, does not follow. As stated by Judge Vogel in the case of Kansas City Star Company v. U. S., supra, at pages 650 and 651: parties have always been allowed "to introduce evidence of other acts and doings of the party, of a kindred character, in order to illustrate or establish his intent or motive in the particular act directly in judgment." And at page 651 is this pertinent language:

"In order to show intent, it was entirely proper to receive evidence of a course of conduct engaged in by the appellants over a period of years leading up to the indictment period which might assist the jury in attempting to determine whether or not the appellants possessed that necessary intent during the time covered by the indictment. It would be illogical not to admit evidence as to a course of conduct over many years which manifested an intent to monopolize. But we need not use a rationale to explain this state of the law. The federal courts in antitrust cases have long admitted evidence of conduct prior to the statutory period. Standard Oil Co. v. United States, 1911, 221 U.S. 1, 75–76, 31 S.Ct. 502, 55 L.Ed. 619; United States v. Pullman Co., supra, [D.C., 50 F.Supp. 123]; American Tobacco Co. v. United States, 6 Cir., 1944, 147 F.2d 93, affirmed 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575."

The objection taken to the introduction of this evidence is therefore without merit.

The second category relates to the offer by the defendants of statements made by public officials as to the damages caused to highways and roads by the use of the heavy truck. The Court feels that that matter was properly handled on the record; the Court holding that while the offers had some probative value, and a few such statements were actually admitted in evidence, that it would unduly burden an already extensive record by the introduction of any further documents of that nature. There was extensive scientific evidence in connection with the Maryland Road Test and other general testimony to fully cover that point.

The third question arose from the admission of testimony of the acts of the conspirators occurring after the veto by Governor Fine of S.B. 615. Again the defendants attempted to limit the proofs of conspiracy to the time within which plaintiffs alleged the activities of defendants had been the cause of actual monetary damages occasioned by the veto. The evidence received as to postveto activities was relevant evidence and admissible, if not for any other purpose, at least to establish the need for injunctive relief against the continuing activities of the defendants against the plaintiffs, which activities the Court has now declared to have been illegal. It was also relevant to show the extent of the activities of the defendants in their campaign or, in other words, to round out a true picture of the full scope of the details of the conspiracy.

The fourth question relates to the interpretation of the stipulation by Byoir referring to the authenticity and source of documents obtained from the Byoir files. It is felt also that the ruling of the Court thereon at page 2225 fully covers the question there raised. Also see R. 122, 123, 356–362a, 528, 529, 616, 617, 622, 633, 2214–2218, 2564, 2568.

Another question which was present throughout this case was that of venue and service of process upon the Eastern Railroad Presidents Conference as an unincorporated association. From all of the evidence the Court has concluded that the activities of the association within the State of Pennsylvania were such as to justify the finding which the Court now makes that ERPC was doing business within the Commonwealth of Pennsylvania and in the Eastern District thereof sufficient to establish venue in the Court. Service upon Mr. Franklin,

the then president of the Pennsylvania Railroad and a ranking member of the Conference, constituted service upon the Conference. Compare these conclusions with Noerr Motor Freight, Inc. v. Eastern R.R. Presidents Conf., D.C.E.D.Pa. 1953, 113 F.Supp. 737, 745, 746. Over and above that, and with the Conference fully aware that the question of venue and jurisdiction was to be determined at trial, the Conference itself joined in the filing of the counterclaim against the plaintiffs. By such action the Conference thereby waived any objections which it might have to venue or jurisdiction over the person of the association. Freeman v. Bee Machine Company, 1943, 319 U.S. 448, 453, 454, 63 S.Ct. 1146, 87 L.Ed. 1509; Merchants Heat & L. Company v. James B. Clow & Sons, 1907, 204 U.S. 286, 27 S.Ct. 285, 51 L.Ed. 488.

The final group of offers of evidence related to statistics covering the basic construction of roads in the northeastern section of the United States; the use given such roads by the trucks using the highways in interstate commerce; the amount of destruction caused by such trucks, including certain specific instances in different sections of the country; the increasing cost of maintenance; the increasing cost of construction of roads and with particular reference to the changing geometric designs of the roads, all said to be caused by the increasing size of trucks and the greater weight of trucks. The defendants offered to prove by the use of experts in the highway and traffic fields that in the opinion of the experts the trucks did not pay their fair share of the cost of the foregoing and that thereby the trucking industry was receiving enormous subsidies at the hands of the taxpaying public. In the offer of proof it was averred that these experts would testify that should the trucking industry pay, what in the opinion of the experts were, fair "user charges", the cost of operation of the trucking industry would immediately rise some 4% to 6%. This entire line of testimony was excluded by the Trial Judge for many reasons among which are: (1) There was ample proof in the record that heavy trucks, along with other factors, do constitute *one* of the main causes in the breaking up and deterioration of the already constructed highways; (2) that such proofs would not justify or be a defense to the railroad-Byoir combination to destroy the trucking industry as such. Again, it may be remarked that this is not a suit between either the United States or any State against the trucking industry itself. In such a suit the question of public welfare would undoubtedly play a large part. The railroads throughout this case have attempted to label themselves as the guardians of the public welfare. They attempted to convince the Court that it should so consider the railroads in their activities against the truckers. The answer to that proposition is self-evident. The railroads assisted by Byoir inaugurated and carried out their campaign to effectively limit and if possible destroy the trucking industry as a competitive factor in the long-haul transportation industry to preserve and increase their dollar volume of business; (3) there was ample evidence heard by the Court, sitting as a jury, with respect to these factors in connection with the highly scientific evidence surrounding the Maryland Road Test, in addition to the extensive evidence heard on these and analogous subjects when the defendants presented their proofs concerning the Pennsylvania situation. In that posture, and in the light of the entire record, the probative value of the evidence would not have warranted the time that would have been expended in further burdening an already lengthy record.

The Court, therefore, is of the opinion on a review of the entire case that the rulings made are consistent with the rules of evidence applicable in the Courts of the United States.

### Rulings on Requests

The Court will now proceed to rule upon plaintiffs' and defendants' requests for findings of fact and conclusions of law. These requests in each instance

will be "affirmed", "denied", or "refused as stated". In passing upon these requests the Court has found many of the defendants' requests which, while they contain substantially accurate statements of some of the facts established at the trial, nevertheless, attempt to link the activities of Charnay, after he was employed to offset the railroad activities, with isolated instances of defensive actions of the truckers prior to Byoir's entrance into Pennsylvania in the year 1951. By so doing they attempt to show a conspiracy of the truckers against the railroads. In this respect their proofs fail to convince the Court. I find no connection between the isolated defensive actions by the defendants prior to Byoir's entry into Pennsylvania and the formal Pennsylvania defensive campaign initiated by Charney after the truckers realized what the railroads had been doing. Since I have found that the truckers were not engaged in a conspiracy against the railroads in violation of the antitrust statutes, such requests cannot be affirmed.

The following plaintiffs' Requests for Findings of Fact are affirmed:

Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 29, 31, 32, 33, 34, 35, 36, 37, 39, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 55, 56, 58, 59, 60.

Request No. 16 is modified by the deletion in line three of the words "and thereby procuring legislation", and the insertion after "public opinion" in line three of the following phrase: "Hostile to the trucking industry thereby destroying its good will with the public and thereafter attempt to secure legislation"; and as so modified is affirmed.

Request No. 28 is modified by the insertion of the following sentence at line eleven after the words "Harpers, October, 1952": "With regard to the last named article defendants furnished for the use of the author extensive research material only and had no part in either the writing or editing of said article"; and as so modified is affirmed.

Request No. 30 is refused as stated.

Request No. 38 is modified by the deletion at line five of the words "because of its inaccuracy" and the insertion of the words "because it was in a final report"; and as so modified is affirmed.

Request No. 40 is modified by the deletion at line five of the words "and are still" and the insertion of the words "and even after the veto of S.B. 615 were still"; and as so modified is affirmed.

Requests Nos. 52, 53 and 54 are denied.

Request No. 57, subparagraphs (a), (b) and (d) are refused as stated.

Request No. 57, subparagraphs (c), (e) and (f) are affirmed.

The following plaintiffs' Requests for Conclusions of Law are affirmed:

Nos. 1, 2, 3, 4, 5, 6, 8, 9, 11, 12, 13, 16, 17, 18.

Request No. 10 with the insertion before the words "the means" in line one of the words "one of"; and as so modified is affirmed.

The following plaintiffs' Requests for Conclusions of Law are denied:

Nos. 7, 14 and 15.

The following defendants' Requests with respect to plaintiffs' case are affirmed:

Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 29, 31, 32, 37, 39, 44, 46, 47, 48, 50, 51, 52, 53, 56, 57, 59, 60, 62, 63, 64, 65, 66, 70, 74.

Request No. 22 with the addition of the words "as public relations counsel to put the projected railroad campaign into effect" after the word "retained" at the end of line four; and as so modified is affirmed.

Request No. 30 with the deletion of the words "in the matter of rates" at lines three and four; and as so modified is affirmed.

Request No. 35 with the deletion of the words "who would be able to counteract PMTA publicity" at lines seventeen and eighteen, and the insertion in lieu thereof of the words "to assist that group in carrying out defendants' pro-

gram already in operation"; and as so modified is affirmed.

Request No. 49 with the deletion of the words "to be issued as a press release" in lines fourteen and fifteen and the insertions in lieu thereof of the words "for discussion"; and as so modified is affirmed.

Request No. 55 with the addition of the phrase at the end thereof: "and was so treated and regarded by the Bureau of Public Roads"; and as so modified is affirmed.

Request No. 67 with the addition of the following sentence at the end thereof: "The memorandum was based partly upon questionable statistics furnished the department by Marine of Byoir on behalf of the railroads."

The following defendants' Requests for Findings of Fact with respect to the plaintiffs' case are refused as stated:

Nos. 14, 17, 18, 27, 40, 41, 45, 54, 68, 69, 71, 73.

The following plaintiffs' Requests for Findings of Fact are denied:

Nos. 13, 15, 16, 19, 20, 21, 23, 24, 25, 26, 28, 33, 34, 36, 38, 42, 43, 58, 61, 72, 75, 76, 77, 78, 79, 80, 81, 82.

The following defendants' Requests for Conclusions of Law with respect to plaintiffs' case are refused as stated:

Nos. IV and V.

The following defendants' Requests for Conclusions of Law with respect to plaintiffs' case are denied:

Nos. I, II, III, VI, VII, VIII, IX.

The following defendants' Requests for Findings of Fact in relation to defendants' counterclaim against plaintiffs are affirmed:

Nos. 1c, 2c, 3c, 4c, 5c, 6c, 7c, 8c, 10c, 11c, 12c, 13c, 14c, 15c, 16c, 17c, 18c, 20c, 25c, 26c, 27c, 29c, 31c, 32c, 33c, 35c, 36c, 37c, 38c, 39c, 41c, 42c, 43c, 48c, 54c, 72c, 73c, 75c, 76c, 82c, 83c, 84c, 85c, 86c, 87c, 89c, 90c, 91c, 92c, 93c, 94c, 96c, 97c, 98c, 99c, 100c, 101c, 102c, 104c, 106c, 107c, 108c, 109c, 110c, 111c, 112c, 113c, 114c, 115c, 116c, 117c, 118c, 119c, 120c, 121c, 122c, 123c, 124c, 125c, 126c, 142c, 144c, 145c, 146c, 147c, 148c, 149c, 151c, 152c, 153c, 154c, 155c, 156c, 157c, 158c, 159c, 162c.

Request No. 24c with the addition of the following sentence at the end thereof: "The cost of financing the present action was included in the above stated sums."; and as so modified is affirmed.

Request No. 28c with the addition of the following sentence at the end thereof: "The main purpose in the year 1952–1953 of solicitation of funds was to combat the railroad program against the truckers waged over the prior three-year period."; and as so modified is affirmed.

Request No. 30c with the deletion of the words at lines three and four: "to mete out rewards and punishments to them"; and as so modified is affirmed.

Request No. 40c with the deletion of the words at lines five and six: "thus enabling plaintiffs to divert business from counterclaimants."; and as so modified is affirmed.

Request No. 44c with the deletion of the words at lines four and five: "in the matter of rates"; and as so modified is affirmed.

Request No. 57c with the addition of the following sentence at the end thereof: "This action was taken by the plaintiffs after the discovery and exposé of the railroad-Byoir campaign against the truckers."; and as so modified is affirmed.

Request No 143c with the addition of the following sentence at the end thereof: "All such attempts were subsequent to the railroad-Byoir antitruck campaign."; and as so modified is affirmed.

Request No. 150c with the addition of the following sentence at the end thereof: "This attempt to secure criticism of road tests occurred after the Byoir connection with the Maryland Road Test and the antitruck campaigns in Ohio and Pennsylvania on behalf of the railroads

by Byoir had been revealed to the truckers."; and as so modified is affirmed.

The following defendants' Requests with respect to the counterclaim are refused as stated:

Nos. 21c, 22c, 34c, 46c, 47c, 49c, 50c, 52c, 53c, 55c, 56c, 58c, 59c, 60c, 61c, 62c, 63c, 64c, 65c, 66c, 70c, 71c, 74c, 78c, 79c, 80c, 81c, 95c, 103c, 105c, 127c, 128c, 129c, 130c, 131c, 132c, 133c, 134c, 135c, 136c, 137c, 138c, 160c, 161c.

The following defendants' Requests with respect to the counterclaim are denied.

Nos. 9c, 19c, 23c, 45c, 51c, 67c, 68c, 69c, 77c, 88c, 139c, 140c, 141c, 163c, 164c, 165c, 166c, 167c.

Defendants' Requests for Conclusions of Law No. Ic is affirmed.

Defendants' Requests for Conclusions of Law Nos. IIc, IIIc, IVc, and Vc, are denied.

Two further sets of requests for findings of fact and conclusions of law have been submitted for consideration by the Court. The first are plaintiffs' requests for findings in opposition to defendants' counterclaim, and the second are requests for findings submitted by certain individual defendants enumerated in paragraph 6 under the heading "Defenses". All of these requests have been considered by the Court and since the Court is of the opinion that it has fully covered the first set of requests under the heading "Counterclaims" and the second set of requests in paragraph 6 under the heading "Defenses", these requests will not be specifically answered.

To the extent that the language of any of the requests which have been affirmed by the Court may be inconsistent with the narrative findings of fact and conclusions of law made by the Trial Judge in the course of this opinion, the language of the opinion shall prevail.